1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3    UNITED STATES OF AMERICA,          Case No. 1:15-cr-0038-CAB-1
                                        Cleveland, Ohio
4              Plaintiff,               Wednesday, March 16, 2016
                                        10:00 a.m.
5         vs.

6    DAVID W. VICKERS,

7              Defendant.

8              TRANSCRIPT OF SENTENCING PROCEEDINGS
           BEFORE THE HONORABLE CHRISTOPHER A. BOYKO,
9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:        Kevin R. Filiatraut
                                Assistant United States Attorney
12                              801 West Superior Avenue
                                400 U.S. Court House
13                              Cleveland, Ohio   44113
                                216-622-3600
14

15   For the Defendant:        McCormack & McCormack
                                Greg D. McCormack
16                              Jarrett L. McCormack
                                611 Lynnhaven Parkway
17                              Suite 100
                                Virginia Beach, Virginia   23452
18                              757-463-7224

19

20

21   Official Court Reporter:  Heidi Blueskye Geizer,
                                Certified Realtime Reporter
22                              United States District Court
                                801 West Superior Avenue
23                              Cleveland, Ohio   44113
                                216-357-7092
24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

1      MORNING SESSION, WEDNESDAY, MARCH 16, 2016  10:00 A.M.

2                      (Call to order of the Court.)

3                      DEPUTY CLERK:  Your Honor, the case before the

4      Court this morning is United States of America versus David

10:10:50 5      Vickers, Case Number 15-cr-38.

6                      THE COURT:  Thank you.  Mr. Vickers, you are

7      present?

8                      THE DEFENDANT:  Yes.

9                      MR. GREG McCORMACK:  Good morning, Your Honor.

10:10:59 10                      THE COURT:  Mr. Greg McCormack and Mr. Jarrett

11      McCormack.  Mr. Kevin Filiatraut for the government.

12                      MR. FILIATRAUT:  Good morning, Judge.

13                      THE COURT:  Miss Kim Wessel.

14                      PROBATION OFFICER:  Good morning.

10:11:07 15                      THE COURT:  We're here today for sentencing.

16      I apologize for not being here yesterday, I was bedridden, a

17      severe migraine.  I apologize we had to continue this. I

18      know you had to come from afar.  My apologies.

19          Mr. McCormack, Greg, would you please go to the podium

10:11:27 20      with Mr. Vickers?

21          Mr. McCormack, I will start with you.  Have you had

22      sufficient time to sit down with Mr. Vickers and go over

23      this report in detail?

24                      MR. GREG McCORMACK:  Yes, Your Honor, we have.

10:11:50 25                      THE COURT:  And Mr. Vickers, I want to make

1    sure that you have had sufficient time to sit down with

2    Mr. Greg McCormack and Mr. Jarrett McCormack, go over this

3    report in detail, and have them answer all of your questions

4    to your satisfaction.  Has that been done?

10:12:04  5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  Mr. McCormack, I read your

7    sentencing memorandum and, of course, the letters that you

8    sent in along with that.

9             MR. GREG McCORMACK:  Yes, Your Honor.

10:12:11 10             THE COURT:  So are there any objections to the

11   report itself?

12             MR. GREG McCORMACK:  No, Your Honor.

13             THE COURT:  And on behalf of Mr. Vickers, in

14   mitigation, please go ahead.

10:12:18 15             MR. GREG McCORMACK:  Yes, Your Honor.  Your

16   Honor, we will have one witness I would like to call, and

17   that would be his father, Wayne Vickers, please.

18             THE COURT:  All right, we can do that.  Miss

19   Wessel, would you please step down?

10:12:28 20             MR. GREG McCORMACK:  May I have Mr. Vickers

21   have a seat?

22             THE COURT:  Have him up here if he's going --

23             MR. GREG McCORMACK:  While Mr. Vickers --

24             THE COURT:  I don't know if you want him to

10:12:38 25   testify or just give a statement.

4

Vickers - Direct

1          MR. GREG McCORMACK:  No.  I'm sorry, this is

2     Mr. Vickers' father.

3          THE COURT:  I understand.  Do you want him to

4     testify or just give a statement?

10:12:45  5          MR. GREG McCORMACK:  No.  Mr. Vickers' father

6     would like to testify, if he could.

7          THE COURT:  Let's have him up here.

8          MR. GREG McCORMACK:  Okay.  Do you want the

9     defendant to remain here or to have a seat, sir?

10:12:53 10          THE COURT:  Have a seat.

11     Sir, please be sworn.

12          (The witness is sworn.)

13          THE COURT:  Please have a seat.  Pull that

14     microphone towards you, please.

10:13:22 15     Go ahead, Mr. McCormack.

16     DIRECT EXAMINATION OF EDGAR WAYNE VICKERS

17     BY MR. GREG McCORMACK:

18     **Q.**   Sir, would you please state your full name?

19     **A.**   Edgar Wayne Vickers.

10:13:27 20     **Q.**   And Mr. Vickers, can you please tell us your city and

21     state of residence?

22     **A.**   I live in Ashburn, Virginia.

23     **Q.**   Mr. Vickers, can you please tell us, how did you find

24     out about your son David being arrested?

10:13:39 25     **A.**   On January 8th, at five minutes to 6:00, I was

Vickers - Direct

1    on -- my wife passed away in September '13.  January 5th I

2    left for a trip to go south to visit friends, trying to get

3    over -- get on with my life.  I had gotten to Litchfield,

4    South Carolina, where my wife and I used to vacation.  It

10:14:07  5    was kind of a closure.  And at five minutes to 6:00 in the

6    morning I get a phone call from my daughter, and that was on

7    January the 8th.  And my daughter then explained to me that

8    she had heard from David's wife that he had been arrested.

9    **Q.**    All right, sir.  And at that particular point did you

10:14:27  10   turn around and come back?

11   **A.**    I immediately checked out of the hotel, got in my car,

12   and drove from Litchfield -- which is below Myrtle Beach --

13   home.  Got into the car and started driving, and talked to

14   my daughter several times, and then called my best friend,

10:14:48  15   who is a -- Albus Kirk, who happens to be a former deputy

16   assistant director for the Secret Service, to try and get an

17   understanding of what I was facing, because this was so

18   foreign to me.

19   **Q.**    All right.  Mr. Vickers, you indicated your wife

10:15:05  20   passed in 2013, correct?

21   **A.**    Correct.

22   **Q.**    What was the cause of her passing?

23   **A.**    She had early onset of Alzheimer's, a specialty called

24   posterior cortical atrophy, where the front of the brain --

10:15:17  25   **Q.**    How old was she when she passed?

6

Vickers - Direct

**A.**    She was 66.

**Q.**    How would you describe your family's relationship and
nature of their relationship before your wife passed?

**A.**    It was good.

It was stressed, it was in turmoil.  When I say
turmoil, Mary was the centerpiece of the entire family, and
we all -- meaning my daughter, who is my eldest, and David
and his family and myself, we were trying to understand
Alzheimer's, how did it happen so quickly, what was going on
with my wife, and what we could best do to help her get
through this.  And then of course I know both of my children
and their families were trying to help me struggle through
this.

**Q.**    How long was she sick with Alzheimer's before she
passed?

**A.**    She was diagnosed August -- not August -- December
27th, '07, and she passed on September 27, 2013.

**Q.**    Is your daughter Kelly with you here today?

**A.**    Yes, she is.  She's sitting in the gallery.

**Q.**    And can you tell me, please, how did your wife's
sickness and her death appear to affect your son David?

**A.**    David became I'll say withdrawn, or to himself.  He
would come to his mother, but when we were around him, when
he was within himself, I could see changes, but then I was
going through major changes myself.  And I kept trying to

Vickers - Direct

1    draw him out and couldn't get any information.  I would go

2    to his wife Dana and wonder if he wasn't going into a

3    depression.

4        It was just a very difficult, difficult time for me to

10:17:12  5    understand what was going on with myself, and then seeing

6    both of my children react to what was happening to their

7    mother, because it was just so unexpected.

8    **Q.**    Was David especially close to his mother?

9    **A.**    Yes, he was.  David was very, very close.  Being the

10:17:33 10    youngest, being a boy, at least with us it was

11    gravitational.  I helped a lot more with Kelly, and Mary

12    helped a lot more with David in growing up.

13    **Q.**    Mr. Vickers, can you tell us when and how did you find

14    out that your son David had been sexually molested as a

10:17:52 15    child?

16    **A.**    I don't remember the exact date, but I can tell you

17    that it was on a snowy night in February when you called me

18    after your first interview with David, and you called me and

19    told me, and I was totally shocked.

10:18:11 20    **Q.**    What would you as a father have done and what do you

21    believe your wife would have done if the two of you were

22    aware of that when David was growing up?

23    **A.**    Obviously we would have reported it, but also would

24    have seeked and gotten him help.  You know, we were in a

10:18:29 25    position, we could have gotten him a lot of help.  Both of

Vickers - Direct

1    us were government employees.  My brother was on Fairfax

2    County police, he was a lieutenant on the police department

3    at the time.  You know, we had the resources to be able to

4    help him and also to help hopefully apprehend somebody.

10:18:51  5    **Q.**    Would you have taken efforts to get David counseling

6    that he obviously would have needed?

7    **A.**    Absolutely.  Absolutely.  You know, and that's

8    what -- I just wish I could have been able to see this when

9    he was younger.  And I don't know, hindsight, I still don't

10:19:15 10    see some of these things, when it was.

11    He was even being examined quite a bit by

12    psychiatrists and psychologists because of a learning

13    disability all the way through from age 3 up until college,

14    and they never reported anything like that.

10:19:34 15    **Q.**    All right.  Mr. Vickers, you have two grandchildren?

16    **A.**    Correct.

17    **Q.**    When is the last time you had any contact with those

18    children?

19    **A.**    Sometime in early February.  After David was arrested

10:19:47 20    we had a good relationship with Dana, and then it kind of

21    fell apart when we started having -- hiring you as counsel

22    to be able to help.

23    **Q.**    So is his wife pretty much excluding you from having

24    contact with the grandchildren because you're supporting

10:20:09 25    your son?

Vickers - Direct

**A.**    Total.  I've sent the children all the Christmas

cards, birthday cards, tried to reach out, get no response

back whatsoever.

**Q.**    Because you're supporting your son?

**A.**    Yes, primarily because, you know, he is my son and

I've got to help him, but I want to help my grandchildren,

too, and it's --

**Q.**    All right.  Mr. Vickers, how old are you, sir?

**A.**    I am 70.

**Q.**    Mr. Vickers, you've been here throughout repetitive

sessions of Court, including when your son stood before this

Court and withdrew from a plea agreement.  Is that correct?

**A.**    That is correct.

**Q.**    And you understand at that particular point your son

is facing life in prison.  You understand that?

**A.**    Yes, I do.

**Q.**    Are you requesting that this Honorable Court consider

a sentence less than life imprisonment?

**A.**    Yes, I do, because --

          MR. GREG McCORMACK:  All right.  Thank you,

sir.  I have no further questions.

          Hold tight, don't get up.

                THE COURT:  Mr. Filiatraut, anything?

                MR. GREG McCORMACK:  Don't get up.

                MR. FILIATRAUT:  Just a couple questions, if I

Vickers - Cross

1    could, Judge.

2                THE COURT:  Go ahead.

3           CROSS-EXAMINATION OF  EDGAR WAYNE VICKERS

4    BY MR. FILIATRAUT:

10:21:22  5    **Q.**    Good morning, Mr. Vickers.

6    **A.**    Good morning.

7    **Q.**    I'm sorry for this case.  All right?  And is it your

8    testimony that the first time you learned that your son had

9    been sexually molested when he was a child was during the

10:21:45 10    pendency of this case?

11    **A.**    Yes, in February '15.

12    **Q.**    All right.  That must have been a pretty awful thing

13    to hear.

14    **A.**    You could say that, yes, sir.

10:21:55 15    **Q.**    Right.  Let me ask you, you testified that if you knew

16    back then you would have wanted the authorities to apprehend

17    the person who did that?

18    **A.**    That is correct.

19    **Q.**    How would you have wanted the criminal justice system

10:22:14 20    to treat that person?

21    **A.**    I would have at least -- how would I want -- the law

22    is the law, sir.

23    **Q.**    Uh-huh?

24    **A.**    You know, there's state and federal laws.  And so I

10:22:24 25    would want them to at least be held accountable.

1    **Q.**    Okay.

2                    MR. FILIATRAUT:  Thank you.

3                    THE COURT:   Thank you, Mr. Filiatraut.

4            Sir, you can step down.  Thank you very much.

10:22:35  5                    THE WITNESS:  Thank you.

6                    MR. GREG McCORMACK:  Sir, I have no further

7    evidence to present.

8                    THE COURT:  Okay, Mr. McCormack.  Then in

9    furtherance of mitigation, anything else?

10:22:47 10                    MR. GREG McCORMACK:  Nothing further in

11   mitigation, sir.

12                    THE COURT:  Okay.  Thank you.

13           Mr. Vickers, I'm going to ask whether you have

14   anything to say before you step down.

10:23:03 15                    THE WITNESS:  No, sir.

16                    THE COURT:  Mr. Filiatraut, on behalf of the

17   government, your thoughts.

18                    MR. FILIATRAUT:  Yes, Judge.

19                    THE COURT:  Sure.  And I have read your

10:23:09 20   sentencing memorandum; I should say Mr. McDonough's.

21                    MR. FILIATRAUT:  Thank you, Judge.

22           May it please the Court:  The government here, Your

23   Honor, is seeking a sentence in the guideline range.  And

24   the guidelines as they apply to this defendant, based on the

10:23:36 25   facts proven at trial, the guideline range is life.

1        The reason for that is because this defendant poses

2    the most severe threat to children everywhere.  This

3    defendant is the person who parents everywhere should fear.

4    Until now, maybe some, maybe people on this jury who saw

10:24:08 5    this case, heard about these things, heard about apps like

6    Kik, heard about Internet websites like Motherless, maybe

7    they hadn't heard about those things, but they exist, and

8    they exist innocuously.

9        The people who make those websites will never admit

10:24:27 10    that we want depravity to exist on websites, we want

11    depravity to infect the lives of children through the use of

12    these websites and apps, but they do.  They do because

13    people are out there like the defendant.  He fully intended

14    to have sex with a 13-year-old girl in Ohio when he got in

10:24:53 15    his car and drove through five states.  He fully intended to

16    groom a 13-year-old girl when he was talking with her on

17    Kik.

18        Parents don't know who these people are.  They don't

19    know what they look like.  They don't know when they're

10:25:15 20    coming, but they could be.  Kids use these apps, kids who

21    are curious.  Kids need to be protected.  He fully intended

22    to rape a 13-year-old.   Let's keep that in mind.

23        Additionally, the government has no reason to doubt

24    that the defendant has been sexually abused in his life, and

10:25:49 25    that's tragic and horrible.  And were it possible, I'm sure

1    the government where he lived would have loved to prosecute

2    that case if they could, but here is the thing:  Imagine for

3    a moment if a tragic moment had been video recorded and

4    passed around on the Internet in perpetuity, because that's

10:26:21  5    the other thing this defendant did when he sent child

6    pornography through the Internet to who he thought was a

7    mother and a 13-year-old girl, re-victimizing those children

8    over and over again.

9         Child pornography is cancer.  There's no other way to

10:26:44 10    describe it.  It's disgusting.  It's abhorrent.  Its mere

11    existence is offensive and disgusting.  People who have it

12    are committing crimes by merely having it.  He had it and

13    sent it to a child, a child who he was grooming.

14    Thankfully it wasn't a child, thankfully he had no

10:27:16 15    opportunity to actually take possession of and rape a

16    13-year-old, but only by the grace of God really.  In his

17    mind he had every intention of doing that to a real child.

18         And the government seeks a guidelines sentence in this

19    case because what needs to happen here is people everywhere

10:27:45 20    need to see that when this threat, when this thing that

21    could come out from anywhere, from any state, from any

22    crevice, from any shadow, and come after their child, when

23    that person is caught that person is dealt with fairly, and

24    the fair sentence here is a guidelines sentence of life.

10:28:14 25         Thank you, Judge.

1          THE COURT:  Thank you, Mr. Filiatraut.

2          All right.  Let's take a look at the report.  Count 1,

3     distributing a visual depiction or material involving the

4     sexual exploitation of minors, Class C felony.  Count 2,

10:28:43  5     coercion and enticement.  Count 3, travel with intent to

6     engage in illicit sexual conduct.  Count 2 is a class A

7     felony, Count 3 is a class B felony.

8          On January 28, 2015, the defendant was named in a

9     three-count indictment filed in this Court.

10:28:58 10          Mr. Vickers, please go to the podium with

11     Mr. McCormack.

12          On December 3, 2015, defendant was found guilty by

13     jury trial to all three counts of the indictment.  As we

14     know, there is no plea agreement in this case.

10:29:11 15          As far as the offense conduct, we'll use the following

16     summary both as the offense conduct and the nature and

17     circumstances of the offense once we get to the 3553(a)

18     factors.

19          In December 2014, an undercover investigator found the

10:29:27 20     defendant on a shared website and noted that the defendant

21     was in several groups who showed an interest in breeding and

22     having sexual relationships with young girls.  Eventually

23     the defendant contacted the undercover investigator, who was

24     posing as a 29-year-old mother of a 13-year-old daughter.

10:29:41 25          Defendant expressed an interest in the child.  He

1    began communicating with the 13-year-old via Kik, a

2    smartphone application used for instant messaging.  He

3    communicated with the undercover investigator/mother about

4    the breeding of the 13-year-old and discussed plans to

10:29:58  5    travel from his home in Virginia to Ohio in order to have

6    sex with the child.

7         Defendant sent pornography videos to the

8    investigator/mother through Kik, which included adult

9    bestiality and child pornography with prepubescent females

10:30:14  10   engaged in sexual acts with older men or other prepubescent

11   females.  Some of the videos appeared to have restrained

12   and/or drugged children involved in the pornography.  He

13   also sent a video to the 13-year-old which contained a

14   prepubescent female engaged in sex with a male, and he told

10:30:31  15   the child that he hoped the video would be them.

16        He told the child he was going to travel to Ohio to

17   have sex with her, possibly impregnate her, and have a

18   long-term relationship with her.  During telephone

19   conversations with the investigator/mother, defendant

10:30:46  20   admitted to having prior sexual relationships with minors.

21        On January 4, 2014, the defendant contacted the

22   investigator/mother and said he may travel to Ohio.  The

23   next day he did, in fact, travel to Ohio, arrived at the

24   predetermined meeting location in Ohio, and was immediately

10:31:05  25   arrested.

1          That's a summary of what we have.  Of course, we have

2    more detail in the report itself.  It is not necessary to go

3    through all of this.

4                    MR. GREG McCORMACK:  Your Honor, if I may,

10:31:13  5    please.

6                    THE COURT:  What, Mr. McCormack?

7                    MR. GREG McCORMACK:  Maybe I misunderstood the

8    Court's procedure.  I'm used to arguing after the

9    prosecution argues.

10:31:24 10                    THE COURT:  I'm not sure what you're used to,

11    but I do it the other way.  That's why I asked if there was

12    anything else in mitigation.

13                    MR. GREG McCORMACK:  I apologize.

14                    THE COURT:  I'll stop right here and allow you

10:31:33 15    to go.  Go ahead.

16                    MR. GREG McCORMACK:  I truly apologize, Your

17    Honor.

18                    THE COURT:  That's okay, go ahead.

19                    MR. GREG McCORMACK:  Yes, sir.  And I do

10:31:38 20    apologize, Your Honor.

21                    THE COURT:  Go ahead, Mr. McCormack.

22                    MR. GREG McCORMACK:  All right.

23          Your Honor, this is obviously an extraordinarily

24    difficult situation we have on our hands here.  Mr. Vickers

10:31:50 25    has been convicted by the jury, and several months ago we

1    came to Court, and the prosecution, the United States

2    Government, was prepared to stand before this Court and

3    accept a sentence that was less than life, to say that that

4    sentence was sufficient but not greater than necessary; yet

10:32:17  5    they stand here now and say that a sentence of life is

6    necessary.  And the only difference at this particular point

7    is Mr. Vickers has withdrawn from the guilty plea and has

8    held the government to its burden of proof.

9        The fundamentals of sentencing before the federal

10:32:40  10    court system under 18 U.S.C. 3553(a) is that the sentence

11    must be sufficient but not greater than necessary.  So the

12    argument from the government at this particular point is

13    contradictory, because before they felt a sentence of less

14    than life was sufficient but not greater than necessary, and

10:33:05  15    now they stand before this Court and they say that a

16    sentence of life is necessary.

17        Clearly evidence that was presented at court during

18    the course of trial was disturbing.  We heard Mr. Vickers on

19    tape after tape after tape and his discussions with the

10:33:26  20    agent.  We heard Mr. Vickers on multiple occasions talking

21    to the agent, discussing with the agent and making

22    conversations with the agent, and we heard the agent on

23    multiple occasions basically convincing Mr. Vickers to stay

24    in this conversation, to stay in this act.  Mr. Vickers was

10:33:49  25    questioning the agent, and the agent was clearly saying

1    different things to Mr. Vickers to keep him involved in

2    this.

3            I'm not here to dispute the verdict of the jury, the

4    jury rendered its verdict.  Mr. Vickers is guilty as he

10:34:01  5    stands before this Court, but clearly Mr. Vickers was

6    questioning the agent about continuing on with this.

7            As Mr. Vickers stands here, he comes before this Court

8    with absolutely no criminal history whatsoever.  He comes

9    from a good family.  His dad has testified that he has a

10:34:23 10    history with some difficulties growing up, going through

11    school, the learning disabilities; yet he made it through

12    school, he overcame those disabilities, he made it through

13    school, he made it through college.

14            He has a college degree.  He was able to maintain

10:34:42 15    employment.  He had difficulties professionally, but he was

16    able to maintain employment.  He supported his family.  And

17    where he went astray we don't know, but what we do know, he

18    had a very difficult situation when his mom passed away in

19    2013.  She suffered a very devastating sickness.  He was

10:35:06 20    very close to his mom.  She suffered a very devastating

21    sickness at that particular point, this disease, and he lost

22    her, and so did his dad and his sister.  And it hit him,

23    literally it just devastated him, and obviously we see that

24    he had an absolute downward spiral at that particular point.

10:35:29 25    And what happened we don't have an explanation for, but he

1    just -- he just literally went into a downward spiral.

2        So here we are at this particular point, we have a man

3    with absolutely no criminal history, we have a man from an

4    absolutely good background.  We have a man who's overcome

10:35:49  5    obstacle after obstacle in his past background, a man who

6    has been subjected to sexual abuse in his background.

7        So we know we have a man who has the ability to

8    overcome obstacles, and Your Honor, that is rehabilitative

9    potential; a man who can get beyond what he's dealing with

10:36:11 10   here if he has the opportunity to get rehabilitation.

11       That is a man who does not need a life sentence.  That

12   is a situation where a life sentence is not necessary.  It's

13   greater than necessary, which is the position the United

14   States Government took several months ago, Your Honor.  Yet

10:36:37 15   here we are at this particular point, the United States

16   says, no, a life sentence is necessary.  So we have a great

17   contradiction in this case.  It's a difficult situation.

18       Mr. Vickers came before this Court several months ago,

19   and we stood before this Court, and the Court cautioned him,

10:37:00 20   I cautioned him.  "Mr. Vickers, you have a deal that gave

21   you a sentencing range of 262 to 327.  What are you doing

22   here?"  And he chose to hold the government to its burden of

23   proof.  Yet at this particular point, because he chose to

24   hold the government to its burden of proof, which the

10:37:22 25   government met its burden of proof in front of a jury, now

1    he's facing life imprisonment.  And I submit to the Court he

2    should not be unnecessarily penalized for doing that at this

3    particular time.

4         I believe we have a sentencing range -- and it's a

10:37:37  5    large sentencing range -- of 262 to 327, that that

6    sentencing range is still an appropriate sentencing range.

7    It gives the ability for a person to be rehabilitated.  It

8    gives the ability for a person to say I still have the

9    ability to be rehabilitated, to take advantage of the

10:37:59 10    programs that the Federal Bureau of Prisons can give me, can

11    give me the ability to be a person who can be returned to

12    society.

13         The government recognized that when we were

14    negotiating the pretrial agreement and we came before this

10:38:14 15    Court ready to enter into that, and yes, I held the

16    government to its burden of proof.  It gives the ability to

17    his dad and his sister -- his dad and myself will probably

18    be long gone, dead and buried -- my son hopefully and his

19    sister hopefully will be here, and his sister will hopefully

10:38:36 20    be available for him to have somebody to support him when

21    he's done with the term.

22         But somewhere in that range of 262 to 327 would be an

23    appropriate range for this man.  As his dad says, as the

24    government asked him, what should happen to a person who

10:38:52 25    commits an offense?  He should be held accountable.  He's

1    being held accountable at this particular point.  He's been

2    convicted.  A sentencing of 262 to 327 clearly holds him

3    accountable, clearly puts him in prison for a significant

4    period of time, and we will hold him accountable for a

10:39:09  5    lifetime of supervised release after that, where he's held

6    to the strictest of terms of supervised release; where he is

7    hounded by a probation officer, he is monitored very

8    closely, yet he has a potential to return to society and he

9    has the rehabilitative potential to be a member of our

10:39:33 10    society, and hopefully he can get beyond that.

11         And it's a difficult case, as I believe we all

12    recognize, when he came into this Court and he withdrew from

13    that pretrial agreement, we all sat there in the Court's

14    chambers and we shook our head.  What's going on?  What is

10:39:53 15    affecting you?  Is it the jailhouse lawyers?  Is it the

16    people who you're talking to?  It's not dad who's talking to

17    you, it's not me who's talking to you.  It's the outside

18    influences.  Is it your wife?  What's going through?  Is it

19    your family situation?  Your wife?  Is it the fact you've

10:40:16 20    lost your kids?  Is it the fact these jailhouse lawyers are

21    doing this to you?  What's going on here?

22         There's outside influences that have affected this

23    man, Your Honor.  I've been practicing 36 years, I've not

24    seen anything like this in my life.  But it's a difficult

10:40:34 25    situation, and I ask the Court look at this very clearly,

1    but that the fundamentals of 18 U.S.C. 3553(a), which

2    support and recognizes the second sentencing factor here is

3    the history and characteristics of the defendant, the

4    history and characteristics of the offender is 100 percent

10:40:55 5    favorable to this defendant, 100 percent favorable to this

6    defendant.  There is nothing adverse in his background,

7    nothing.

8        And then you get to the basic fundamentals of the

9    sentencing, fundamentals of sentencing is that the sentence

10:41:08 10    has to be sufficient but not greater than necessary.  We go

11    back to when we first came into this Court, when I first met

12    Your Honor, was for the purpose of entering a guilty plea

13    with a range of 262 and 327, and the government was prepared

14    to say that was sufficient but not greater than necessary

10:41:26 15    for this defendant with this case.  Nothing has changed

16    except he held the government to its burden of proof.

17                    THE COURT:  Thank you, Mr. McCormack.

18                    MR. GREG McCORMACK:  Thank you, Your Honor.

19                    THE COURT:  Mr. Filiatraut, any response?

10:41:37 20                    MR. FILIATRAUT:  Yes, Judge, if I could.

21        The government offered a plea in this case, and in the

22    plea the government agreed to stay within a recommended

23    guideline sentence.  The defendant had an opportunity to

24    take that plea, and the crimes didn't change, that plea had

10:41:59 25    all three counts in the indictment accounted for.  He has

1   been found guilty of all three counts of the indictment.

2   The guidelines have changed, the governmental's position has

3   not.  The government's position has always been we want a

4   sentence in the guideline range.  Had he pled he would have

10:42:17   5   had acceptance of responsibility points, and he would have

6   been able to show this Court he's able to be rehabilitated

7   potentially.

8         The government's position has not changed.  Now we

9   want a guidelines sentence.  He's been found guilty.  He has

10:42:35  10   chosen to exercise his right to a trial.  We are not

11   penalizing him for that.  We are not asking the Court to

12   penalize him for that.  We're asking for a guidelines

13   sentence.

14         Thank you.

10:42:46  15             THE COURT:  Thank you, Mr. Filiatraut.

16             MR. GREG McCORMACK:  Thank you, Your Honor.

17   And again, I apologize, Your Honor.

18             THE COURT:  That's okay, Mr. McCormack.

19         All right.  We've gone through the offense conduct.

10:43:00  20   Again, that will also serve as the nature and circumstances

21   of the offense once we get to the 3553(a) factors.

22         Victim impact:  No identifiable victims, but we know

23   the background of this case.

24         There's no information indicating the defendant either

10:43:13  25   impeded or obstructed justice.  No acceptance of

1    responsibility, obviously, you went to trial.

2         Offense level computation:  We use the 2015 edition of

3    the guidelines manual.  Count group 1, distributing a visual

4    depiction of material involving the sexual exploitation of

10:43:33  5    minors, base offense level is 22.

6         Specific offense characteristic:  Because the material

7    involved a prepubescent minor or a minor who had not

8    attained the age of 12, there is an increase by two.

9         Specific offense characteristic:  Since the offense

10:43:49 10    involved distribution to a minor that was intended to

11    persuade, induce, entice, coerce, or facilitate the travel

12    of the minor to engage in prohibited sexual conduct, there

13    is an increase by seven levels.

14         Specific offense characteristic:  Since the offense

10:44:05 15    involved material that portrays sadistic or masochistic

16    conduct or other depictions of violence, there's an increase

17    of four.

18         Specific offense characteristic:  Since the defendant

19    engaged in a pattern of activity involving the sexual abuse

10:44:18 20    or exploitation of a minor, increase by five.

21         Specific offense characteristic:  Since the offense

22    involved the use of a computer or an interactive computer

23    service for the possession, transmission, receipt, or

24    distribution of the material, or for accessing with intent

10:44:34 25    to view the material, there is an increase by two levels.

1          Specific offense characteristic:  Since the offense

2     involved at least 600 images, there is an increase of five

3     levels.

4          No victim-related adjustment, no adjustment for role,

10:44:48 5     no adjustment for obstruction.  Subtotal is 47.

6          And Counts 2 and 3 are grouped for guideline

7     calculation purposes.  For group 2, coercion and enticement,

8     the base offense level is 28.

9          Specific offense characteristic:  Since the offense

10:45:03 10     involved the use of a computer or an interactive computer

11     service to, A, persuade, induce, entice, coerce, or

12     facilitate the travel of the minor to engage in prohibited

13     sexual conduct; or B, entice, encourage, offer, or solicit a

14     person to engage in prohibited sexual conduct with a minor,

10:45:22 15     increase by two.

16          No victim-related adjustment, no adjustment for role.

17     No adjustment for obstruction.  Subtotal is 30.

18          We do a multiple-count adjustment, and the greater of

19     the adjusted offense level above is 47.  No increase in the

10:45:36 20     offense level.  Combined adjusted offense level is 47.

21          No Chapter IV enhancements, no acceptance of

22     responsibility.  Total offense level is 43, because that's

23     how high the guideline table goes.  So we bring it back down

24     to 43 because he's literally off the charts.

10:45:59 25          The offense behavior not a part of relevant conduct,

1    none.  Defendant's criminal history:  No juvenile

2    adjudications, no adult criminal convictions.

3         Criminal history computation:  He scores zero, he's

4    automatically in a Category I.

10:46:12  5         Other criminal conduct:  He's got 22 infractions for

6    failure to pay a toll, he's got some traffic matters in

7    paragraph 75.  No pending charges, no other arrests.

8         Offender characteristics:  Mr. Vickers was born in

9    1973 in Virginia, raised in Virginia by his parents.  Mother

10:46:31 10   was an accountant for the government, father was a

11   cartographer for the government.

12        He reported experiencing a positive childhood.  No

13   drug use, no alcohol abuse, no physical abuse, no other

14   financial difficulties.  Good relationship with his parents

10:46:47 15   and his only sister.

16        As we've heard, his mother died in 2013 from

17   Alzheimer's.  His father is retired and lives in Virginia.

18   His sister is here.  In 2001 he married, has two children

19   together; appears to be ages 7 and 3, they may be older now.

10:47:10 20        Since his incarceration his wife has filed for

21   divorce, and as we've heard from the defendant's father,

22   she's really cut off contact.  His support system, that is

23   defendant's, is limited to his father and sister at this

24   point.

10:47:27 25        Physical condition:  Appears to be healthy, no issues.

1    Mental and emotional health:  He has no mental health

2    counseling experience.  Said while he does not believe he

3    needs mental health services, he is open-minded about

4    participating in treatment.

10:47:44   5    Substance abuse:  He reports no illegal drug use, no

6    prescription drug abuse.  He notes for the six months

7    immediately before his arrest he was drinking a couple

8    drinks per day, daily, to the point of intoxication once or

9    twice weekly.  Appears to be wanting to celebrate his

10:48:09  10    birthday.

11    Educational, vocational, special skills:  Graduated

12    from high school in Virginia in 1991.  Reports being

13    involved in special ed classes due to a form of dyslexia.

14    Earned his bachelor of science degree in prelaw from George

10:48:26  15    Mason University, Fairfax, Virginia, in '97.  Reports no

16    licenses, certifications, or special skills.

17    Employment record:  2010 to his arrest he was employed

18    full time as a medical courier in Virginia, delivering

19    medical supplies, organs, and blood, earned commissions.

10:48:49  20    Worked as a courier for LaserShip.  He owned and operated a

21    Quiznos sub shop, was self-employed as a restaurant

22    consultant.  He was one of 20 partners in a Dunkin' Donuts

23    franchise, worked full time as a franchise support

24    specialist for Quiznos.

10:49:04  25    Financial condition:  At this time he has no assets,

1    appears to have no ability to pay a fine or any other costs

2    associated with this case.

3         Sentencing options:  Under the statute, for Count 1

4    the minimum term is five years, the maximum is 20; Count 2,

10:49:20  5    minimum term of imprisonment is 10 years, maximum is life;

6    Count 3, the maximum term is 30 years.

7         Under the guidelines, based upon a total offense level

8    of 43 and a Category I, his guideline range is life.

9         There is no plea agreement, as we know.

10:49:39  10         Supervised release:  Under the statute, for Count 1,

11   five years to life; Count 2, five years to life; and Count

12   3, five years to life.  They all run concurrently.

13        Under the guidelines, the same thing for Counts 1, 2,

14   and 3.

10:49:57  15        Probation:  Under the statute and the guidelines, he's

16   ineligible for probation.  It's barred by law.

17        Mandatory drug testing will apply unless the Court

18   finds based upon reliable sentencing information that

19   Mr. Vickers would indicate a low risk of future substance

10:50:13  20   abuse.

21        Fines:  Under the statute, for each one of these

22   counts it's $250,000.  A special assessment of $100 for each

23   one of these three counts.  The fine range is $25,000 to

24   $250,000.

10:50:31  25        Paragraph 109 gives us the factors the Court must

1    consider in determining the amount of any fine to impose and

2    the costs.  I'll find those to be irrelevant, he has no

3    ability to pay.  Restitution does not apply in this case,

4    either under the statute or under the guidelines.

10:50:46  5    Turning to factors that may warrant a departure, Miss

6    Wessel has not identified any factors that would warrant a

7    departure outside the range.

8    Factors that may warrant a sentence outside of the

9    system:  We start with the Court's job, which is to impose a

10:50:59 10    sentence sufficient but not greater than necessary to comply

11    with the 3553(a) factors.  In making this determination, we

12    look at the nature and circumstances of the offense, history

13    and characteristics of the defendant, the need for the

14    sentence imposed, and kinds of sentences available.

10:51:20 15    Okay.  There appear to be no unresolved objections by

16    either the government or the defense, so let's move on to

17    the 3553(a) factors.  The Court has already gone over the

18    nature and circumstances of the offense when I dealt with

19    the offense conduct, there is no need to repeat for that

10:51:36 20    category.

21    History and characteristics of the defendant:  We've

22    covered much if not all of this.  We take a look at any

23    prior record, violence, physical abuse, diminished capacity,

24    employment, age, substance abuse, and family ties.

10:51:51 25    Let's briefly summarize for Mr. Vickers:  No prior

1    criminal record.  No history of violence.  He did admit to

2    the undercover investigator he had prior sexual

3    relationships with minors.

4         He reports no history of physical abuse.  No history

10:52:07  5    of mental health services.  No reason to believe he suffers

6    from any diminished capacity.

7         He believes since his incarceration he's been

8    prescribed an antidepressant.  That's not unusual.  Reports

9    earning a bachelor's degree in prelaw and maintaining

10:52:24 10   regular employment.  We've gone over that already.

11        Is currently 42.  At the time of the offense he was

12   married, raising two minor children.  However, as we know,

13   his wife has since filed for divorce and cut off the rest of

14   the family.  Support system now limited to his father and

10:52:42 15   sister.

16        He reports no illegal drug use.  He did have some

17   excessive alcohol use for a period of time.

18        All right.  Need for sentence imposed, I'll come back

19   to that when I actually sentence Mr. Vickers.

10:53:05 20        Sentencings disparities:  We look at defendants with

21   similar records and conduct.  There are no codefendants in

22   this case, and the guideline range that Mr. Vickers faces

23   would be the same for those under similar circumstances,

24   offense levels, personal characteristics, criminal

10:53:25 25   histories, et cetera.  And considering the facts of this

1    case, restitution does not apply here.

2         We'll come back to the final category, which is need

3    for sentence imposed.  And we look at just punishment,

4    afford adequate deterrence, protect the public, reflect the

10:53:42  5    seriousness of the offense, and improve offender conduct and

6    condition.

7         Mr. Vickers, we take a look at all these factors,

8    every single one of them.  They're all important.  We hope

9    collectively no matter what that you do improve yourself, no

10:53:59 10    matter what sentence I give you.  It's important.  So are

11    the other factors.  And a lot of these are not equally

12    weighed in every single case.  The Court must take all of

13    them into consideration, but they could have uneven weight

14    depending on the facts and circumstances and the law that

10:54:19 15    applies to each case.  So that's what we have to consider.

16         So what is just punishment?  What is adequate

17    deterrence?  How do we protect the public?  This is a

18    serious offense, we know that, and I've discussed improving

19    offender conduct and condition.

10:54:42 20         Both Mr. McCormacks have done a nice job of presenting

21    me with mitigating evidence; the government, the same way,

22    for aggravating circumstances.  And that's where the balance

23    comes in, how do they weigh against each other.

24         Let me first address Mr. McCormack's comment about the

10:55:09 25    range that the government felt was appropriate for the plea

1    deal but now is asking for a guideline range of life.

2         That was the negotiation part, Mr. Vickers, and you

3    know that.  That was the negotiation.  You received very

4    competent and good advice from both Mr. McCormacks, I'm sure

10:55:33  5    from your family.

6         I asked you more than one time whether you really

7    wanted to go forward with this.  You were absolutely

8    convinced that this was the right thing to do for you.  So

9    as you know, you cannot now get the benefit of what the

10:55:54 10   government was offering before trial because you used the

11   government resources.

12        We brought jurors in here.  They had to go through

13   everything, listen to everything that was put forth in this

14   trial, consider all of the evidence, and that evidence

10:56:14 15   including them having to watch child pornography and

16   bestiality videos.  They had to watch a horse and a dog with

17   humans, females.  I was disgusted.  You can imagine how that

18   jury felt.

19        But you absolutely had the right to go to trial, no

10:56:37 20   question about it.  It is guaranteed under the law.  That

21   doesn't mean you get the benefit of what the government was

22   offering you before they had to use their resources, put

23   their evidence on, and for us to pull the jury in here.  It

24   doesn't work that way.

10:57:12 25        Let me also address another comment Mr. McCormack made

1    about no criminal history.  That's true, you have none.

2    Most of the people that we have here charged with child

3    pornography have no criminal history, none.  Very small

4    percentage have any history, some not even traffic tickets,

10:57:32  5    and they come in here and facing lengthy sentences for their

6    first time around.

7         It's not unusual, because it's a crime that you can

8    sit in your room and commit with the door closed, nobody

9    watching.  You don't have to venture out of the house.  And

10:57:51 10    I've said before that one of the worst things about the

11    Internet is that you can commit 25 federal crimes by sitting

12    in the comfort of your home, in front of that computer,

13    until you get that knock on the door.  Time to answer for

14    what you've done.

10:58:07 15         Same thing here.  We did the calculation for your

16    offense level, it came to 47.  That's four levels above

17    where the chart stops.  We had to come back down to 43 for

18    the maximum.

19         The child pornography is a cancer, I would agree.

10:58:50 20    Every time those videos are played those children are

21    reminded of the hell that they went through, and they have

22    to live with it.  But as we know, you took it a step

23    further.  You actually traveled to our state for the purpose

24    of engaging in sexual intercourse with a 13-year-old, whom

10:59:16 25    you thought was a 13-year-old.  That makes you dangerous,

1    because when people act on their fantasies, that's what

2    makes them dangerous.

3         I remember during the trial and watching some of these

4    communications going back and forth how you said how natural

10:59:51    5    this felt to you.  How natural?  Natural?  Not according to

6    the law and our morals of society.  It is so unnatural, and

7    quite frankly disgusting; but if you feel it's so natural

8    that's what really makes you dangerous, because there's no

9    hesitation there, there's no block.  There's no barrier that

11:00:26    10    stopped you or would stop you from impregnating a

11    13-year-old.  And by your own admission, you had a sexual

12    relationship with, as you said, maybe a 10-year-old at the

13    time, and apparently you thought that was natural, too.

14    It's not, it's abhorrent.

11:00:47    15         And you are according to these calculations every

16    parent's worst nightmare, because you're willing to act on

17    it and rape a minor.  I use the word "rape" because at a

18    certain age it becomes that, and if you'd done that with a

19    10-year-old, that's rape.

11:01:15    20         Sometimes you just can't save somebody from

21    themselves, and everybody around you, including your good

22    counsel, tried to do that.  So there is some wiring that

23    appears to be off, because you just think that this is

24    natural conduct, and maybe everybody should be doing it, and

11:01:38    25    society should be this way.

1          But Congress has heard these horror stories across the

2     country about the victimization of children, not just

3     through child pornography, but through people like you who

4     are willing to cross state lines and engage in illicit

11:02:04  5     sexual conduct with minors.  Families crying, what happened

6     to my child; some of them stolen for these purposes, never

7     to be seen again except on the Internet.

8          Babies being raped is child pornography.  Bestiality,

9     what part of that is human?  Really, what part of that is

11:02:37 10    human?  And who gets sexual satisfaction from the rape of a

11    baby, let alone having sex with a horse or a dog?  Yet this

12    jury had to watch that.  They may need some mental help or

13    health treatment after that trial.  I wouldn't doubt it.

14         So really we've discovered that there's evidence of a

11:03:18 15    predatory nature, seeking out a lone child in a park,

16    purposely treating a child as a lover rather than as a

17    child.  And there is evidence of deceit.  At the time of

18    your arrest the Kik app was deleted from your phone.  No

19    videos were found on your phone.

11:04:02 20         No one should be sexually abused, including you -- no

21    one -- but it's a factor, but not a major one, and I'll tell

22    you why:  Because most of the abuse occurs with females in

23    this country, and we don't see female child pornographers or

24    females willing to cross state lines to have sex with

11:04:35 25    minors, but yet females are more sexually abused in this

1    country than males.  So the argument that you were sexually

2    abused and therefore this may have given you a tendency to

3    do what you did rings pretty hollow, the evidence is just

4    not there.

11:05:12  5    So this case becomes more of the aggravating factors

6    substantially outweighing the mitigating, substantially,

7    because you have a good family, good parents, good sister,

8    good father.  We heard him testify.  No physical abuse, no

9    drugs or alcohol, no financial difficulties.  All the

11:05:39 10   factors that we see that put somebody in the hole in the

11   beginning were not there in your life.

12        Yes, it's devastating that you lost your mother to

13   Alzheimer's, no family should have to go through that, but

14   how that translates into crossing a state line to have sex

11:06:00 15   with a 13-year-old, the connection is just not there.

16        You're educated, more so than most people who come

17   into this courtroom, with a college degree, good employment

18   history.  All the things that point to you should have known

19   better, especially with the good advice of counsel.  But

11:06:31 20   there's no way in the world you should have gone through

21   with this trial, let alone did what you did; but again, it's

22   your choice and your absolute constitutional legal right to

23   do so.  And you turned down an offer made by the government

24   and rolled the dice.

11:07:02 25   So I find you to be a high risk to the children.

1    Deterrence is a major factor.  We have to protect society,

2    part of which, of course, are the children, because if this

3    weren't an investigator and this were actually a 29-year-old

4    mother who was willing to give her 13-year-old daughter up

11:07:27    5    for sex to a stranger in another state, that would have been

6    another problem, because there's no doubt in my mind that

7    you would have followed through.

8         All right, Mr. Vickers, let's go ahead and sentence

9    you.  All right.  Mr. Vickers, you are committed to the

11:08:39    10    custody of the Bureau of Prisons as follows:  For Count 1,

11    240 months; Count 2, life; Count 3, 360 months, all

12    concurrent.

13         Supervised release:  Life, if it so applies, on each

14    count, to run concurrently.  If for some reason you are

11:09:33    15    released, because we can't predict what's going to happen

16    years and years from now, you will report to the U.S.

17    Probation Office in the sentencing district or the district

18    to which you are released.

19         I'll waive the fine.  $300 special assessment to the

11:09:51    20    United States.  Restitution is not in issue.

21         If you are on supervision, you'll not commit another

22    federal, state, or local crime.  You'll not illegally

23    possess a controlled substance.  You'll comply with the

24    standard conditions that have been adopted by this Court,

11:10:07    25    and with the following additional conditions:  I'll suspend

1    the mandatory drug testing, it's not drug related.  He has

2    no history.

3         The defendant will abide by all rules of the minor

4    protection and restriction program of the U.S. Probation

11:10:23 5    Office.  And again, this is supervised release conditions if

6    he gets that far.

7         He'll submit to a mental health evaluation and sex

8    offender assessment as directed by Probation.  The defendant

9    shall participate in any treatment program, including for

11:10:36 10   sexual deviancy, which may include polygraph testing if

11   recommended by these evaluations.

12        Defendant shall submit to periodic polygraph testing

13   as directed by Probation.  No violation proceedings will be

14   based solely on the results of the polygraph exam or a valid

11:10:51 15   Fifth Amendment refusal to answer a polygraph question.

16        The defendant will not own or possess any type of

17   camera, photographic device, and other equipment, including

18   video recording equipment, without the written approval of

19   the probation officer.

11:11:05 20        You will not possess a firearm, destructive device, or

21   any dangerous weapon.  And you'll cooperate in the

22   collection of DNA as directed by Probation.

23        Under 18 U.S.C. § 3583, defendant is required to

24   register under the Sex Offender Registration and

11:11:21 25   Notification Act and must comply with the requirements of

1    that act as directed by Probation.

2         Pursuant to the Adam Walsh Child Protection Act of

3    2006, defendant will keep the registration current in each

4    jurisdiction in which he resides, is employed, or is a

11:11:36 5    student.  Defendant shall no later than three business days

6    after each change of name, residence, employment, or student

7    status, appear in person in at least one jurisdiction in

8    which he is registered and inform that jurisdiction of all

9    changes in reporting information.  Failure to do so may be a

11:11:50 10   violation of his conditions of supervised release and may be

11   a new federal offense punishable by up to ten years.

12        Defendant is prohibited from accessing any online

13   computer service at any location, including employment or

14   education, without the prior written approval of the

11:12:05 15   probation officer or the Court.  This includes any Internet

16   service provider, bulletin board system, or any other public

17   or private computer network.  Any approval shall be subject

18   to conditions approved by the probation officer or the Court

19   with respect to that approval.

11:12:22 20        Defendant shall consent to the U.S. Probation Office

21   conducting periodic unannounced examinations of his computer

22   systems, which may include retrieval and copying of all

23   memory from hardware, software, and/or removal of such

24   systems for the purpose of conducting a more thorough

11:12:37 25   inspection, and will consent to having installed on his

1    computer at his expense any hardware or software to monitor

2    his computer use or prevent access to particular materials.

3        Defendant consents to periodic inspection of any such

4    installed hardware or software to insure it is functioning

11:12:54   5    properly.  And defendant shall provide the U.S. Probation

6    Office with accurate information about his entire computer

7    system, that is hardware and software, all passwords used by

8    him, and his Internet service providers, and will abide by

9    all rules of the computer restriction and monitoring

11:13:10  10    program.

11        And he'll submit his person, residence, place of

12    business, computer, or vehicle to a warrantless search

13    conducted and controlled by the U.S. Probation Office at a

14    reasonable time, in a reasonable manner, and based upon

11:13:21  15    reasonable suspicion of contraband or evidence of a

16    violation of a condition of release.  Failure to submit to a

17    search may be grounds for revocation.

18        Defendant shall inform any other residents that the

19    premises and his computer may be subject to a search under

11:13:34  20    this condition.

21        That's all I have.  Mr. McCormack, I will assume that

22    Mr. Vickers objects to the sentence; therefore, I will note

23    that for the record --

24                MR. GREG McCORMACK:  Yes, sir.

11:13:47  25                THE COURT:  -- and read him his appellate

1    rights.

2         Mr. Vickers, if you wish to appeal the conviction or

3    sentence in this case you must do so within 14 days after

4    entry of the Court's judgment.  You have the right to have

11:13:58  5    papers properly prepared and filed on your behalf and the

6    right to counsel on appeal, and if you cannot afford counsel

7    I'll appoint counsel to represent you at no cost to you.

8         Do you understand those rights?

9              THE DEFENDANT:  Yes, sir.

11:14:08  10              THE COURT:  And Mr. McCormack, please protect

11    his appellate rights pending any decision he makes in that

12    regard.

13              MR. GREG McCORMACK:  Yes, Your Honor.

14    Mr. Vickers has advised me that he does intend to appeal,

11:14:16  15    and he in fact will be requesting a court-appointed counsel.

16              THE COURT:  Fine.  I'll go through the list,

17    and I'll have somebody ready for him.

18              MR GREG McCORMACK:  Yes, sir.

19              THE COURT:  Mr. Filiatraut, anything further

11:14:26  20    on behalf of the government?

21              MR. FILIATRAUT:  No, Judge.  Thank you.

22              THE COURT:  Miss Wessel, anything further?

23              PROBATION OFFICER:  No, Your Honor.

24              THE COURT:  The defendant is remanded, and we

11:14:32  25    are adjourned.

1          DEPUTY CLERK:  All rise.  This Court is in

2     recess.

3                    -  -  -  -  -

4

5

6                    C E R T I F I C A T E

7

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11               s/Heidi Blueskye Geizer     June 1, 2016

12               Heidi Blueskye Geizer, RMR-CRR        Date

13

14

15

16

17

18

19

20

21

22

23

24

25