```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3
         UNITED STATES OF AMERICA,        Case No. 15CR38
 4
                      Plaintiff,
 5                                        December 2, 2015
              vs.                         9:00 a.m.
 6
         DAVID W. VICKERS,                Volume 3
 7
                      Defendant.
 8

 9
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE CHRISTOPHER A. BOYKO
                  UNITED STATES DISTRICT JUDGE
11                        AND A JURY

12
         APPEARANCES:
13
         For the Government:      Brian McDonough, AUSA
14                                Kevin Filiatraut, AUSA
                                  Office of the U.S. Attorney
15                                Northern District of Ohio
                                  801 West Superior Avenue
16                                400 U.S. Court House
                                  Cleveland, Ohio    44113
17                                (216) 622-3600

18       For the Defendant:      Greg McCormack, Esq.
                                  Jarrett McCormack, Esq.
19                                McCormack & McCormack
                                  Suite 100
20                                611 Lynnhaven Parkway
                                  Virginia Beach, Virginia  23452
21                                757-463-7224

22       Court Reporter:         Susan Trischan, RMR, CRR, FCRR
                                  7-189 U.S. Court House
23                                801 West Superior Avenue
                                  Cleveland, Ohio    44113
24                                (216) 357-7087

25       Proceedings recorded by mechanical stenography.
         Transcript produced by computer-aided transcription.
```

1          THE COURT:  Please be seated, ladies and

2     gentlemen.

3               Good morning, everyone.

4               THE JURORS:  Good morning.

09:13:04  5          MR. GREG McCORMACK:  Good morning, Your

6     Honor.

7               THE COURT:  You're on cross, Mr. McCormack.

8               MR. GREG McCORMACK:  Thank you, Your Honor.

9     Good morning.

09:13:10 10          THE COURT:  Good morning.

11               MR. GREG McCORMACK:  Good morning, members

12     of the jury.

13               THE JURORS:  Good morning.

14          CROSS-EXAMINATION OF MIRANDA HELMICK

09:13:14 15  BY MR. GREG McCORMACK:

16     Q.    All right.  Investigator Helmick, let's talk a

17     little bit about your training.

18               You said that you started out your law

19     enforcement career in, what, June of 2014?

09:13:26 20  A.    That is correct, sir.

21     Q.    What did you do before that?

22     A.    Before that, I was a stay-at-home mother.

23     Q.    All right.  So in June, 2014, you started your law

24     enforcement training, and your initial training consisted

09:13:40 25     of what?

1    A.    I did go to college and I have an Associate's

2    Degree in police science and digital forensics.

3                   After completing the two years at Lorain

4    County Community College located in Elyria, Ohio, I

09:13:57 5    enrolled into the Police Academy also at Lorain County

6    Community College.

7    Q.    And that was in June of 2014, I take it, correct?

8    A.    No, sir.  That was in January of 2014.

9    Q.    Okay.  And then continue, please.

09:14:13 10    A.    And then I went through the Police Academy.  I

11    graduated in June of 2014.

12                   I took the State test, and passed, and am

13    commissioned as an Ohio peace officer.

14    Q.    Okay.  And then after that, what happened?

09:14:29 15    A.    After that, I became a reserve police officer for

16    the Village of Wakeman, Ohio, and also an auxiliary

17    police officer for the City of Elyria.

18    Q.    Okay.  And then continue.

19    A.    During that time I took several police tests for

09:14:51 20    various cities around this area in Ohio, and I

21    interviewed and obtained the job with Ohio Internet

22    Crimes Against Children task force in September of 2014.

23    Q.    All right.  Now, once you accepted that position,

24    September, 2014, did you receive additional training?

09:15:11 25    A.    Yes, I have, sir.

1   Q.   So you started that position in September of 2014,

2   and you started your additional training at that point,

3   correct?

4   A.   That is correct, sir.

09:15:18  5   Q.   And what did that training consist of?

6   A.   I've been to training for undercover chat

7   investigations.  I have been to training for interviewing

8   and interrogating techniques.  I've been through training

9   for child exploitation, child pornography, as well as for

09:15:43  10   computer forensics such as peer-to-peer software, digital

11   evidence recovery.

12              I've also been to training for tactical

13   search warrant training.  And overall, just in general,

14   chat training through the office as well as through OPOTA

09:16:07  15   which is Ohio Peace Officer Training commission.

16   Q.   So that's been an ongoing training since you

17   accepted that position with the task force, correct?

18   A.   That is correct.

19   Q.   So when were you actually released in the field, so

09:16:20  20   to speak, to conduct investigations with the task force?

21   A.   I couldn't give you an exact date.

22              I received training from other colleagues

23   at Ohio Internet Crimes Against Children task force from

24   day one that I started.

09:16:38  25              From there, I attended my first training in

```
         1    September of 2014, and every month I go to one to two

         2    training classes.

         3                  So I would say it would probably have been

         4    the month after in October of 2014.

09:16:55 5    Q.    All right.  How many investigations did you

         6    actually become involved with before the investigation

         7    involving Mr. Vickers?

         8    A.    I could not give you an exact number on that, sir.

         9    Q.    All right.  Were there any?

09:17:10 10   A.    Yes, there was.

         11   Q.    Okay.  So can you give me an estimate?  Was it one?

         12   A.    I would say between five and ten.

         13   Q.    Between five and ten.

         14                 All right.  Did any of those investigations

09:17:22 15   lead to an arrest before Mr. Vickers?

         16   A.    Yes, sir.

         17   Q.    And did you use the same persona involving Traci

         18   and Katie in each one of those investigations?

         19   A.    Yes, sir.

09:17:33 20   Q.    All right.  And how many of those investigations

         21   involved an arrest of somebody before Mr. Vickers?

         22   A.    All of the cases that I had before Mr. Vickers

         23   ended in an arrest.

         24   Q.    So every one that you were involved with ended in

09:17:49 25   an arrest before Mr. Vickers?
```

1    A.    That is correct, sir.

2    Q.    Correct?

3              Now, you say you had specifically training

4    about protocols as to how to conduct these undercover

09:17:57 5    investigations, correct?

6    A.    That is correct, sir.

7    Q.    And what did that training actually consist of

8    pertaining to protocols as it pertained to how to handle

9    a situation when the person who was a target became

09:18:12 10    interested in you who was posing as the mother of the

11    child?

12    A.    I'm sorry, I got a little bit lost in that

13    question.

14    Q.    Okay.  You said you use the same persona; you, in

09:18:27 15    all these prior investigations, you basically pose as

16    Traci, correct?

17    A.    That is correct, sir.

18    Q.    And you pose also as Katie, correct?

19    A.    That is correct, sir.

09:18:35 20    Q.    Did you have any of those investigations encounter

21    a situation where the person involved, the target,

22    developed an interest in you as Traci as occurred in this

23    particular case?

24    A.    Yes, sir.

09:18:51 25    Q.    Okay.  So tell me about the training as to the

1    protocol as to how to handle that situation before you

2    encountered Mr. Vickers.

3                    You indicated you had training how to

4    handle that.  What did that training consist of?

5    A.    It was a general training as far as how to chat

6    undercover.

7                    I don't necessarily -- I wouldn't

8    necessarily say it was for that case exactly as you

9    stated.

10                    It was taught -- I did receive training as

11    far as how to talk as a child, how to talk as an adult,

12    and also when the focus became on me, I wanted to see if

13    that was truly the focus as in a fantasy or role

14    playing-type situation, or if it was a real attachment to

15    myself as an adult mother.

16    Q.    All right.  Well, that's what I'm asking, ma'am.

17                    Did you have training as to how to handle

18    this, or were you pretty much on your own in figuring out

19    how to handle this?

20    A.    After going through the training, we are allowed to

21    chat as we see fit.

22                    And during the entire process of a chatting

23    case, in this instance my chats are reviewed by my

24    supervisor as well as two prosecutors assigned to our

25    task force.

1    Q.    So you're telling me that all these chats which we

2    have seen -- the jury's going to see the actual full

3    scope of the chats in this case, but Mr. McDonough has

4    shown the jury quite a bit of it -- your supervisor has

09:20:36 5    seen and approved all these chats?

6              Is that what you're telling us?

7    A.    Yes, he has, sir.

8    Q.    All right.  And are you telling us that throughout

9    the course of this investigation, a prosecution team or

09:20:47 10   at least a prosecutor reviewed these chats, all the way

11   through, correct?

12   A.    That is correct, sir.

13   Q.    Okay.  Would this be a state or federal prosecutor?

14   A.    State.

09:20:54 15   Q.    All right.  And you say that you pretty much, you

16   have some training but you were able to handle this as

17   you see fit, correct?

18   A.    That is correct.

19   Q.    But you indicated to Mr. McDonough that you had

09:21:06 20   training as to giving the suspect or the target an option

21   out, a way out at some particular point, correct?

22   A.    That is correct, sir.

23   Q.    Why was that?

24   A.    In the chat training that I had received, it is

09:21:23 25   talked about to give a target, as you call it, an out

1    meaning you give them an opportunity to bow out of the

2    conversation, to cut ties and no longer go forward with

3    the chatting.

4    Q.    Okay.  Is any part of your training or your

09:21:44  5    protocol in these types of cases designed to entice the

6    target to be sexually interested in you in your role as a

7    mother?

8              I would assume not, correct?

9    A.    No, sir.

09:21:56  10    Q.    Okay.  So that is correct, so you're not in any

11    manner trained in this entire program, it is not in any

12    manner designed to entice the target to be sexually

13    interested in you as Traci?

14              That's pretty much taboo, you're not

09:22:17  15    supposed to be doing that, correct?

16    A.    I would say I can't control how somebody feels

17    about my persona.

18    Q.    True.  I understand that.  But you would agree as a

19    law enforcement officer, you certainly should not be

09:22:33  20    attempting to entice the target to be sexually interested

21    in you as Traci, would you agree with that?

22    A.    I put forward chats and pictures as I see fit, and

23    that goes along with the investigation.

24              I -- I try to chat and send pictures that

09:22:58  25    are in kind and in like the other person.

```
           1   Q.    I understand that.

           2                 Now, can you try answering my question?  My

           3   question is as a law enforcement officer, you

           4   specifically should not be attempting to entice the

09:23:13   5   target to be sexually interested in you.

           6                 Do you agree with that?

           7   A.    I do not entice anybody.

           8   Q.    So the answer is correct, you agree that as a law

           9   enforcement officer you should not be specifically trying

09:23:25  10   to entice the suspect to be sexually interested in you?

          11                 Do you agree with that, yes or no?

          12   A.    Yes.

          13   Q.    All right.  Thank you.

          14                 And did your supervisor ever discuss that

09:23:37  15   with you, that, "Hey, wait a minute, Traci, now, you

          16   should not be trying to sexually entice this man, David

          17   Vickers, to be sexually interested in you"?

          18                 Did he ever discuss this with you?

          19   A.    No, sir.

09:23:48  20   Q.    Did he ever discuss with you, "Traci, now, you're

          21   probably going too far with this case, you're really

          22   enticing this man to be sexually interested in you"?

          23                 Did your supervisor ever do that to you?

          24   A.    No, sir.

09:23:59  25   Q.    All right.  And you're sure he read these chats?
```

```
 1    A.    Yes, sir.
 2    Q.    All right.  Now, when you say you have a protocol
 3    for giving the individual the option out, do you agree
 4    that once you give him an option out, that you should not
 5    continually keep trying to draw him back in?
 6                Do you agree with that?
 7    A.    I give the out, and if they decide to come back,
 8    that's on them.
 9                I leave it very open-ended.  I never want
10    to force anyone to do something that they're not wanting
11    or willing to do.
12    Q.    I agree.  But do you agree that you should not be
13    trying to goad, literally goad the suspect into
14    committing these types of acts?
15                Do you agree with that?
16    A.    I do not goad anybody.
17    Q.    You did not goad anybody.
18                Okay.  So you did not call him names like,
19    "You're a pussy if you don't do this"?
20                You didn't do that, did you?
21    A.    I responded in the same fashion that was through
22    the history of the chatting.
23    Q.    All right.  Do you deny calling him a pussy if he
24    didn't do this?
25    A.    No, I don't.
```

1    Q.    So you did that?  You called him a pussy if he

2    didn't do this, correct?

3    A.    That's correct, sir.

4    Q.    Okay.  We'll go over that in a second.

09:25:28  5         Now, you indicated, when the prosecutor

6    talked to you about giving him an option out, that the

7    reason for doing this was because you were concerned that

8    with these wink wink comments that he was making to you,

9    and I'm going to show you prosecution Exhibit 36 -- I'm

09:25:58 10    sorry -- Prosecution 20, Government's Exhibit 20,

11    Page 36.

12         And specifically, and I've taken the

13    liberty of highlighting it, you can see where I have

14    "Wink wink" highlighted?

09:26:14 15    A.    Yes, sir.

16    Q.    Here and down here.

17         What were your concerns with that?

18    A.    Honestly, I was a bit confused about the

19    conversation.  I didn't know what exactly the wink wink

09:26:25 20    meant, and that's why I requested the phone call, to

21    understand what was being said because it was different

22    from all of the other communications that we had had

23    previous to this conversation.

24    Q.    Right.  And he, as I have highlighted here, he has

09:26:45 25    some comments here about, "Let's be 100% clear, you told

193

1    me yesterday you have 0% interest in a sexual thing

2    between me and you?"  And then you have before and after

3    that the wink wink and wink wink.

4              And your testimony yesterday on direct

09:27:02 5    examination was that you considered that to be sarcasm?

6    A.    That is correct, sir.

7    Q.    A sarcastic statement.

8              In what respect did you consider that to be

9    sarcastic?

09:27:14 10   A.    As far as the second one you have highlighted where

11   it says, "And let's be 100% clear, you told me yesterday

12   you have a 0% interest in a sexual thing between me and

13   you," I took that as to be sarcastic.

14             He -- he was thinking that I had an

09:27:38 15   interest, a sexual interest in him, and that's why he

16   said, "You have a 0% interest in a sexual thing, wink

17   wink," meaning the opposite.

18             And I told him, "Right now, correct" in

19   regards to having a 0% interest in a sexual thing between

09:27:59 20   him and myself.

21   Q.    And what do you mean by "Right now"?

22             In other words, you're saying again "Right

23   now" meaning you were pretty much indicating to him,

24   "Well, if you do what I'm asking you to do with Katie,

09:28:15 25   there could be some sexual interest down the road," is

1    what you're basically saying to him, correct?

2    A.    That's incorrect, sir.

3    Q.    That's incorrect?

4    A.    That's incorrect.

09:28:22  5    Q.    Are you testifying that you were not leading him

6    throughout all these chat conversations that basically

7    the goal right now is, "Listen, you need to link up with

8    Katie, then there can be some sexual activity with us

9    down the road"?

09:28:37 10              Are you denying that?

11    A.    What I'm saying, sir, is --

12    Q.    Please answer my question.

13              Are you denying that?

14    A.    I am denying that.

09:28:42 15    Q.    Okay.  So you're denying under oath that you did

16    not lead this man to believe that if he did not meet your

17    immediate goal of engaging in this breeding of Katie,

18    that you would potentially engage in sexual activity with

19    him down the road?

09:28:56 20              You deny that under oath, correct?

21    A.    Yes, I do, sir.

22    Q.    Okay.  Showing you now Page 37 of Prosecution

23    Exhibit 20, and again this is just a continuation of the

24    page we just saw, he's continuing now "Cause you're a

09:29:17 25    good girl that likes to make a guy wait for a long time

1    and I get and respect your virgin values.  Get it?

2    Ha-ha.  Yes."

3                Now, in fact, here what you're doing is

4    you're just kind of -- you're kind of goading him, you're

09:29:31 5   kind of playing along with him basically indicating,

6    "Hey, right now it's Katie, but down the road there could

7    be something going on between you and me," that's

8    basically what you're saying to him, aren't you?

9    A.    That's incorrect, sir.

09:29:44 10  Q.    That's -- okay.  You deny that?

11   A.    I do deny that.

12   Q.    All right.  And he's telling you right here that,

13   "Cause all that talk before was just fantasy talk, at

14   least on my end.  How about you?"

09:29:54 15              And then he gives you the wink wink, okay,

16   because this is what he needs to say to keep this

17   scenario going between you and him, correct, or else

18   you're going to cut him off, correct?

19   A.    That's incorrect, sir.

09:30:10 20  Q.    That's incorrect.

21              Then he keeps on going down at the bottom

22   here and says, "I thought you were serious about all that

23   stuff before" and we got another "Wink wink."

24              So I mean, as an investigator, you know

09:30:33 25  because of all your training with your experience of

1    what -- how much experience you got here, two months'

2    experience as an investigator in these types of cases,

3    two months?

4    A.    Yes, sir.

09:30:43  5    Q.    Okay.  Two months' investigating experience in

6    working these types of cases and you know, you're

7    concerned enough to know this guy really wants you, he

8    wants to have sex with you, correct?

9               You know that, correct?

09:30:57 10    A.    I wasn't sure completely at that time what his

11   intention was.

12   Q.    Okay.  But you certainly had that concern in your

13   mind, correct?

14   A.    Correct, sir.

09:31:06 15   Q.    Do you go to talk to your supervisor at this point

16   and say, "Hey, boss, I have a major problem on my hands

17   here, I need to shut this thing down"?

18   A.    No, sir.

19   Q.    You don't?  Okay.

09:31:17 20            But you have enough of concern, because the

21   prosecutor asked you about this, that you feel you need

22   to give him this option out at this point, correct?

23            Because on Page 40, this is what the

24   prosecutor was talking to you about, again I'm showing

09:31:34 25   you Government's Exhibit 20, Page 40.

1           This is exactly what the government was

2    talking to you about because he continues, "I want to be

3    with you so bad."

4           He's making it very clear to you,

09:31:46  5    Investigator Helmick, he wants to be with you, correct?

6    A.    That is correct, sir.

7    Q.    So right there now black and white he's making it

8    very clear his interest is you, correct?

9    A.    At this point he --

09:32:02 10    Q.    At this point.  Okay.  "You're just super amazing,

11    I don't want to lose you," correct?

12    A.    That is correct, sir.

13    Q.    Now, here with your investigative knowledge and

14    experience of how long?  Two months?

09:32:20 15    A.    That's correct, sir.

16    Q.    Okay.  You come back and you realize you have a

17    major issue on your hands, Investigator, and you say, "I

18    think I've clouded your wants and desires.  I pushed

19    Katie on you and I'm sorry for that.  You said all that

09:32:32 20    stuff you were gonna do with her, but I don't."

21           All right.  And you continue, "I think

22    you're into me."

23           Investigator, you know what, with two

24    months' experience, you hit that right on the head,

09:32:43 25    didn't you?

```
 1    A.    Yes, I did, sir.

 2    Q.    Okay.  And you just said whatever you thought I

 3    wanted to hear and you said with two months' experience,

 4    Investigator, you hit that right on the head, didn't you?

 5    A.    Yes, I did, sir.

 6    Q.    Okay.  So as the prosecutor indicated, now you know

 7    you need to give this man the option out, correct?

 8    A.    That is correct, sir.

 9    Q.    And at this particular point, you realize, don't

10    you, it's time to shut this thing down, correct?

11    A.    I gave him an out.

12    Q.    You gave him the out.

13          Did you go to your boss and say, "Hey,

14    boss, I got a problem"?

15    A.    No, sir, I did not.

16    Q.    No.  Now, with two months' worth of experience, did

17    you not think that -- well, first of all, had you ever

18    experienced this situation in your two months' worth of

19    law enforcement experience, had you ever encountered this

20    situation before?

21    A.    Yes, sir, I had.

22    Q.    This exact situation?

23    A.    Yes, sir, I had.

24    Q.    All right.  Did you go to your boss at that time

25    and ask your boss the situation?
```

1    A.    I turn in my chats on a daily basis so my boss can

2    review the chats.

3    Q.    Okay.  So you're telling me under oath that on the

4    day you received this chat, you showed this chat to your

09:33:55  5    boss, is that correct?

6    A.    Yes, sir, it is.

7    Q.    Okay.  So you and your boss reviewed this chat when

8    it happened?

9    A.    We did not review it together.

09:34:03 10    Q.    You did not review it together.

11                 So how do you know your boss saw this and

12    actually evaluated this situation?

13    A.    The protocol in my department is to submit my chats

14    for review, and if there is an issue, my boss would talk

09:34:20 15    to me about it.

16    Q.    Okay.

17    A.    If there's not, it -- it --

18    Q.    So you're telling this jury that the manner that

19    your office operated was your boss -- that you of two

09:34:32 20    months' worth of experience make decisions as to whether

21    to turn this thing down or not, turn this thing off or

22    not, turn this federal investigation off or not with two

23    months' worth of experience?

24                 Your boss lets you make that decision?

09:34:46 25    A.    There's other investigators in the office.

1    Q.    Okay.

2    A.    And --

3    Q.    So other investigators reviewed this chat?

4    A.    We talk about our cases in the office.

09:34:53 5    Q.    Okay.  Tell me the names of the other investigators

6    you specifically discussed this page of this chat with at

7    this time.

8    A.    I do not remember, sir.

9    Q.    Well, okay, ma'am, you're under oath.

09:35:02 10          Did you discuss this chat, this page, with

11   these other investigators, yes or no?

12   A.    I -- I don't know.

13   Q.    Okay.  Well, I mean, you were so concerned with

14   this because you knew you had a major problem.  I mean,

09:35:19 15   this is a major situation you've got here.  Okay?

16          Did you or did you not discuss this with

17   other investigators, yes or no?

18   A.    I don't know, sir.

19   Q.    You don't know.

09:35:28 20          All right.  Then why did you bother telling

21   us there's other investigators in the office?

22   A.    Because --

23   Q.    What was the purpose of that?

24   A.    It's the general practice when we are chatting, we

09:35:38 25   talk about our cases in general.

1    Q.    Okay.

2    A.    I don't know if specifically in this case I talked

3    about this particular chat.

4    Q.    Okay.  So you're in this -- you're in this trial,

5    you're telling us what the general practices are, that

6    you discuss your cases in general, you bring that up in

7    front of this jury, but now you're telling us you can't

8    tell us whether or not you did that, correct?

9    A.    I don't know if I did in this case, sir.

10    Q.    Pardon me?

11    A.    I don't know if I did in this case.

12    Q.    Okay.  Now, you say you've run into this exact

13    situation with another one of the people involved with

14    this exact scenario involving you and Katie, so this

15    would be one of the other daddies that you referred to in

16    the chats with Mr. Vickers?

17    A.    That is correct, sir.

18    Q.    That's correct.  Okay.

19          So you go on with Mr. Vickers here and you

20    tell him, which is exactly right on point again, that you

21    are the one who suggested the breeding of Katie, not him,

22    correct?

23          You're the one who put this idea in his

24    mind; he didn't certainly raise this, correct?

25    A.    I mentioned breeding based off of the interest on

1   his profile when we first met.

2   Q.    Okay.  Ma'am, answer my question.

3              You were the one who suggested the breeding

4   of Katie; not him, correct?

09:37:01 5   A.    Correct.

6   Q.    And his response was, "I would do that if you

7   want," correct?

8   A.    That's correct, sir.

9   Q.    Okay.  Now, as you testified to the prosecution,

09:37:23 10  you said that you gave him this option out at that

11  particular point.

12             Now, on direct examination, I never heard

13  anything else about giving him any options out; that this

14  was the only one that he apparently at that point just

09:37:38 15  never indicated you never gave him any other options out.

16  He never indicated any other hesitations at all.

17             You never testified about that on direct

18  examination, did you?

19  A.    I did not testify about that.

09:37:49 20  Q.    Right.  Okay.  So without cross-examination, the

21  jury would have the belief that there was never any other

22  reservations by Mr. Vickers, correct?

23             That's simply not the case, is it?

24  A.    I gave him several other outs.

09:38:03 25  Q.    Well, I know you did, but we didn't hear about that

1    on direct examination, did we?

2    A.    That's correct, sir, we did not.

3    Q.    Okay.  All right.  Because when we go to Page 46,

4    obviously there's again Exhibit 20, there's some

5    discussions on Page 46 about him coming up there or not,

6    and there's discussions where you're saying, "It's on you

7    whether you come or not.  I just want to be clear that

8    you're coming and it's not for me or the things I pushed

9    on you."

10         Okay.  So again there's -- again there's

11   more discussion involving the -- and again the jury is

12   going to get this entire package and I'm not going to go

13   over and do what we saw yesterday and go page-by-page or

14   line-by-line on this thing -- but right here we have

15   discussions that you're raising a concern again, you

16   again have a concern that what's going on here after you

17   had that option out that you gave him six pages ago, that

18   he still is leading you to be concerned that he's talking

19   about coming up for you and not for Katie, correct?

20   A.    That's correct, sir.

21   Q.    Okay.  So even though you satisfy your concern six

22   pages ago, ah, things are still out there as an

23   investigator, you know, something's not right here, this

24   guy's interested in you; not Katie.  Correct?

25   A.    At this point, yes.

204

Q.    Okay.  But yet you just keep on chugging along with this investigation, don't you?

Do you go to your boss and say, "Hey, boss, you know, I tried this the other day and it just keeps on going here"?

A.    Your client kept --

Q.    Pardon me?

A.    Your client kept chatting and so I continued to chat.

Q.    Right.  You just keep on going even though you're still concerned he's more interested in you than Katie, correct?

A.    Yeah, I kept the investigation going, yes, sir.

Q.    All right.  Now, again we talk about your goal as an investigator is not to try to entice this man to be sexually interested in you, correct?

So when he's asking for pictures of you, you have control over what pictures you send to him, correct?

A.    That's correct, sir.

Q.    Okay.  You certainly don't have to send him sexually provocative pictures at all, do you?

A.    I don't have to, no.

Q.    No.  You decide what pictures you send him, correct?

1                     Correct?

2    A.    I send pictures based off of requests.

3    Q.    Okay.  You decide what pictures to send him,

4    correct?

09:41:00  5    A.    That's correct, sir.

6    Q.    Okay.  So you decide to send him that picture,

7    correct?

8    A.    Yes, sir.

9    Q.    Show you Government's Exhibit 9, Page 8, okay.

09:41:11 10              Do you consider that to be a sexually

11    provocative picture?

12    A.    No, sir.

13    Q.    You don't.  Okay.  All right.  And you made

14    reference, that's a picture of you, correct?

09:41:20 15    A.    That's correct, sir.

16    Q.    That you took of yourself when?

17    A.    It would have been the summer -- sometime in the

18    summer of 2014 while I was camping.

19    Q.    Okay.  Now, although you may not consider that a

09:41:35 20    sexually provocative picture, did you get a response from

21    Mr. Vickers that you would consider, whew, he may be

22    sexually provoked by that?

23    A.    I don't remember what he said, if you can move that

24    up.

09:41:49 25    Q.    Does that refresh your recollection a little bit?

```
 1         A.     Yes.

 2         Q.     Okay.  Does that indicate he may be sexually

 3    provoked by that?  "Wow, you're hot."

 4         A.     He stated that I was attractive.

09:41:59 5   Q.     Okay.  Right.  So that indicates that he feels

 6    you're attractive, correct?

 7         A.     That's correct, sir.

 8         Q.     Now, when you see that and you start seeing these

 9    assorted responses that we've talked about, and again

09:42:12 10   we're not going to go through them all, but you see these

11    assorted responses and the jury is going to have the

12    option of going through this, you very clearly and based

13    upon your responses of cross-examination and so forth,

14    you see this man has the hots for you, correct?

09:42:26 15   A.     Correct.

16         Q.     Okay.  And when he asked for an additional picture

17    of you, the jury has seen this in my opening statement,

18    Government Exhibit 9, Page 24, some guys may think that's

19    pretty sexually provocative, too, and obviously

09:42:51 20   Mr. Vickers certainly thinks that is, "Oh, my God, you're

21    hot," correct?

22         A.     He did say that, yes.

23         Q.     Okay.  And then I understand he asked you for a

24    picture of you in your, what, your underwear?

09:43:06 25   A.     My bra and underwear.
```

Q.    Okay.  Now, at some particular point, you're a law
enforcement officer, you have to draw the line, correct?

          Correct?  As to what you're giving the man?

A.    I don't understand what you're asking.

Q.    You're not going to send him a picture of your bra
and underwear, correct?

A.    I am allowed to do that, yes, sir.

Q.    You are allowed to do that.

          Now, why from a law enforcement
perspective, if the goal here is to get a person, a
suspect, a target interested in a child, to see if he's
going to be enticing a child, why is the government using
or trying to use sexy attractive mother photographs?

          What's the purpose of that?

          Why not take a photograph of a law
enforcement officer dressed like you're dressed right
now?  Why go to the extent of using pictures that are in
any manner sexy or provocative?  Why do anything other
than that?

A.    It's, if I sent a picture of myself dressed like
this, and talked in a certain manner, right away somebody
would say that, "Oh, you're a law enforcement officer."

Q.    Okay.  So but you feel it's necessary to send him
something like this, and I'm showing you now Defendant's
Exhibit Alpha, correct?

1    A.    What was the question, sir?

2    Q.    So what you feel is necessary to satisfy his

3    desires, so to speak, is to send him Defendant's Exhibit

4    Alpha, correct?

09:44:46 5    A.    I sent this after the request, also to make sure to

6    convey that I was a real person because there was a

7    question about whether or not I was even a female.

8                There was discussion about "I thought you

9    were a male, you know, you're not real."

09:45:05 10   Q.    Okay.  So you want to send this to show him that

11   you're not a male?

12   A.    And after the request, yes.

13   Q.    Okay.  And do you think that he might be sexually

14   attracted to this photograph?

09:45:18 15   A.    I'm not sure.

16   Q.    You're not sure?

17   A.    I'm not sure.

18   Q.    Is that your answer?  Your answer is that you don't

19   think he's going to be sexually attracted to this

09:45:27 20   photograph?

21                THE COURT:  She can't answer for him so

22   that's her answer.

23                MR. GREG McCORMACK:  Yes, sir.

24   BY MR. GREG McCORMACK:

09:45:37 25   Q.    You know for a fact from his responses throughout

1    the entire chat conversations that he was, in fact,

2    sexually attracted to this photograph, correct?

3    A.    To this photograph?

4    Q.    Yes.

09:45:48  5    A.    I don't remember if there was a response after this

6    photograph.

7    Q.    All right.  The jury will have that picture, okay?

8              Throughout the entire scope of the

9    communication between you and Mr. Vickers, he referred to

09:46:07  10    you on numerous occasions as being sexy or attractive,

11    correct?

12    A.    I'm not sure what you're referring to, like the

13    wording or --

14    Q.    All right.  Ma'am, with regards to the wording, he

09:46:21  15    referred on numerous occasions to being sexually

16    attracted to you, did he not?

17    A.    As we saw previously, he said, "Oh, my God, you're

18    hot."

19    Q.    Okay.

09:46:31  20    A.    So if you --

21    Q.    Again, regards to wording, he referred on numerous

22    occasions to being sexually attracted to you, correct?

23    A.    I don't know, sir.

24    Q.    You don't know.  He, on numerous occasions,

09:46:42  25    referred to wanting to be sexually involved with you,

1    correct?

2    A.    I don't -- I'm very sorry, I don't know what you're

3    referring to.

4    Q.    Okay.  So your recollection now is, and I'm sure

09:47:02 5    you reviewed these chats before you testified here,

6    correct?

7    A.    That is correct, sir.

8    Q.    So your testimony now, after reviewing these chats

9    and I'm sure with the prosecutor and reviewing them in

09:47:14 10    your own personal time, is you're not willing to admit

11    that throughout these conversations with Mr. Vickers,

12    that he was sexually attracted to you?

13                    Is that your testimony under oath?

14                    MR. McDONOUGH:  Objection.

09:47:30 15                    THE COURT:  Here's the question.

16                    Do you believe he was sexually attracted to

17    you?

18                    THE WITNESS:  I do believe he was attracted

19    to my appearance.

09:47:42 20    BY MR. GREG McCORMACK:

21    Q.    All right.  Do you believe that Mr. Vickers wanted

22    to engage in sexual relations with you based upon the

23    communications that you had received from him in these

24    assorted chat conversations and the communications you

09:47:58 25    had received from him?

1    A.    I do not believe in the actual act of sex.

2    Possibly being undressed and involved in a capacity as

3    being a spectator or helping, but not in the actual act

4    of sex.

09:48:16 5    Q.    Okay.  So what you want this jury to take back into

6    deliberations is that you don't believe that Mr. Vickers

7    was interested in engaging in sexual activity with you?

8    That's what you want this jury to believe

9    and take into deliberations, correct?

09:48:30 10    A.    Based off of the chats that we had, I --

11    Q.    Okay.  That's fine.

12    That's fair with me.

13    Now, you also at some point sent

14    Mr. Vickers pictures of Katie, correct?

09:48:46 15    A.    That's correct, sir.

16    Q.    Showing you Defendant's Exhibit B.  Okay.  That I

17    understand is a photograph actually of yourself, correct?

18    A.    That is correct, sir.

19    Q.    And that photograph is a photograph of you when you

09:49:02 20    were how old?

21    A.    I couldn't give you the exact age.

22    Q.    Approximately.  I understand that.

23    A.    Approximately between 12 and 14.  It's a school

24    picture.

09:49:10 25    Q.    All right.  Do you know how many pictures you sent

```
 1    of Katie to Mr. Vickers?
 2    A.    I would say three to four.
 3    Q.    Okay.  I believe it's a total of three.  Let me
 4    just show you the ones that I have received.
 5              I'm going to show you Defense Exhibit C,
 6    Charlie.
 7              Is that a picture of you?
 8    A.    Yes, it is, sir.
 9    Q.    Okay.  And what is that a picture of?
10              You will obviously tell us when that
11    picture was taken, approximately; I understand that.
12    A.    I would say approximately between the ages of 12
13    and 14.
14              I was in The Nutcracker.  I used to do
15    ballet, and it was a professional picture for The
16    Nutcracker.
17    Q.    Okay.  And tell me approximately what year that
18    photograph approximately would have been taken.
19    A.    I would have been between the ages of 12 and 14.
20    Q.    Okay.  Which would have been approximately what
21    year?
22    A.    I'm trying to do math now.
23              I'm 33 years old.  I can't give you the
24    year off the top of my head.
25    Q.    So approximately 19 years ago?
```

1    A.    I would say approximately 19 years ago.

2    Q.    Okay.  And I only have one other photograph, so and

3    this is Defendant's Exhibit Delta.

4              Did you send that photograph?

09:50:45  5    A.    Yes, I did.

6    Q.    Okay.  And what is that a photograph of?

7    A.    Again I was approximately between the ages of 12

8    and 14.  I used to roller skate and compete, and this was

9    a skating competition where I won a trophy for my skating

09:51:03 10   routine.

11   Q.    Okay.  And did you intentionally crop the head off

12   of that photograph?

13   A.    I believe when it was sent, the view here it looks

14   cropped, but if you, like, click on the picture, the

09:51:16 15   entire picture would be shown and you would see my face.

16   Q.    All right.  Now, if you bear with me, I'm going to

17   go through some additional pages that were sent just to

18   go over things where he was asking about getting some

19   additional pictures of information about Katie and you,

09:51:41 20   and then also indicating interest in you.

21              We're just going to do that very briefly.

22   Won't take too much time.

23              I'm going to show you Government Exhibit

24   20, Page 53.  All right.  And in this particular page,

09:51:59 25   this is where you're indicating at this particular point

1    that again you're talking about obviously there was

2    discussions here about him coming up, and then I mean

3    there were several occasions where he discussed coming up

4    to see you, correct?

09:52:18  5    A.    That is correct, sir.

6    Q.    And this is one time where apparently he pulled out

7    and decided not to come up and you're making reference

8    that "I figured.  You're just like the other guys.  I

9    didn't want to get my hopes up again."

09:52:32 10          All right.  So here's the situation where

11    he indicated that, you know, he's really, you know, he's

12    not going to come up and so you're kind of -- I mean,

13    you're in effect goading him a little bit here, "Well,

14    you're not going to come up, you're just like the other

09:52:48 15    guys."

16          You're kind of goading him, are you not?

17    A.    I would not agree with that statement.

18    Q.    Okay.  That's fine.  All right.  And he's indicated

19    here, he's questioning about whether or not you were

09:53:02 20    real, and then I guess maybe you would say here you're

21    kind of telling him good luck to you at that point.

22          But again on Page 53, you're making once

23    again the comment about you put these ideas in his head.

24    "I feel you get attached to me.  I would say you do

09:53:22 25    things with Katie that you really didn't want to do and

1    that's why I pulled away, I want you to be honest with

2    yourself and me."

3                And on Page 77, he's telling you that he

4    wants to see pics of you guys together so again he's

5    questioning the veracity, you know, whether you two are

6    actually real or Katie is actually real.

7                He's asking again "Can you send a picture

8    of the two of you together?"  Common theme throughout,

9    he's asking for verification that Katie is a real person,

10   correct?

11   A.    Correct.

12   Q.    All right.  And this is interesting, Page 82.  This

13   is one I had in my PowerPoint at opening where he's

14   telling you that he had second thoughts and he didn't

15   think he could morally do this, so he's basically telling

16   you, you know, "I'm cutting this thing off, you know,

17   I'm" -- he is cutting this thing off, and he's telling

18   you, "I think I was trying to get with you more than

19   anything, but the more I wrap my brain around it I was

20   saying and doing things that weren't true to myself.  I

21   was just trying to impress you instead.  Most of the

22   things I said weren't true after all."

23                And your response as an investigator with

24   two months of experience, "I knew you were like the last

25   guy.  You're an asshole."

1          Okay.  So does that fit within your

2     protocol?

3          The target is telling you, "I'm done, you

4     know, I can't do what you want me to do," this Traci, who

09:55:14  5     is actually an investigator with two months' worth of

6     experience, "I'm done with this," and your response is,

7     "Awesome.  I knew you were like the last guy.  You're an

8     asshole," Mr. Vickers.

9          So tell me, is that within your training

09:55:28 10     protocol?  Is it?

11     A.    Is what in my training protocol?

12     Q.    Is that within your training protocol?  The target

13     tells you, "I'm done, I can't do what you want me to do

14     with this kid, with Katie, who I don't even think is

09:55:43 15     real, I'm done with this, Ms. Investigator or Traci or

16     whoever you are, I'm done," so I'm asking you was that

17     within your training protocol to say, "I knew you were

18     like the last guy.  You're an asshole."

19     A.    It was within a normal conversation between two

09:56:03 20     people.  It was just a continuation and a reaction of a

21     statement that was made.

22     Q.    Well, aren't you, in fact, trying to goad him into

23     continuing this?

24     A.    No, sir.

09:56:14 25     Q.    So you're not?  You deny that you were trying to

1    goad him into continuing this?

2              He's telling you he's done, I mean is that

3    very clear here?

4    A.    Yes, sir.

09:56:23 5    Q.    Okay.  So you agree on Page 82, your target is

6    telling you he's done with you and Katie, correct?

7    A.    Correct.

8    Q.    Okay.  And then you don't let that go and you now

9    are calling him an asshole, do you agree, correct?

09:56:41 10    A.    I did call him an asshole.

11    Q.    Okay.  And do you agree you're trying to goad him

12    into continuing?

13    A.    I was not goading him to continuing.

14    Q.    Okay.  So do you agree if you said, "Fine, goodbye,

09:56:54 15    I agree, we're done," it would be over, we would not be

16    here?

17              Do you agree with that?

18    A.    I did end it many times.

19    Q.    Okay.  Do you agree if when he, after he said what

09:57:09 20    he said in this paragraph right here, if you said

21    "Goodbye," we would not be here, do you agree with that?

22    A.    My statement where I said, "Awesome, I knew you

23    were like the last guy, you're an asshole," was a final

24    statement --

09:57:28 25    Q.    Okay.

1    A.    -- on my part.

2    Q.    Okay.  Can you please answer my question?

3          Okay.  You testified that he was telling

4    you he was done with you, correct?

09:57:39 5    A.    Correct.

6    Q.    Okay.  If you said nothing in response except

7    "Goodbye," do you agree, Investigator Helmick, we would

8    not be here today?

9    A.    I can't answer that.  I don't know.

09:57:53 10    Q.    If you did not respond, okay, and there was no

11   further communications, do you agree we would not be here

12   today?

13          THE COURT:  She can't answer, she said.  It

14   would be speculation.

09:58:04 15          MR. GREG McCORMACK:  Yes, Your Honor.

16          THE COURT:  Your objection, Mr. McDonough,

17   is sustained.

18          MR. McDONOUGH:  Yes.

19   BY MR. GREG McCORMACK:

09:58:10 20   Q.    All right.  Now, it doesn't stop there because we

21   go to the next page and here's what we talked about

22   before, because you go on and you say, "You're jacking me

23   around and I don't appreciate it.  I'll send the picture

24   and you won't come.  You've just been fantasizing and

09:58:43 25   jacking off this whole time, haven't you?  But when it

1    comes time to follow through, you're a big pussy."

2             All right.  Now, this whole Experience

3    Project, I mean, we've talked about that briefly, you

4    talked about it.

09:59:00   5             I mean, part of that's I mean it's

6    experiencing, it's people's experience, part of it can be

7    role playing, actual, fantasizing; we just don't know,

8    correct?

9    A.    Correct.  I don't know.

09:59:13  10   Q.    Okay.  And here he's -- you are specifically

11   saying, "You've just been fantasizing and jacking off,"

12   but then you called him an asshole isn't enough for you,

13   then you turn around and tell him, "You're a big pussy,"

14   correct?

09:59:33  15   A.    Correct, sir.

16   Q.    Okay.  And again I'm sure you're not going to say

17   you're not goading him to try to come back, actually

18   you're not goading him to come back into this, are you?

19   A.    That's correct, sir.  This was another final

09:59:46  20   statement.

21   Q.    "And you keep calling me names and you'll get me

22   there."

23             You see the additional comments.

24             Then it continues.  Again he expresses

10:00:29  25   doubt as to who he's dealing with as to whether Katie is

1    real.  It says, "I've never seen the pictures of the two

2    of you together.  I've never talked to her on the phone."

3                 MR. GREG McCORMACK:  That's on Page 104,

4    I'm sorry, Your Honor, of Government Exhibit 20.

10:00:56  5    Q.   Page 105, Government Exhibit 20, he's -- again he's

6    asked for one simple recent picture of the two of you

7    together.

8                 Again one pic of the two of you guys

9    together.

10:01:11 10                 He's saying, "You two guys are similar

11    facial features.  I just want to see you side by side."

12    And he just continues page after page of basically saying

13    "I don't think Katie's a real person."

14                 Page 108, Government's Exhibit 20, "Can I

10:01:33 15    get a pic of the two of you together?"  Page 109, "Can I

16    get a pic of you guys?"

17                 Page 110, when he's supposedly talking to

18    Katie, this is on the way up there supposedly, "Can I get

19    a pic of you and mom?  Can I get a pix?"

10:02:13 20                 Now, when you're talking to him, and again

21    I'm not going to go through all these pages, at some

22    point in these chats he talked to you about the fact he

23    recently lost his mom to Alzheimer's, correct?

24    A.   I'm sorry, I couldn't hear you.

10:02:26 25    Q.   Pardon me?

221

```
         1    A.     I couldn't hear what you said.
         2    Q.     I'm sorry.  At some point he talks to you about the
         3    fact he recently lost his mom to Alzheimer's in 2013,
         4    correct?
10:02:38 5    A.     He did state that.
         6    Q.     And she's been sick for a while, and he was very
         7    close to his dad, correct?
         8    A.     He did say that.
         9    Q.     He was married and his marriage is on the rocks.
10:02:48 10   He was having employment issues, correct?
        11    A.     He did not mention a marriage.
        12    Q.     Did not mention a marriage?  He did not indicate he
        13    had two kids?
        14    A.     No, he did not, sir.
10:02:57 15   Q.     Okay.  He talked about being suicidal at some
        16    point, you know, having some real suicidal issues,
        17    correct?
        18    A.     He did.
        19    Q.     There was discussion about Motherless, Inc. or the
10:03:16 20   Motherless.com website?
        21    A.     That's correct, sir.
        22    Q.     And during the course of that discussion, first
        23    off, what was Motherless?
        24                    You brought up the Motherless.com.  What
10:03:33 25   was that?
```

1      A.      What is Motherless.com?

2      Q.      Yes.  Right.  I mean, you brought that up.

3      A.      Motherless.com is a social media site where users

4      can make profiles very similar to Facebook, have friends,

10:03:52  5   join groups, upload videos, pictures, and it is

6      pornographic in nature.

7      Q.      Okay.  And he, during the course of that

8      discussion, he was asking you about did it have kids

9      involved, and you indicated to the effect either you

10:04:11  10  thought there were kids, because he asked you were the

11     kids doing stuff to each other or stuff.

12             I mean, had you seen that or not?

13     A.      No, I've never seen any child pornography on

14     Motherless.

10:04:22  15  Q.      Okay.  You provided him the link to Motherless.com,

16     correct?

17     A.      I don't know, sir.  I don't believe I provided a

18     link to Motherless.com.

19     Q.      All right.  Now, who -- there was discussion about

10:04:44  20  him getting panties for Katie.

21             That was your suggestion as far as him

22     getting panties for Katie, correct?

23     A.      Correct, sir.

24     Q.      All right.  When the car was searched, there were

10:04:55  25  no panties in the vehicle, correct?

           1    A.    No, there was not, sir.

           2              MR. GREG McCORMACK:  One second, Your

           3    Honor, please.

           4              One second, Your Honor, please.

10:05:56   5              THE COURT:  Sure.

           6              (Pause).

           7              MR. GREG McCORMACK:  Your Honor, may I have

           8    a side-bar?

           9              THE COURT:  Yes.

10:07:17  10              (Proceedings at side-bar:)

          11              MR. GREG McCORMACK:  Could we have a break

          12    at this point?  I just want to make sure I get everything

          13    before I finish up.

          14              THE COURT:  Okay.  How much longer do you

10:07:33  15    have, Greg?

          16              MR. GREG McCORMACK:  I'm just about done.

          17    I just want to make sure I get everything.

          18              THE COURT:  How much?

          19              MR. GREG McCORMACK:  A 15-minute break.

10:07:40  20              THE COURT:  You have about how long after

          21    that?

          22              MR. GREG McCORMACK:  Literally I think I'm

          23    done.  I just want to make sure I don't miss anything.

          24              THE COURT:  We can wait.  If you want to go

10:07:49  25    over that, we can wait.

224

1          MR. GREG McCORMACK:  I'd rather take a
2     break so I'm not doing it in front of the jury.
3          THE COURT:  Okay.  That's fine.  Let's take
4     a 15-minute break.
10:07:58  5          MR. FILIATRAUT:  I'll check to see if the
6     next witness is here just to keep things rolling.  He
7     should be here.
8          THE COURT:  Sure.  You can check.
9          Brian, you have some redirect?
10:08:07  10          MR. McDONOUGH:  Yes.
11          THE COURT:  About how long, roughly?  15,
12     20?
13          MR. McDONOUGH:  Yes, 15, 20.
14          THE COURT:  We'll see if there's any
10:08:14  15     questions after that, after redirect.
16          Okay.  We'll take a break.
17          (End of side-bar conference).
18          THE COURT:  Ladies and gentlemen, let's
19     take our 15-minute break at this point.
10:08:21  20          (Recess taken).
21          THE COURT:  Please be seated, ladies and
22     gentlemen.
23          When you're ready, Mr. McCormack.
24          MR. GREG McCORMACK:  Thank you, Your Honor.
10:30:45  25

BY MR. GREG McCORMACK:

Q.    Now, Investigator Helmick, just a few more
questions, if I could, please?

What was the ultimate goal in this
investigation?

A.    Well, the ultimate goal in any of my investigations
is to --

Q.    Not any investigation.  In this investigation.

A.    In this investigation was to have a conversation
with an individual, in this case your client, and to see
if -- what they're interested in, what he was interested
in, and what his intentions were.

Q.    All right.  Now, you had an opportunity to discuss
an ultimate goal with Mr. Vickers at some point, didn't
you?

A.    In what way, sir?

Q.    Well, I mean, let's just look at it.  I'm going to
Exhibit 20, Page 31.

You specifically, when he was discussing
with you the fact that you never answered any of his sex
questions, at some particular point you told him that you
did not want to cloud the ultimate goal here.

What were you talking about?

A.    In previous conversations we had talked about him
having a relationship with my 13-year-old daughter Katie.

1    Q.    Right.

2    A.    And there was talk about impregnating her and

3    having a long-term arrangement or relationship.

4    Q.    Right.  And what, what this conversation to that

10:32:23  5    point was, he asked you what your favorite sexual

6    position was, correct?

7    A.    Yes, he did.

8    Q.    And then when apparently you didn't respond, he

9    said, "LOL, I notice you don't answer my sex questions."

10:32:39 10          And your response was "Well, what's the

11    point?"

12          Correct?

13    A.    That's correct, sir.

14    Q.    Now, you testified that you don't believe from all

10:32:48 15    these chat conversations that Mr. Vickers indicated he

16    wanted to have sexual relations with you.

17          That's your testimony, correct?

18    A.    I stated that I did not think it was the sex act

19    itself.  I thought it was me being involved in some

10:33:06 20    capacity.

21    Q.    Right.  Okay.  So that's your testimony, we're on

22    record of that, and so also you've reviewed these text

23    messages numerous times.

24          But he says "Why not?  I thought this might

10:33:24 25    be a mutual thing?"   Correct?

```
 1    A.    Yes, he did.

 2    Q.    And you respond, "Eventually, but not right now."

 3          Correct?

 4    A.    Correct.

 5    Q.    And then you respond again, "It's all about Katie

 6    this first time."

 7          And then he eventually says, "Sorry, I just

 8    got so into you."

 9          Correct?

10    A.    Correct.

11    Q.    And again, you immediately respond back, "Well, I

12    don't want to cloud the ultimate goal here at this

13    moment."

14          Correct?

15    A.    Correct.

16    Q.    So here you've got the target who is clearly

17    focusing on Katie -- not on Katie, on you, I'm sorry,

18    correct?

19    A.    Correct.

20    Q.    And you're saying, "Whoa, whoa, wait a minute.  The

21    ultimate goal here is Katie," correct?

22    A.    Correct.

23    Q.    So you have this target focused on you and you're

24    trying to get him back on goal here is Katie, correct?

25    A.    Correct.
```

1    Q.    All right.  And he indicates that he gets

2    sidetracked and he's saying that he's getting emotionally

3    tied to you, correct?

4    A.    Correct.

10:34:25  5    Q.    The conversation continues, this is Page 32, and

6    you say, "I can understand emotionally but not sexually

7    right now."

8              So the sexual aspect of it is discussed

9    between you and him, and you specifically refer to it as

10:34:47 10   not sexual right now, correct?

11    A.    Correct.

12    Q.    So you clearly are indicating, are you not, that if

13    he plays your game now, that sexually between him and you

14    is down the road, correct?

10:34:56 15              You're telling him that in black and white,

16    aren't you?

17    A.    In any relationship that is a possibility.

18    Q.    So -- what?

19    A.    In any relationship in life, that is a possibility

10:35:07 20   in the future.

21    Q.    Okay.  So you do now agree that you're telling him

22    that if he does what you want with Katie, that a sexual

23    relationship him and you down the road is possible,

24    correct?

10:35:18 25              You admit that, correct?

1    A.    It was not pivoted on the relationship.

2    Q.    Ma'am, answer my question.

3              MR. McDONOUGH:  Objection.

4              THE COURT:  No, she has to answer the

10:35:31 5   question is it a possibility or not.

6    A.    Is it a possibility or not?

7              THE COURT:  Based on your conversation with

8    the defendant.

9    A.    Of a future sexual relationship?

10:35:38 10            THE COURT:  Yes.

11             MR. GREG McCORMACK:  Yes.

12   A.    That was talked about.

13   BY MR. GREG McCORMACK:

14   Q.    No, it's not a question being talked about.

10:35:44 15            You were very clearly leading him to

16   believe with your conversations that you and he can

17   engage in sexual activity, sexual relationship down the

18   road if he does what you want him to do with Katie, yes

19   or no?

10:35:55 20  A.    I don't agree with that entire statement.

21   Q.    All right.  Ma'am, do you or do you not agree that

22   you lead him to believe that if he does what you want him

23   to do with Katie, you will engage with him down the road

24   sexually; yes or no?

10:36:12 25  A.    I don't agree with the entire statement.

```
         1    Q.    Okay.  Well, what do you agree with?

         2    A.    I agree with I had conveyed that there was a

         3    possibility of a future sexual --

         4    Q.    Relationship?

10:36:26 5    A.    -- relationship.

         6    Q.    With the target of this offense, if he does what

         7    you want him to do, correct?

         8    A.    Incorrect, sir.

         9    Q.    Pardon me?  Incorrect?

10:36:35 10   A.    I don't agree with the part where you say it's

         11   pivoted on him doing something with my 13-year-old

         12   daughter, and then having a sexual relationship.

         13   Q.    Okay.  What's it pivoting on then, ma'am?

         14   A.    General relationships, after, in general, in life.

10:36:54 15   Q.    In general?

         16   A.    Once you become emotionally connected with

         17   somebody, have a relationship with them in some way,

         18   sometimes that does lead into a sexual relationship at

         19   some time.

10:37:05 20   Q.    This relationship between you and Mr. Vickers was

         21   specifically pivoting on him breeding Katie, yes or no?

         22   A.    I don't know if it would be pivoted on that.

         23   Q.    What else was it related to?

         24   A.    In general, it was a -- there was discussion of an

10:37:29 25   open family relationship, you know, referencing incest
```

1    relationship.

2              That's what our discussions were about in

3    general.

4    Q.    The ultimate goal, as you indicated on the page

10:37:45  5    before, was what?  Him breeding Katie, correct?

6    A.    The ultimate goal, what I meant by those two words,

7    was the relationship with Katie.

8    Q.    What kind of a relationship with Katie?

9    A.    It would be a sexual relationship with Katie.

10:38:05 10    Q.    Right.  So the ultimate goal in your communications

11    with Mr. Vickers was him having a sexual relationship

12    breeding with Katie, is what you wanted him to do,

13    correct?

14    A.    Correct, sir.

10:38:17 15    Q.    And if he did that, you clearly indicated to him

16    that in the future, there might be a sexual relationship

17    with you, correct?

18              Yes or no?

19    A.    I don't agree with that entire statement, sir.

10:38:29 20    Q.    What don't you agree with in that entire statement?

21    A.    I don't agree that if he had sex with my

22    13-year-old daughter Katie, that I would in turn

23    automatically have a sexual relationship with him in the

24    future.

10:38:44 25    Q.    You certainly lead him to believe with this that

```
 1   that could happen, correct?
 2   A.   A sexual relationship in the future may or could
 3   happen.
 4   Q.   If he bred your daughter, correct?
 5   A.   Incorrect, sir.
 6   Q.   Incorrect.  You're just simply not willing to admit
 7   that, are you?
 8              MR. McDONOUGH:  Objection.
 9              THE COURT:  Sustained.
10              MR. GREG McCORMACK:  Yes, Your Honor.
11   BY MR. GREG McCORMACK:
12   Q.   Showing now what's market as Government's Exhibit
13   20, Page 7.
14              He specifically talked to you about the
15   fact that he didn't specifically ever have sex with a
16   grandmother before, correct?
17   A.   Correct.
18   Q.   He indicated to you, "I would have to do you just
19   for that reason," correct?
20   A.   Correct.
21   Q.   And you responded, "Ha-ha," and then he asked "You
22   up for that," correct?
23   A.   Correct.
24   Q.   And you responded "We shall see, LOL."
25              Correct?
```

1    A.    Correct.

2    Q.    Finally, I show you Government Exhibit 20, Page 85.

3              At one point you respond, "I get this was

4    all fantasy for you and you got your rocks off.  You

10:40:20  5    never intended to come.  Could have saved a lot of time

6    if you were honest from day one.  But you're not an

7    honest guy, so I don't know why I expected more from

8    you."

9              Correct?

10:40:29 10   A.    Correct.

11   Q.    You then again -- you respond or you indicate,

12   "You're just a scared little boy.  You can go fuck

13   yourself because Lord knows nobody else will," correct?

14   A.    Correct.

10:40:45 15            MR. GREG McCORMACK:  All right.  Thank you,

16   ma'am.

17              I have no further questions.

18              Thank you, Your Honor.

19              THE COURT:  Thank you, Mr. McCormack.

10:40:53 20              Redirect, Mr. McDonough.

21        REDIRECT EXAMINATION OF MIRANDA HELMICK

22   BY MR. McDONOUGH:

23   Q.    On cross-examination, you were asked about some of

24   the operations and investigations that you have been

10:42:09 25   involved in since you've been on the Ohio Internet Crimes

1     Against Children task force, correct?

2     A.    That is correct.

3     Q.    And you had a number of successful operations

4     before this case?

10:42:21 5     A.    Yes, I have.

6     Q.    You've had successful ones after this case?

7     A.    Yes, I have.

8     Q.    Have you ever had an unsuccessful operation?

9     A.    Many times.

10:42:29 10    Q.    And what occurs in an unsuccessful operation?  What

11    happens?

12    A.    A period of time of chatting, phone calls,

13    pictures, videos sent back and forth, and for whatever

14    reason that person on the other end of the investigation

10:42:49 15    decides that they don't want to follow through in

16    traveling or they cut off communication completely.

17              They might stop e-mailing, they might stop

18    calling, and may disappear for a time.  Sometimes they

19    return back after a certain time, or sometimes they never

10:43:07 20    return back.

21    Q.    Have you had cases where individuals do not

22    distribute child pornography to the 13-year-old profile?

23    A.    Correct.  I've had cases where they do not

24    distribute child pornography to my 13-year-old profile.

10:43:24 25    Q.    Have you had cases where they do not attempt to

1   persuade or entice or ask about having sex with your

2   13-year-old profile?

3   A.   That's correct.

4   Q.   And have you had cases where individuals do not

10:43:37 5   travel across state lines with the intention of engaging

6   in illicit sexual conduct?

7   A.   That's correct.

8   Q.   Okay.  And you indicated that you are not the only

9   investigator for the Ohio Internet Crimes Against

10:43:51 10   Children task force?

11   A.   That is correct.

12   Q.   There are other investigators?

13   A.   Yes, there are.

14   Q.   And you also have a supervisor?

10:43:57 15   A.   That's correct.

16   Q.   And who is your supervisor?

17   A.   David Frattare.

18   Q.   And can you -- on cross-examination, you were asked

19   about various protocols.

10:44:07 20            What are the protocols that govern your

21   conduct and your undercover standards and operations?

22   A.   Through ICAC or Internet Crimes Against Children,

23   we are governed by many rules and policies in regards to

24   how we may chat, what pictures we can send, and where

10:44:34 25   these investigations can take place.

1    Q.    Okay.  You were asked on cross-examination about a

2    photograph that you sent of yourself regarding that was

3    the bra picture?

4    A.    Correct.

10:44:49  5    Q.    Was that picture within the -- within the protocol?

6    A.    Yes, it was.

7    Q.    As an investigator, do you have a latitude

8    regarding the chatting that you have with the target?

9    A.    Yes, we do.

10:45:02 10    Q.    And you indicated that the chats that you have in

11    the case and in this case you had several, correct?

12    A.    Yes, I did.

13    Q.    And on cross-examination, I believe you were asked

14    you have different -- certainly different types of

10:45:17 15    communication involving the Google Voice text messages?

16    A.    Yes.

17    Q.    And in addition, you would also have the KIK

18    communications between the 13-year-old account?

19    A.    Yes.

10:45:31 20    Q.    As well as your account?

21    A.    Yes.

22    Q.    And then obviously the recorded calls as well,

23    correct?

24    A.    Correct.

10:45:37 25    Q.    And as part of the process, does your -- does the

1    Internet Crimes Against Children task force review at

2    some point the evidence in the case before the

3    investigation gets turned over for prosecution?

4    A.    Yes.

5    Q.    And is that done on any kind of traveler case of

6    someone traveling across state lines?

7    A.    It is.  Anytime before a person indicates an

8    interest in traveling, the chats are reviewed or

9    pictures, the various means of communication, they are

10   all reviewed.

11          If a person states that they may be

12   traveling, you know, the next day or anything like that,

13   the chats are re-reviewed.  And then like you said,

14   before prosecution they are reviewed again.

15   Q.    Sure.  You were asked on cross-examination about

16   any training that you might have had involving having a

17   mother profile and a 13-year-old profile, and that type

18   of chatting with a target, correct?

19   A.    Correct.

20   Q.    Is every case unique or is every case the same when

21   it comes to the undercover role-playing that you do?

22   A.    Most of these cases are very similar in the fact

23   that I do my undercover operations on the same websites,

24   so I am in the same groups, I am finding the same type of

25   person that is interested in these kind of things.

```
 1    Q.    You indicated on cross-examination that you

 2    had -- one of the things that you did was actually look

 3    at the profile and see what the -- what your interests

 4    were, what the defendant's interests were, correct?

 5    A.    That's correct.

 6    Q.    And then you mentioned some of the chatting that

 7    went on from there, correct?

 8    A.    Correct.

 9    Q.    Okay.

10              MR. McDONOUGH:  Just a moment, Your Honor.

11              THE COURT:  Sure.

12    BY MR. McDONOUGH:

13    Q.    All right.  Showing you what was mentioned on

14    cross-examination as Government's Exhibit 20, Page 40,

15    you recognize this exhibit from cross-examination?

16    A.    Yes, I do.

17    Q.    And part of it in going through on

18    cross-examination was a line that you had here, "I think

19    I've clouded your wants and desires.  I pushed Katie on

20    you and I'm sorry for that.  I think you're into me and

21    just said whatever I wanted to hear."

22              Correct?

23    A.    Correct.

24    Q.    You even give, "I suggested the breeding, not you,"

25    correct?
```

1    A.    Correct.

2    Q.    Now, before that, the one line that was not

3    highlighted is what was the response from the defendant

4    in that chat to you?

10:49:36  5    A.    He said, "No, I really, really am I to younger."

6    Q.    And what did you interpret that to mean?

7    A.    I interpreted it to be "No, I really, really am

8    into younger."

9              MR. GREG McCORMACK:  I'm going to object as

10:49:52 10    to her interpretation.

11              She can testify what it reads; not her

12    interpretation of what he meant by that.

13              THE COURT:  It's her interpretation, but

14    she can't put that on the defendant.

10:50:02 15              In other words, how did you view that,

16    Investigator?

17              THE WITNESS:  I viewed it the part where it

18    says "I to" to mean "Into."

19    BY MR. McDONOUGH:

10:50:13 20    Q.    Okay.  Was this one of the outs that you mentioned

21    giving the defendant?

22    A.    Yes, it was.

23    Q.    And what was the effect of the defendant's response

24    to you of, "No, I really, really am into younger"?

10:50:28 25    A.    I'm sorry, could you repeat that?

1    Q.    Yeah.  You received a response from the defendant

2    regarding that?

3    A.    Yes, I did.

4    Q.    And what did you take that to mean?

10:50:41  5    A.    I took it to mean that he was into younger girls

6    because previously in the line above I said, "But I don't

7    think you're into young girls," and his response, "No, I

8    really, really am into younger," meaning in my opinion

9    that he was into younger girls.

10:51:03  10    Q.    Okay.  Let me ask you this, in all the

11    communications, whether it be through Google Voice text

12    messages, through the KIK communications to 13-year-old

13    Katie, so the KIK communications to you, and the recorded

14    calls, was there ever a communication from the defendant

10:51:25  15    that he wanted to have sex with you but not have sex with

16    Katie?

17    A.    No, never.

18    Q.    In every communication that he had, was there

19    always a reference to having sex with Katie and then

10:51:40  20    potentially your involvement somewhere down the road?

21    A.    That is correct.

22    Q.    Turning your attention to Government's Exhibit 20,

23    Page 85, on cross-examination, you were asked about outs

24    that you gave the defendant.

10:52:12  25                    Looking at Page 85, looking at the bottom

1    of the page, do you see your -- the response starting,

2    "If you come, you come"?

3    A.    Yes, I do.

4    Q.    Was this an out that you gave the defendant?

10:52:39 5    A.    Yes, it was.

6    Q.    Turning to Government's Exhibit 20, Page 89,

7    turning your attention to that phrase, "Like I said, if

8    you're actually here, let me know, quit this online

9    chat," is that another out that you gave?

10:53:23 10    A.    Yes, it is.

11    Q.    Government Exhibit 20, Page 102, and the top half

12    of the page referring to the bottom line, "Listen,

13    killing yourself is never the answer.  I don't need

14    money.  If you ever show up in Cleveland, text me and we

10:53:49 15    will come get you.  Otherwise good LU."

16                    What did you mean by that?

17    A.    It continues on the next line.

18    Q.    Oh.  "Good luck with your life."

19    A.    Yes.

10:54:05 20    Q.    Was that an out that you gave him?

21    A.    Yes, it was.

22    Q.    Turn to Exhibit 20, Page 108, the top half of the

23    page, third line from the top.

24                    Could you read that line?

10:54:25 25    A.    I said, "You know you're welcome for as long as you

1    want, but if you don't want to come, that's fine."

2    Q.    Okay.  And that was another out that you gave him,

3    correct?

4    A.    Correct.

10:54:35 5    Q.    On cross-examination, you were also asked about

6    some of the language, language that was used, correct?

7    A.    That is correct.

8    Q.    And part of your duties as an investigator in terms

9    of engaging in this chat, are there protocols or

10:54:58 10    standards for the language that you use?

11    A.    There's no protocol or standards as far as, like,

12    the language.

13              We are trained and told to make it as

14    realistic as possible, and also to communicate

10:55:16 15    effectively with another person in the same way that they

16    communicate.

17              In this case, there were several profane,

18    you know, words used by both Mr. Vickers and myself.

19    Q.    Okay.  On cross-examination you were asked about an

10:55:35 20    ultimate goal, and turning to Exhibit 20, Page 45, and

21    it's the bottom half of the page.  Drawing your attention

22    to the third line.

23              What was the third line?

24    A.    He said, "Honestly, I don't want you.  I want her."

10:56:02 25    Q.    And that "her" referring to?

1    A.    Katie.

2    Q.    And Exhibit 20, Page 51.  The top half of the page,

3    and the second line that the defendant communicated to

4    you.

10:56:24 5   A.    He said, "Just text me and let me know if you still

6    want, it's all about her.  I will wait to hear back from

7    you though."

8    Q.    And the following line?

9    A.     "Monday equals breeding day."

10:56:39 10  Q.    Okay.  And Government's Exhibit 20, Page 52.  The

11   top half of the page, and what is the fourth line that

12   the defendant communicated to you?

13   A.    He said, "I still want her 13 YO body," meaning

14   13-year-old body.

10:56:59 15  Q.    And continue.

16   A.     "You know you want the baby from it.  I

17   generally -- genuinely just want her sexually, not you.

18   You're kind of old for me (no offense)."

19   Q.    Okay.  On cross-examination you were asked about

10:57:19 20  the defendant wanting to have a picture of Katie.

21              Do you remember those questions?

22   A.    Yes, I do.

23   Q.    Okay.  And turning to Government Exhibit 18,

24   Page 26, okay, do you recognize what this is?

10:57:45 25  A.    Yes, I do.

1    Q.    What is it?

2    A.    It would be the KIK conversations.

3    Q.    And these KIK conversations are between the

4    defendant and you, the mother profile?

10:58:00  5    A.    Correct.

6    Q.    Okay.  And I'm looking on this.

7              Can you see the -- can you read the

8    communications from the defendant?

9    A.    He said, "I done a lot of bad things, I am not

10:58:14 10    telling anyone over text or phone.  I dated the one girl

11    with adopted kids and stuff happened there was secret."

12              MR. GREG McCORMACK:  Your Honor, I object.

13    This goes beyond the scope of cross-examination.  My

14    cross specifically asked --

10:58:29 15              THE COURT:  No speaking.

16              MR. GREG McCORMACK:  Yes, sir.

17              THE COURT:  No speaking.

18              I'll sustain on that.

19              MR. McDONOUGH:  Yes.  I'm sorry.

10:58:35 20    BY MR. McDONOUGH:

21    Q.    At the bottom of -- underneath that message, at the

22    last message, is there reference to pics of Katie, the

23    third box?

24              Actually, you know what?  Can we go to

10:58:49 25    Government's Exhibit 18, Page 27.  I'll flip the page.

1    Okay.  Thank you.

2            Can you read the first communication on

3    that?

4    A.    He said, "It's like you not giving me pics of

10:59:00  5    Katie.  You wouldn't do it period cause you need that

6    barrier."

7    Q.    Okay.  What was your response?

8    A.    I responded "True.  I just don't want her pic out

9    there."

10:59:12 10    Q.    Okay.  Are there, as part of the protocols and

11    standards for chatting, what are the protocols regarding

12    sending pictures of children?

13    A.    First of all, they have to be of a law enforcement

14    officer, whether they are pictures from the past or

10:59:36 15    regressed pictures of an adult law enforcement officer

16    that is regressed to make them look like a child.

17    Q.    Okay.

18    A.    No child pornography can be sent.

19    Q.    Okay.  You indicate on cross-examination that the

10:59:51 20    pictures that you use are actually your own personal

21    pictures of yourself, correct?

22    A.    That is correct.

23    Q.    Okay.  Turning to Government's Exhibit 17,

24    Page 148.  And focusing on the right side of the page, do

11:00:30 25    you recognize this -- what this is?

1    A.    Yes.  This would be the KIK communications between

2    Mr. Vickers and my 13-year-old profile for Katie.

3    Q.    And again on cross-examination, you were asked

4    about the defendant wanting to receive a picture of

11:00:48 5    Katie.

6                    What did the defendant communicate to

7    13-year-old Katie, if you could read the third box on the

8    right side of the page?

9    A.    He said, "Send me a pic of your underwear to

11:01:01 10    motivate me."

11    Q.    And then?

12    A.     "You don't have to be wearing them, though," with

13    a smiley face.

14    Q.    What was 13-year-old Katie's response?

11:01:13 15    A.     "K."

16    Q.    And what was the defendant's response?

17    A.    A winky face, and "I would love to see."

18    Q.    Okay.  All right.

19                    MR. McDONOUGH:  All right.  May I have just

11:01:30 20    a moment, Your Honor?

21                    THE COURT:  Sure.

22                    MR. McDONOUGH:  No further questions.

23                    THE COURT:  Thank you, Mr. McDonough.

24                    MR. GREG McCORMACK:  One second, please,

11:01:48 25    Your Honor.

1              THE COURT:  Okay, Mr. McCormack.

2              (Pause).

3              MR. GREG McCORMACK:  Thank you, Your Honor.

4         RECROSS-EXAMINATION OF MIRANDA HELMICK

11:04:24   5   BY MR. GREG McCORMACK:

6    Q.    There was a period of several days in December when

7    there was no communications that you were not responding

8    to him, correct?

9    A.    I can't remember the exact dates, sir.

11:04:45  10   Q.    Okay.  Let me see if I can just refresh your

11   recollection.

12              Showing you Government Exhibit 20, Page 49.

13   I see communications, this is Page 50, on 12/18 we have

14   communications from him here and I see no response from

11:05:27  15   you on 12/18 at all, correct?

16   A.    Correct.

17   Q.    And I have 12/19, I have no response from you at

18   all, correct?

19   A.    Correct.  On Google Voice texting.

11:05:43  20   Q.    Pardon?

21   A.    This is the Google Voice texting.  There is no

22   response on this communication, correct.

23   Q.    On this communication, correct?

24              All right.  And 12 -- again 12/19, I have

11:06:00  25   communications again from him.  No response, correct,

1    from you?

2    A.    Correct.

3    Q.    All right.  And Page 51, it's continuing 12/19, I

4    have no response.  It says, "I haven't heard from you in

11:06:25 5    the past day.  Worried about you guys."

6              He's talking about wanting to come up, hang

7    out with Katie?

8              And again at this particular point we can

9    argue about why he's saying what he's saying, but he's

11:06:42 10   indicating at this particular point, "Let me know if you

11   still want.  It's all about her" at this particular

12   point, correct?

13   A.    Correct.

14   Q.    No response, correct?

11:06:54 15   A.    Correct.

16   Q.    On 12/20.

17             12/21, again no response, correct?

18   A.    Correct.

19   Q.    12/21 here, again no response, "Tell Katie I was

11:07:19 20   thinking about her," correct?

21   A.    Correct.

22   Q.    Again 12/21, at this particular point when he

23   contacts you again at this particular point, and this is

24   where he says he just passed Pittsburgh and he says he's

11:07:44 25   keeping his word, he's coming up, says he's going to be

|  |  |
|---|---|
| 1 | up there in about two hours, how does he find you. |
| 2 | Now, he never actually shows up on 12/21, |
| 3 | correct, or 12/22, I'm sorry? |
| 4 | A.   Correct. |
| 11:07:59  5 | Q.   And this is Government's Exhibit 20, Page 52.  And |
| 6 | again he's making reference as the prosecution just made |
| 7 | reference "You're kinda old for me, no offense," correct? |
| 8 | A.   Correct. |
| 9 | Q.   Now, there's no wink wink after that.  What is that |
| 11:08:13 10 | after that, is that a smiley face or -- |
| 11 | A.   That's a smiley face. |
| 12 | Q.   All right.  Now, as we know every time he's made |
| 13 | reference when he's talking about you directly, you |
| 14 | immediately kind of turn him off and say, "It's going to |
| 11:08:24 15 | be about Katie, not me," correct? |
| 16 | In the past we've seen communications about |
| 17 | that, correct? |
| 18 | A.   Can you repeat that question? |
| 19 | Q.   Sure.  In the past when he's talking about you and |
| 11:08:33 20 | not Katie, you shut him down and you indicate, "No, it's |
| 21 | got to be about Katie," correct? |
| 22 | A.   Correct. |
| 23 | Q.   Okay.  So now he's indicating it's about Katie, not |
| 24 | you, correct? |
| 11:08:42 25 | A.   Correct. |

1  Q.    All right.  And then on 12/22, because he indicates

2  it's about Katie at this particular point, you do

3  respond, correct, right here?

4  A.    I don't see where you're referencing.

11:09:05  5  Q.    Where you make reference right here, "Me:  What?"

6  He asked, "How will I find you?"

7              And you respond, "Me:  What"?

8  A.    I don't see that on my screen, sorry.

9  Q.    That's because I was too low.  I'm sorry, I

11:09:20 10  apologize.

11              Right?  Right here.

12  A.    Yes.

13  Q.    You respond, because at this particular point he's

14  saying it's all about Katie, he's not talking about you,

11:09:35 15  correct, so now you've got him where he's saying it's all

16  about Katie and now you start responding again, correct?

17  A.    I did respond back.

18              MR. GREG McCORMACK:  Right.  Thank you.

19              No further questions.

11:09:46 20              THE COURT:  All right, Mr. McCormack, thank

21  you.

22              All right.  Ladies and gentlemen, before

23  she steps down, any questions?  Can you write it down?

24              (The following is a question from a juror:

11:10:26 25  "What is on Mr. Vickers' profile (EP) that indicates he

1    wanted breed with young girls?")

2              THE COURT:  Counsel.

3              (Proceedings at side-bar:)

4              THE COURT:  Take a look.  It's a loaded

11:11:14  5    question.

6              Do you want to rearrange that to say that

7    what sparked your interest based on his profile?

8              MR. McDONOUGH:  Yes, because the

9    investigator would testify that, you know, as part of

11:11:45  10   after he -- after he contacted her, she looked at the

11   profile and based on that continued the undercover op

12   with him.

13             So I would be happy to rephrase or to

14   rearrange that.

11:12:00  15   MR. JARRETT McCORMACK:  Judge, I think any

16   question about that -- I think any question about that at

17   all is going to invite response that goes directly into

18   what we dealt with on the motion in limine because her

19   testimony was going to be his interests and groups he

11:12:15  20   belonged to and everything else.

21             Before you address that, I think that goes

22   down a slippery slope.

23             THE COURT:  I agree with you.

24             The objection will be sustained.  We won't

11:12:25  25   ask that.

1           I do have one question I am going to ask so
2      I'll let you guys follow-up.
3                  (End of side-bar conference).
4                  THE COURT:  We received one question, it's
11:12:34 5      a good question but, unfortunately, we can't ask it based
6      on the Court's prior rulings in this case.
7                  I do have one question, Ms. Helmick.
8                  So that the jury is clear, who has the
9      authority to shut down an investigation?
11:12:51 10                  THE WITNESS:  I do.
11                  THE COURT:  Okay.  On your own, or in
12      conjunction with a supervisor?
13                  THE WITNESS:  I would run -- I would talk
14      to my supervisor before shutting an operation down.
11:13:06 15                  THE COURT:  Okay.  Mr. McDonough, any
16      follow-up question to that?
17          REDIRECT EXAMINATION OF MIRANDA HELMICK
18      BY MR. McDONOUGH:
19      Q.    If you wanted to proceed on an investigation and
11:13:26 20      your supervisor wanted to terminate it, it would be your
21      supervisor's call?
22      A.    It would be.
23                  MR. McDONOUGH:  Okay.  Thank you, Your
24      Honor.
11:13:32 25                  THE COURT:  Okay.  Mr. McCormack, anything?

1          MR. GREG McCORMACK:  Yes.

2          RECROSS-EXAMINATION OF MIRANDA HELMICK

3    BY MR. GREG McCORMACK:

4    Q.    Did you ever go to your supervisor to request to

11:13:39 5   shut down an investigation?

6    A.    No, I did not.

7    Q.    How many times does an individual during the course

8    of the investigation have to say no and indicate they're

9    not interested before you would go to your supervisor to

11:13:52 10  request to shut down the investigation?

11          MR. McDONOUGH:  Objection.

12          THE COURT:  Sustained.

13          Investigator Helmick, thank you very much.

14   You can step down.

11:14:01 15          (Witness excused).

16          THE COURT:  I will see counsel at side-bar,

17   please.

18          (Proceedings at side-bar:)

19          THE COURT:  Okay.  Witness here, Kevin?

11:14:18 20          MR. FILIATRAUT:  Yeah, he's here.  I would

21   like just a minute, I'm going to move the evidence

22   computer to the back so I can control it from the podium.

23          THE COURT:  Okay.

24          MR. FILIATRAUT:  But he should be out there

11:14:29 25  ready to go.

             1              THE COURT:  Okay.  How long you figure?

             2              MR. FILIATRAUT:  I figure no longer than an

             3      hour.

             4              THE COURT:  Okay.  That would be lunch time

11:14:38     5      break then.

             6              Okay.  Let's get the direct in --

             7              MR. FILIATRAUT:  Okay.

             8              THE COURT:  -- before lunch, and then we'll

             9      have the opportunity, obviously we'll do that.

11:14:47    10              MR. GREG McCORMACK:  Yes, sir.

            11              THE COURT:  Just a heads-up, don't worry

            12      about seeking to introduce the exhibits after you rest.

            13      I do that at the end of the case for everybody.

            14              MR. McDONOUGH:  Yes, sir.

11:14:55    15              MR. GREG McCORMACK:  I was wondering how

            16      you do that.

            17              MR. McDONOUGH:  We have actually gone

            18      through the exhibits and we have an agreement as to what

            19      would go.

11:15:01    20              THE COURT:  Okay.  That would be fine.

            21              MR. McDONOUGH:  I would say the government

            22      rests pending the admission of the Government's Exhibits,

            23      and that's all.

            24              THE COURT:  That's fine.  We'll do the

11:15:10    25      admission of exhibits at the end of the case after

1   everything is done.

2                   Still plan on not testifying?

3                   MR. GREG McCORMACK:  Correct.

4                   THE COURT:  Just so we know.

11:15:17  5         MR. GREG McCORMACK:  On track.

6                   THE COURT:  And we are on track.  Okay.  I

7   don't want to take a break.  Let's just go ahead and set

8   up and let's get going.

9                   MR. FILIATRAUT:  Yes, sir.

11:15:25 10         (End of side-bar conference).

11                  MR. FILIATRAUT:  Government would call

12  David Frattare.

13                  THE COURT:  Hold on.  Do you have something

14  in your mouth, sir?

11:16:23 15         THE WITNESS:  No, I don't.

16                  THE COURT:  You can stay right there.

17                  (Pause).

18                       DAVID FRATTARE,

19     of lawful age, a witness called by the Government,

20            being first duly sworn, was examined

21              and testified as follows:

22                  THE COURT:  Please have a seat.

23                  THE WITNESS:  Yes, Your Honor.

24                  THE COURT:  Mr. Filiatraut, when you're

11:17:21 25  ready.

1          MR. FILIATRAUT:  Thank you, Your Honor.

2       DIRECT EXAMINATION OF DAVID FRATTARE

3    BY MR. FILIATRAUT:

4    Q.    Sir, would you please state your name and spell it

5    for the record?

6    A.    It's David Frattare, it's F-R-A-T-T-A-R-E.

7    Q.    All right.  Would you please tell the jury where

8    you work and what you do?

9    A.    Employed by the Cuyahoga County Prosecutor's

10   Office.  I serve as the director of state investigations

11   and the ICAC commander for the Ohio Internet Crimes

12   Against Children task force.

13   Q.    All right.  And how long have you had that

14   particular position?

15   A.    I have been the ICAC commander for about a year

16   now.  I've been employed by the Prosecutor's Office since

17   October of 2009.

18   Q.    Okay.  And are you a law enforcement officer?

19   A.    Yes, I am.

20   Q.    Okay.  Please explain what type of officer you are,

21   the training you've had, for the jury.

22   A.    I've been in law enforcement for 17 years, from

23   1997 to 2009.

24            I was employed as a special agent with the

25   Pennsylvania Office of Attorney General in their Bureau

                    1   of Criminal Investigations.

                    2               From 2009 to the present I've been employed

                    3   as an investigator and a certified peace officer here in

                    4   the State of Ohio with the Cuyahoga County Prosecutor's

    11:18:31        5   Office.

                    6   Q.    All right.  And can you explain to the jury what

                    7   does the commander of ICAC do?

                    8   A.    There are 61 federally funded ICAC task forces

                    9   throughout the country.  Each one of those task forces

    11:18:46       10   has an ICAC commander who's responsible for the

                   11   day-to-day administration of the task force, the

                   12   administration of the federal grant that funds that task

                   13   force, as well as the investigation sort of collaboration

                   14   of child exploitation investigations throughout the State

    11:19:07       15   of Ohio.

                   16   Q.    As commander, are you the supervisor of any

                   17   individuals with the ICAC task force?

                   18   A.    I am.  I supervise eight individuals directly out

                   19   of our Parma office; four investigators, three forensic

    11:19:25       20   examiners and a civilian analyst.

                   21   Q.    Okay.  And let's talk about those positions within

                   22   ICAC for a moment.

                   23               What is the job of an investigator with

                   24   ICAC?  Please tell the jury.

    11:19:39       25   A.    Investigators would be responsible for conducting

1    proactive and reactive investigations.  Those may pertain

2    to undercover investigations online dealing with social

3    networking sites.  May also deal with peer-to-peer

4    investigations which are investigations involving child

11:19:59  5    pornography that is shared via what we would call file

6    sharing networks or peer-to-peer networks.

7                    Investigators would also be responsible for

8    reacting to complaints that we may receive from the

9    National Center for Missing and Exploited Children, the

11:20:14 10    general public, as well as initiating their own

11    investigations, any one of those types of investigations.

12    Q.    All right.  As part of your description of

13    proactive investigations, you mentioned peer-to-peer.

14                    Are there any other types of proactive

11:20:31 15    investigations that go on?

16    A.    We would also conduct, as I said, undercover online

17    investigations where an investigator may pose either as a

18    minor child online or an adult, a parent with a minor

19    child, to engage in online conversations with individuals

11:20:51 20    dealing with child sexual exploitation.

21    Q.    What is the purpose of those types of

22    investigations?

23    A.    Essentially to locate offenders, those individuals

24    who may have a proclivity toward children or an interest

11:21:04 25    in children, to attempt to identify those individuals and

1    either get them to travel to a location here within

2    Cuyahoga County, or to obtain evidence that they are, in

3    fact, involved in the exploitation of children.

4    Q.    Now, are your investigators and you and your unit

5    trained in this type of undercover operation?

6    A.    We are, yes.

7    Q.    Okay.  Could you explain what that type of training

8    that is, for the jury?

9    A.    The ICAC task force is governed by, as I said, a

10   federal grant from the Department of Justice.

11           Additionally, the Department of Justice has

12   contracted with Fox Valley Technical College out of

13   Wisconsin to provide a number of training opportunities

14   for ICAC investigators, namely among those trainings that

15   involve how to respond, how to engage in, how to initiate

16   investigations dealing with online offenders.

17           That training through Fox Valley, in

18   addition to training that we would receive from the Ohio

19   Peace Officer Training Academy as well as some training

20   that we put on ourselves as an ICAC task force, allows

21   our investigators and the investigators that work ICAC

22   cases throughout Ohio to sort of better understand the

23   nature of these investigations and how they're to be

24   conducted.

25   Q.    All right.  Now, when an investigation like this is

1    occurring, do you as a supervisor check in to see what's

2    happening with any particular investigation?

3    A.    I do.

4    Q.    Okay.  Please explain to the jury what it is to

11:22:48 5    conduct one of these undercover investigations.

6    A.    Typically one of our investigators would create a

7    profile, they would set up an essentially a fictitious

8    account online, whether that be a minor child or an

9    adult, as I said with minor children.

11:23:07 10                 And they would essentially input or insert

11    that profile into the landscape of the Internet.  That

12    may be on a social networking site like Facebook.  It may

13    be on a website that is more geared toward adult fetishes

14    like Motherless or the Experience Project, or it may be

11:23:24 15    something as simple as going onto Craig's List or a site

16    like Back Page and basically setting up that profile and

17    waiting for an offender or a subject to make contact with

18    that profile.

19    Q.    All right.  So your investigators, when they create

11:23:42 20    these profiles, are they portraying themselves as they

21    are, genuine people, or are they playing a role?

22    A.    They're playing a role.

23    Q.    Okay.  Now, do these investigations happen on

24    mainstream-type social networking and then other types

11:24:02 25    that might not be mainstream?

1    A.    They may.  They may, as I said, something as simple

2    as Facebook or Instagram.  We tend to focus on those

3    sites popular with young children, teenagers, young

4    adults.

5                    We also do a number of investigations that

6    focus on nontraditional websites, sites that may be

7    geared more toward, as I said, adult fetishes, sexually

8    explicit content, things of that nature.

9    Q.    And prior to the investigation which resulted in

10   the arrest of David Vickers, had you heard of a website

11   called the Experience Project?

12   A.    I had, yes.

13   Q.    All right.  And is this the type of website where

14   undercover investigations have occurred?

15   A.    Yes.

16   Q.    Now, your investigators, is one of them an

17   individual named Miranda Helmick?

18   A.    She is, yes.

19   Q.    Okay.  How long has she been an investigator with

20   your unit?

21   A.    She has been employed with us about a little more

22   than a year.

23   Q.    Okay.  And are you familiar with the investigation

24   that occurred on -- beginning with the Experience Project

25   and resulting in the arrest of an individual named David

1    Vickers?

2    A.    Yes, I am.

3    Q.    Who conducted that investigation from ICAC?

4    A.    Investigator Helmick.

11:25:30 5    Q.    Okay.  Did you have supervision of that

6    investigation?

7    A.    I did.

8    Q.    Were you aware of the types of -- the operation

9    that Investigator Helmick was conducting?

11:25:48 10    A.    Yes, I was.

11    Q.    Okay.  Let's step back for a moment.

12                    Generally speaking, you have said in

13    undercover investigations, sometimes your investigators

14    pose as children, sometimes they pose as parents.

11:26:02 15                    Do they ever pose as both?

16    A.    Yes.

17    Q.    Okay.  And is that -- was that the case with this

18    particular investigation?

19    A.    Yes, it was.

11:26:12 20    Q.    All right.  Now, let's step back again.

21                    Generally speaking, when an undercover

22    investigation is occurring and someone might travel, is

23    there protocol for that within your unit?

24    A.    There is, yes.

11:26:29 25    Q.    Explain that to the jury.

1    A.    The investigator would work the case as he or she

2    sees fit.  They would engage in the conversations.  They

3    would make arrangements to have the suspect travel, as we

4    would say.

11:26:46  5          At that point I typically will ask the

6    investigator to provide me all of the case-related

7    materials, specifically the chats, the text messages, any

8    of the phone calls that occurred, to allow me to review

9    that material before we make a decision as far as setting

11:27:04 10   up an operation to effect that arrest.

11   Q.    Okay.  And when that occurs, as the supervisor

12   overviewing one of your investigators' work, what sorts

13   of things are you looking for?

14   A.    I'm looking to make sure that the language that the

11:27:26 15   undercover investigator is using with the defendant or

16   the subject is appropriate for the type of conversation

17   or for the type of profile that's being used.

18          I'm looking for any sort of red flags that

19   I may see that may cause us concern down the road from a

11:27:42 20   prosecution standpoint.

21          Anything that maybe we've trained our

22   investigators not to say, I'm looking for those things.

23   Q.    Okay.  As part of the training, are members of your

24   unit trained on knowing the difference or identifying the

11:28:02 25   difference between someone who is just interested in

1    talking and then someone who is interested in talking and

2    doing?

3    A.    Yes.

4    Q.    And what's the difference there?

11:28:12  5    A.    Well, it can be a difficult -- it can be difficult

6    to make that determination sometimes.

7              We've tasked the investigators with knowing

8    when, as you said, an investigator or, I'm sorry, if a

9    subject is simply role playing or fantasizing as opposed

11:28:30 10   to actually making arrangements or setting up a meeting

11   or an opportunity to travel.

12              So investigators will typically look for is

13   the subject on his own, maybe looking up where the child

14   or the adult lives.  Is he making plans on his own to

11:28:51 15   figure out how to get here, things of that nature.

16   Q.    Okay.  And in terms of the idea of fantasy versus

17   action, all right, do you have investigations where

18   subjects might talk about child pornography, yet not

19   obtain it and distribute it?

11:29:10 20   A.    Certainly.

21   Q.    Okay.  So is there a difference between talking

22   about child pornography and then actually sending some

23   child pornography to somebody?

24   A.    There are a lot of times where individuals will say

11:29:22 25   that they have child sexual exploitation material, that

1    they're interested in traveling to engage in sexual

2    activity with a minor.

3              Some of those investigations may go on for

4    months or years, and that individual may never travel or

11:29:36  5    may never actually send that material.

6              Those investigations usually are sort of

7    set aside or set into an inactive state until the subject

8    either returns to the conversation or, as I said, maybe

9    if they've indicated that they have material, if they

11:29:54 10    send it at some point, we may sort of reinitiate with

11    that individual.

12    Q.    Okay.  Is there a time frame that's typical in

13    these investigations?

14              You just mentioned sometimes someone might

11:30:05 15    chat for years before they actually do something.

16    A.    There's really not in my experience.  I've arrested

17    individuals after several hours, but I've also engaged in

18    online conversations where they've gone on for two years

19    in some cases.

11:30:21 20              It just depends on the subject, how they

21    want to proceed, what they're saying in their

22    conversations.

23              Obviously, as an undercover investigator,

24    you may be dealing with five, ten, 20 different subjects

11:30:34 25    through one undercover profile so you may need to

1    prioritize an individual who's actively talking about

2    engaging in this activity as opposed to someone who may

3    appear to be fantasizing or role playing.

4    Q.    Now, let's talk about the undercover activities.

11:30:52  5              You've already testified that your

6    investigators, when they do this activity, they're

7    playing a role.

8              Is that true?

9    A.    Yes.

11:30:59 10  Q.    Explain what that means, when you're talking about

11   websites that are not mainstream.

12   A.    Well, we're obviously -- we're obviously interested

13   in or looking for offenders who have a proclivity or an

14   interest in children, so we are forced to look for these

11:31:18 15  individuals not simply on mainstream websites like

16   Facebook, but on sites that, as I said, would cater

17   toward adult fetishes or adult interest or illicit

18   activity.

19              We do a lot of work with a site known as

11:31:36 20  Motherless which is geared towards adults and adult

21   fetishes, and from time to time you will see extremely

22   explicit sexual material.  You will see graphic sexual

23   conversation about the exploitation of children, about

24   the exploitation of adults.

11:31:51 25              And so we've been forced to sort of gear

1    our efforts away from traditional sites like Yahoo and

2    Facebook, and focus more on these, these adult-type

3    sites.

4    Q.    When an undercover officer is on one of these sites

11:32:07  5    pretending to be somebody, do they have to be -- pretend

6    to be somebody who is believably interested in that

7    material?

8    A.    Certainly.  A number of these sites ally to join

9    groups, groups certainly unlike what you see on Facebook,

11:32:26 10    groups that have an interest toward children, the sexual

11    abuse of children.

12              So to provide some validity to the profile,

13    the investigator may utilize photographs, they may

14    utilize joining these groups, being associated with these

11:32:40 15    groups, maybe posting some comments on their page that

16    would sort of let others know that they share similar

17    interests as the users that we may be looking for.

18    Q.    All right.  And is it the goal to, for the first

19    contact of an undercover officer, to have someone make

11:33:01 20    contact with them?

21    A.    With the undercover?

22    Q.    Yes.

23    A.    Yes.

24    Q.    Okay.  Are there rules about what types of photos

11:33:12 25    they could put on these sites or distribute to subjects

1   they're communicating with?

2   A.    There are.  We will never post photos that show

3   nudity, either of ourselves or of a child, but obviously

4   that's a -- that hampers our investigations in some

11:33:34  5   respects, especially with these adult websites.

6              Most of the photos you see of users'

7   profiles on these sites are rife or filled with pictures

8   of nudity, images of nudity, adults who have taken nude

9   photos of themselves, made them a part of their profile.

11:33:51 10              We will certainly draw the line at that,

11  but we will, if need be, post some scantily clad photos.

12  If the undercover investigator feels that that may help

13  their profile, that may be a photo that we need to use.

14  Q.    Okay.  Before an undercover utilizes a photograph,

11:34:12 15  do you review it?

16  A.    I do.  I review the photo.

17              The photos are also reviewed by two ICAC

18  prosecutors who are assigned to the ICAC task force

19  through the Cuyahoga County Prosecutor's Office.  The

11:34:25 20  three of us sign off on that photo.

21              We then allow the investigator to utilize

22  it for their undercover purposes.

23  Q.    All right.  And are there rules, if they're posing

24  as a child, what types of photographs they can use for

11:34:39 25  that?

1    A.    The photographs that we use for child profiles,

2    those fall under the guideline and standard that has been

3    established by the Department of Justice.

4                Those photos are -- we're required to use

11:34:57  5    photos of individuals associated or employed by criminal

6    justice agencies or law enforcement agencies.

7                So all of the photos that we have of

8    children would be a law enforcement officer or a criminal

9    justice employee, usually a picture of them as a minor

11:35:13  10   child, but that individual at the current time has to be

11   over the age of 18.

12   Q.    And with that, is that an idea of consent in terms

13   of -- let me ask it this way.

14               Why is that?  Why is that that you can only

11:35:33  15   use a picture of a law enforcement officer as a child in

16   these investigations?

17   A.    Well, we obviously want to obtain their consent,

18   but we also want to make sure that the photos we're using

19   are not just random, random individuals or random

11:35:46  20   children from the Internet.

21               We want to make sure that the photos we're

22   using are provided to us by a law enforcement officer or

23   criminal justice employee who has consented to the use of

24   those photos.

11:36:08  25   Q.    Thank you.  Getting back to this particular

1    investigation, did you review all the photographs that

2    Investigator Helmick used in this case?

3    A.    I did.

4    Q.    And were you aware that during this -- during her

11:36:29  5    chats with the subject in this case, the subject was also

6    chatting with a 13-year-old persona that she was

7    operating?

8    A.    I was aware of that.

9    Q.    Okay.  Were you aware that during this operation,

11:36:44 10    the subject of this investigation sent child pornography

11    to that 13-year-old persona?

12    A.    Yes.

13    Q.    And were you aware that during this investigation,

14    the subject of the investigation was interested in

11:37:04 15    traveling across state lines to Ohio?

16    A.    Yes.

17    Q.    All right.  Now, was there a time in this

18    investigation where you reviewed it in terms of deciding

19    whether to proceed with further investigation prior to

11:37:21 20    the subject traveling?

21    A.    Yes.

22    Q.    Okay.  Explain that to the jury.

23    A.    I would have reviewed -- in the lead up to the

24    early days of January of this year, Investigator Helmick

11:37:33 25    would have provided me, as I said, with the chats, the

1    conversations, any of the text messages, e-mails,

2    telephone calls that had occurred between her and the

3    defendant.

4                    I would have made a decision at that point

11:37:46  5    to go ahead with essentially allowing him to -- when I

6    say "allowing him to travel," I mean it was on our end

7    operationally a good time for us to be able to conduct an

8    operation and effect an arrest.

9    Q.    Okay.  What type of apparatus or things go into

11:38:10 10    effect when you are going to arrest someone who travels

11    across state lines?

12    A.    In an ideal situation, we would have enough time to

13    utilize the resources of the local police, of other

14    agencies that are affiliated with the ICAC task force.

11:38:27 15                    We like to have anywhere from eight to 12

16    officers on scene to effect the arrest safely, to conduct

17    surveillance of the location, to be able to detain the

18    individual, and then conduct both an interview of him if

19    he's willing, and then also handle any evidence or

11:38:48 20    inventory issues that need to be handled upon that

21    arrest.

22    Q.    What type of locations -- let me step back.

23                    Were you involved in the arrest in this

24    particular case?

11:39:02 25    A.    Not the physical arrest.

1          I was there on scene.  There were other

2    officers in a better vantage point that were able to move

3    in and effect the arrest.

4    Q.    Okay.  Were you there when the arrest was made?

11:39:15  5    A.    I was.

6    Q.    Okay.  And did you conduct further investigation

7    after the arrest in terms of seizing physical evidence?

8    A.    I did, yes.

9    Q.    The individual who was arrested at the conclusion

11:39:29 10    of Miranda Helmick's investigation, is that person in the

11    courtroom today?

12    A.    Yes, he is.

13    Q.    Would you please point to him and describe what

14    he's wearing?

11:39:36 15    A.    He's wearing a white shirt with a, looks like, a

16    red, blue and gray tie.

17          MR. FILIATRAUT:  Your Honor, could the

18    record please reflect the witness has identified the

19    defendant?

11:39:44 20          THE COURT:  He has.

21          MR. FILIATRAUT:  Thank you.

22    BY MR. FILIATRAUT:

23    Q.    Now, where was this arrest made?

24    A.    It was made in the parking lot of Jordan's

11:39:57 25    Restaurant, which is located at the corner of Brookpark

```
        1    and Chevy Boulevard.

        2    Q.    In what city?

        3    A.    That would be Brooklyn, I believe.

        4    Q.    Okay.  And why Jordan's Restaurant?

11:40:13 5    A.    We will utilize various public locations based on

        6    the time of day, the conversation that's occurring.

        7                 We typically will leave it up to the

        8    undercover investigator.  Sometimes the suspect or the

        9    subject will mention a place they would like to meet, but

11:40:35 10   we typically like to make it a public place that allows

        11   us some easy access or easy vantage points for the

        12   operation.

        13   Q.    Okay.  And when this occurred and after the arrest

        14   was made, did you take photographs?

11:40:54 15   A.    I did.

        16   Q.    Okay.  In front of you in Binder 2 of 2, if you'd

        17   turn to Tab 21, all right, we have 46 photographs there.

        18                 If you could flip through them.

        19                 THE COURT:  Mr. Filiatraut, do we have

11:42:10 20   exhibit numbers just for purposes of the record for

        21   those?

        22                 MR. FILIATRAUT:  Yes.  This is Exhibit 21,

        23   Pages 1 through 46.

        24                 Thank you, Judge.

11:42:16 25   A.    Okay.
```

274

1    BY MR. FILIATRAUT:

2    Q.    All right.  So you've been able to look through

3    Exhibit 21, Pages 1 through 46.

4                    Just talking about them as a group, do you

11:42:27  5    recognize them?

6    A.    I do.

7    Q.    Okay.  Generally speaking, what do they depict?

8    A.    They depict the location where the arrest was

9    effected, specifically the Jordan's Restaurant, the

11:42:38  10    parking lot outside, and then the contents, exterior and

11    interior photos of the vehicle driven by the defendant to

12    the location.

13    Q.    These photographs, did you take them?

14    A.    I did.

11:42:47  15    Q.    And are they true and accurate representations of

16    the way things looked at the time you took them?

17    A.    They are, yes.

18    Q.    All right.  Okay.  Now, on the screen I'm putting

19    up Exhibit 21, this is Page 1 of 46 here.

11:43:09  20                    What does this show?

21    A.    This would be the defendant's vehicle parked in

22    front of Jordan's Restaurant.

23    Q.    All right.  Looking at Page 3 here, what do we see

24    there?

11:43:30  25    A.    Same vehicle, just a view of it from the front.

1    Q.    Okay.  And in taking these photographs, did

2    you -- aside from taking the photographs, did you search

3    the car?

4    A.    We did, yes, sir.

11:43:55 5    Q.    Okay.  Did you find anything inside the car?

6    A.    We did, yes.  Several items, including the

7    defendant's phone as well as a bag that contained a

8    pre-packaged cell phone.

9    Q.    All right.  Were those items seized as evidence?

11:44:22 10    A.    They were.

11    Q.    Okay.  When you -- when you do this sort of search,

12    do you record the items that you take and see on an

13    inventory sheet?

14    A.    We do, yes.

11:44:39 15    Q.    All right.  Let me show you Government's Exhibit 30

16    on the screen there.

17                Do you recognize that?

18    A.    Yes, I do.

19    Q.    Okay.  And going to Page 2, what do we see there?

11:45:01 20    A.    That would be the second page of the vehicle

21    inventory and release form that we utilize, the second

22    page or the back page contains a listing of the items

23    that were inventoried from the vehicle incident to the

24    defendant's arrest.

11:45:15 25                THE COURT:  Mr. Filiatraut, can you blow

```
 1    that up a little bit, please, for the jury?
 2              MR. FILIATRAUT:  Yes.
 3    BY MR. FILIATRAUT:
 4    Q.   And is it fair to say we see 25 items on this list?
 5    A.   That's correct.
 6    Q.   All right.  Were these items taken as evidence?
 7    A.   They were, yes.
 8    Q.   All right.  Government's Exhibits 27, 26, 28 and
 9    29.
10              MR. FILIATRAUT:  May I approach the
11    witness?
12              THE COURT:  Yes.
13    BY MR. FILIATRAUT:
14    Q.   I'm going to hand you these exhibits.
15              I'd like you to take a look at them and
16    tell us if you recognize them.
17    A.   I do.
18    Q.   All right.  Generally speaking, are these items
19    that you took from the defendant's car as evidence?
20    A.   Yes, they are.
21    Q.   Let's begin with item, this would be Government's
22    Exhibit 26.
23              And what is that?
24    A.   Item 26 is an Apple iPhone with a rubber case.
25    Q.   Okay.  If you could please hold that up for the
```

1    jury.

2              All right.  This iPhone, was this analyzed

3    by, forensically, by your unit?

4    A.    Yes, it was.

11:47:01  5    Q.    All right.  We'll return to that idea momentarily.

6              What was Government's Exhibit 27?  That

7    might be on the paper bag in front of you.

8    A.    27 is a paper bag with red stripes which contains a

9    Boost Mobile LG Realm cellular telephone.

11:47:25 10    Q.    All right.  And inside the bag, is there something

11    else there?

12    A.    There's a red tissue paper, wrapping paper of

13    sorts.

14    Q.    All right.  Thank you.  All those items, the bag,

11:47:45 15    the phone and the tissue paper, were those seized from

16    the defendant's car?

17    A.    Yes, they were.

18    Q.    And just so we are clear with the record, the

19    phone, is that in pre-packaged retail packaging?

11:47:54 20    A.    Yes, it is.

21    Q.    And was it unopened at the time it was seized?

22    A.    Yes, it was.

23    Q.    All right.  What is Government's Exhibit 28?

24    A.    28 is a black wallet which contains, among other

11:48:09 25    things, a Virginia driver's license for David Wayne

1    Vickers.

2    Q.    All right.  Was that seized from the car?

3    A.    Yes, it was.

4    Q.    What is Government's Exhibit 29, please?

11:48:39  5    A.    Exhibit 29 is a receipt from the Pennsylvania

6    Turnpike, excuse me, Plaza 30 at the Warrendale

7    interchange dated January 5th, 2015 at 7:20 a.m. for a

8    total of $16.20.

9    Q.    Okay.  And back to the screen which is Government's

11:49:06 10    Exhibit 30, the inventory sheet, is this a sheet that you

11    completed and kept in the ordinary course of business of

12    the Internet Crimes Against Children task force?

13    A.    Yes, it is.

14    Q.    All right.  Were these items seized from the car

11:49:24 15    and then photographs taken as showing how they were in

16    the car at the time you found them?

17    A.    Some of the photos were.

18              Some of the photos that are listed in here,

19    the items were arranged at a later date to show the

11:49:40 20    contents.

21    Q.    All right.  And we'll just go through a few of

22    these then.

23              Let me show you on the screen Government's

24    Exhibit 21, Page 12.  What do we see there?

11:49:56 25    A.    That's the rear, rear of the vehicle.  There's a

| | |
|---|---|
| 1 | blue cooler-type bag as well as some other, other items |
| 2 | on the seat. |
| 3 | Q.    Looking at Government's Exhibit 21, Page 16, what |
| 4 | do we see there? |
| 11:50:20 5 | A.    That's the front passenger seat of the vehicle, |
| 6 | miscellaneous paperwork, water bottles, looks like a CD |
| 7 | holder there, as well as a brown paper bag. |
| 8 | Q.    Looking at the next page, Page 17, what do we see |
| 9 | there? |
| 11:50:43 10 | A.    That is the front passenger seat foot area, feet |
| 11 | area as well, same blue clipboard with some paperwork |
| 12 | attached to it, and a water bottle. |
| 13 | Q.    Page 18, what do we see there? |
| 14 | A.    That is the front passenger seat, also.  Just a |
| 11:51:00 15 | close-up of some of the items that are on the seat there |
| 16 | as well as the Apple iPhone face -- face down on the seat |
| 17 | there. |
| 18 | Q.    Okay.  The iPhone, is that underneath the wallet? |
| 19 | A.    That looks to be a CD case possibly. |
| 11:51:19 20 | Q.    Oh, okay.  Thank you. |
| 21 | Next page, 19, what do we see there? |
| 22 | A.    That was a close-up of the receipt that I |
| 23 | referenced as Government's Exhibit 29 from the |
| 24 | Pennsylvania Turnpike. |
| 11:51:33 25 | Q.    Okay. |

1    A.    That appears to be on the front passenger seat as

2    well.  You see the -- I believe that's the iPhone in the

3    upper left corner of the photo.

4    Q.    Okay.  Showing you Page 25, what do we see there?

11:51:50  5    A.    That's simply a close-up of a Virginia driver's

6    license belonging to David Wayne Vickers.

7    Q.    Okay.  And where does it show that his residence

8    was at the time of his arrest?

9    A.    175 Spencer Terrace, Southeast, Leesburg, Virginia

11:52:11  10    20175-8997.

11    Q.    Page 26, what do we see there?

12    A.    These are additional cards that were found in the

13    defendant's wallet.  That specifically is a close-up of a

14    business card belonging to, looks like, a Diana Beckman

11:52:40  15    with the National Center for Missing and Exploited

16    Children in Alexandria, Virginia.

17    Q.    Was this among the items that were on the

18    defendant's person or in the possession of his car at the

19    time of his arrest?

11:52:54  20    A.    These were items that were in his car at the time

21    of his arrest.

22    Q.    All right.  Now, showing you Page 32, what do we

23    see there?

24    A.    These are miscellaneous items, a bottle of cologne,

11:53:23  25    some gum or mints, a pill bottle, two pens, earplugs or

1    earphones, and a then roll of mints and a paper bag.

2              These were items found in the vehicle as

3    well.

4    Q.    All right.  Thank you.

5              Now, let's talk about that iPhone for a

6    moment.

7              Was the iPhone forensically examined?

8    A.    Yes, it was.

9    Q.    And could you please tell the jury how that occurs?

10   A.    In this case we obtained an additional search

11   warrant for the forensic examination of the iPhone.

12             I believe on January 8th we obtained that

13   search warrant, and then I was able to examine the phone

14   forensically using a mobile forensic tool known as

15   Cellebrite which is an industry standard cell phone

16   extraction suite of software tools that allows us to

17   extract the data from a device into a readable format in

18   a report that we can then generate.

19   Q.    Tell us what is Cellebrite, how does it work?

20   A.    Cellebrite, as I said, is a suite of tools.  It's a

21   computer program utilized by ICAC task forces, by

22   computer forensic examiners worldwide as well as various

23   corporations that need to extract data from cellular or

24   mobile devices.

25             The software works essentially by

1    connecting the device to the software.  The software then

2    sends essentially several commands to the device asking

3    the device for text messages, images, videos, MMS

4    messages, asks for the contents of the phone.

11:55:13  5          The contents of the phone, a copy of those

6    contents are then extracted out to the software, and then

7    the software analyzes the contents of the device and

8    generates a report that we can then use to review

9    essentially the contents of the phone or the device in

11:55:26 10    question.

11    Q.    All right.  Now, are there different types of

12    extractions that can be performed?

13    A.    There are.

14    Q.    Please explain to the jury what those are.

11:55:36 15    A.    There are three main types of extractions, the

16    first being a logical extraction.

17          The logical extraction is the quickest type

18    of extraction and it's the most -- the extraction that's

19    most supported by most mobile devices on the market.  It

11:55:53 20    allows us to just really scrape the surface of the

21    device, grab evidence quickly, images that are there,

22    messages that are there, some of the basic content of the

23    phone.

24          A step above that is a file system

11:56:06 25    extraction which digs a little deeper, takes in

1    essentially a picture of the file system or the image of

2    the phone, and then transfers that to the analyzer

3    software.

4                    And then a physical extraction would be an

11:56:21  5    in depth dive into the phone's contents in an attempt to

6    extract all of the data, all of the deleted information,

7    all of the metadata, all of the information associated

8    with that device, and then again transfer that back out

9    to the analyzer software.

11:56:42 10    Q.    Although these are phones, are they also computers?

11    A.    They are.

12    Q.    Okay.  And by that, this particular phone here,

13    Government's Exhibit 26, the Apple iPhone, is this phone

14    capable of accessing the Internet --

11:57:02 15    A.    It is.

16    Q.    -- in interstate commerce?

17    A.    Yes, it is.

18    Q.    Now, you mentioned when you described the different

19    types of extractions, you mentioned something about the

11:57:13 20    device supporting it.

21                    Explain what you mean by that.

22    A.    Cellebrite, as the industry standard for mobile

23    device extraction, works very closely with the cell phone

24    providers, cell phone companies to ensure that their

11:57:30 25    software can work with these phones.

1          And obviously there are hundreds of

2     thousands of different phone carriers, phone types

3     throughout the world.

4          Cellebrite has worked with these companies

11:57:41  5     in advance of the phone's release to try and be able to

6     obtain the programming information to be able to extract

7     the data from these phones.

8          So not every phone supports a logical file

9     extraction or a physical extraction.  In this case the

11:57:59 10     iPhone in question here only supported a logical

11     extraction, so while we tried to conduct a physical

12     extraction or a file system extraction, those extractions

13     were unsupported by the Cellebrite tool, leaving us with

14     a logical extraction as our only means to extract the

11:58:19 15     data.

16     Q.    All right.  Thank you.

17          And is there -- is the amount of

18     information you can learn from a device dependent upon

19     the type of extraction you can complete?

11:58:32 20     A.    Yes.

21     Q.    So in terms of logical versus physical, are you

22     learning more or less with logical?

23     A.    You're learning less with a logical extraction.  As

24     I said, logical is really just a quick, quick preview of

11:58:50 25     the device.  It may contain some deleted information from

285

1    the phone, but not as much as you'd get from a physical

2    extraction.

3    Q.    Okay.  Did you perform the examination on this

4    phone?

11:58:57  5    A.    I did.

6    Q.    And when you did that, was a report generated?

7    A.    Yes, it was.

8    Q.    All right.  I'm going to put now Government's

9    Exhibit 23 on the screen.

11:59:13 10              Okay.  This is the cover sheet of a 36-page

11    document?

12              THE COURT:  Blow it up, please.

13              MR. FILIATRAUT:  Oh, yes.

14    BY MR. FILIATRAUT:

11:59:28 15    Q.    Thank you.  And this would be under Tab 23 in Book

16    2 of 2, if you'd look at the paper.

17    A.    Yes.

18              THE COURT:  I think we're still having a

19    hard time seeing it, Mr. Filiatraut.

11:59:43 20              MR. FILIATRAUT:  I'm sorry.

21    BY MR. FILIATRAUT:

22    Q.    All right.  There we go.

23              Please take a look on the paper form, flip

24    through Pages 1 through 36, and can you tell us if this

11:59:57 25    is the report with certain photographs attached?

1    A.    Yes, it is.

2    Q.    Okay.  Is this a report that was generated by you

3    after the extraction of material from the defendant's

4    phone, Government's Exhibit 26?

5    A.    Yes, it was.

6    Q.    And is this a report that's kept in the ordinary

7    course of business of Internet Crimes Against Children

8    task force?

9    A.    Yes, it is.

10   Q.    Okay.  What type of extraction was able to be done

11   on the phone?

12   A.    This was a logical extraction performed on

13   January 8th, 2015.

14   Q.    And after performing this logical extraction of the

15   defendant's phone -- well, first off, this is the least

16   informative extraction?

17   A.    Correct.

18   Q.    Okay.  Did you try more informative ones?

19   A.    I would have tried a physical extraction.  The

20   device or the software would have told me that the phone

21   did not support the physical extraction, so we would have

22   moved on to the logical extraction.

23   Q.    Okay.  And what types of information were you able

24   to discover from the defendant's phone with the logical

25   extraction?

1    A.    We extracted, among other things, SMS messages.  We

2    extracted some MMS messages, some images that were

3    contained in the phone, some location information as far

4    as from the metadata of those images.  And then just an

12:01:32  5    overview of the contents of the phone, how many SMS

6    messages, how many MMS, how many images.

7    Q.    Okay.  And just to be clear, what is an SMS message

8    versus an MMS message?

9    A.    An SMS message is virtually a text message whereas

12:01:47 10    an MMS message would be a multi-media message containing

11    either an image or a video.

12    Q.    This particular phone, Government's Exhibit 26,

13    does this have the capability of taking photographs?

14    A.    Yes, it does.

12:01:59 15    Q.    And taking videos?

16    A.    Excuse me.  Yes.

17    Q.    Please explain to the jury what metadata is.

18    A.    Metadata is essentially just data that's embedded

19    inside of a file.

12:02:12 20             In the case of an image, the metadata may

21    contain the type of phone that was used to take the

22    image, it may contain the hash value, it may contain the

23    latitude and longitude of where the photo was taken, just

24    data that's sort of embedded inside of those files.

12:02:30 25    Q.    Now, with this extraction, were you able to tell

1    what apps, applications, apps, were on the phone?

2    A.    The logical extraction did provide us with a list

3    of 60 applications that had been installed or were

4    installed at one point.

12:02:51 5    Q.    Okay.  Was -- are you familiar with text messaging

6    and social messaging apps such as Google Voice and KIK?

7    A.    Yes.

8    Q.    Okay.  Was the KIK app on this phone?

9    A.    Based on my examination, it was not.

12:03:12 10    Q.    I'm sorry?

11    A.    It was not, no.

12    Q.    Okay.  The logical extraction, was it able to tell

13    you whether previously apps that were on the phone were

14    deleted?

12:03:22 15              Could it tell you that information?

16    A.    The extraction did not indicate, of those 60 apps

17    listed, it did not indicate that there were any that had

18    been deleted.

19    Q.    Okay.  Is that one of the limitations of logical

12:03:41 20    versus physical extractions?

21    A.    Yes.

22    Q.    Explain that to the jury.

23    A.    Well, there may be other -- as I said, the logical

24    doesn't necessarily extract all of the data, all of the

12:03:52 25    deleted data, data that may reside in unallocated space

1    or deleted space, as we would call it.

2              The possibility that if the phone were

3    supported, or we were able to do a physical extraction at

4    a later date, we may find more evidence of deleted files,

12:04:09 5    deleted applications, deleted messages.

6    Q.    Okay.  Now, are you -- please, are you aware of

7    text messaging apps as opposed to using the phone for

8    text messaging purposes by itself?

9    A.    Yes.

12:04:25 10    Q.    Can you explain the difference between those two

11    things for the jury?

12    A.    Well, most, most cell phones nowadays would come

13    with the ability to send a text message right from the

14    phone without needing to install a separate app.

12:04:36 15              So you would be communicating through your

16    cell phone provider and their text messaging capabilities

17    or limitations.

18              Newer phones obviously allow you to

19    download apps, have the ability to allow you to install

12:04:52 20    an app like KIK or Text Me Now or What's App, that would

21    allow you to text outside of the traditional Internet

22    service provider, allow you to text if you're on wi-fi,

23    maybe offer you some additional bells and whistles,

24    emoticons, things that would allow you to have a better

12:05:21 25    text messaging experience, if you will.

1    Q.    Now, if someone is using a text messaging app as

2    opposed to the phone's text messaging abilities itself,

3    would the data of those text messages be stored within

4    the app or on the phone?

12:05:32  5    A.    It depends.  Typically that information is stored

6    within the app, but again it would depend on the type of

7    extraction that we would do.

8                   As far as physical extraction would dig a

9    little deeper into those messages, associate them with

12:05:48 10    other applications as opposed to this logical extraction

11    where we're sort of grabbing the text messages from the

12    cell phone texting service instead.

13    Q.    All right.  Thank you.  Now, of the items that you

14    were able to extract, were any of them -- well, let me

12:06:17 15    step back for a second.

16                   Did any of the information extracted from

17    this phone support the idea that this defendant traveled

18    from Virginia to Cleveland on the day in question?

19    A.    Yes, it did.

12:06:33 20    Q.    Explain that to the jury.

21    A.    We found, in addition to several hundred messages

22    sent and received that talked about the defendant

23    traveling, indications of the undercover officer's cell

24    phone found within the -- or cell phone number found

12:06:50 25    within the device as well indicating those conversations,

1    we also found several images that had data associated

2    with them with latitude and longitude coordinates that

3    ranged from just east of Pittsburgh on the Pennsylvania

4    Turnpike to the area of, I believe, 271 and 71 on the

12:07:11    5    Ohio Turnpike, images where that data indicated that

6    those images were taken during the course of that trip.

7    Q.    Okay.  Now, before we get to that, you mentioned

8    first messages between your investigator and the

9    defendant.

12:07:27    10    A.    Yes.

11    Q.    Are you aware that your investigator was using

12    Google Voice, a Google Voice account to communicate with

13    the defendant?

14    A.    I was, yes.

12:07:40    15    Q.    All right.  And were all communications to and from

16    her account on Google Voice memorialized and kept as

17    evidence?

18    A.    They were.

19    Q.    All right.  So would you expect then that the

12:07:55    20    messages you found from the defendant's phone to your

21    investigator's phone through the Google Voice, her Google

22    Voice phone number, were on this extraction of the

23    defendant's phone?

24    A.    I would expect to find them, yes.

12:08:08    25    Q.    Okay.  However, if he was using a messaging app as

1    opposed to the phone itself, was that found in this

2    extraction?

3    A.    I'm not sure I can answer that.

4    Q.    Okay.  Now, let's get back to the pictures you

12:08:30  5    mentioned.

6             And I'm going to put up Page 5 of your

7    report.  What do we see here?

8             Let's focus on the top half of Page 5 here

9    for a moment.  What do we see here?

12:08:49 10    A.    The top of Page 5 is simply a graphical

11    representation.  It's a world map.  If you look closely,

12    you will see several small red dots around the area of

13    Pennsylvania, Ohio, the Great Lakes.

14             Those dots correspond to the five locations

12:09:07 15    that are listed below under the category "Locations," the

16    subcategory "Media locations."

17             These media locations refer to images that

18    were found on the device that have latitude and longitude

19    coordinates as part of the metadata or the data.

12:09:28 20    Q.    Okay.  So scrolling down here, how many images were

21    on the defendant's phone that showed location?

22    A.    There are five image files or JPEG files that are

23    listed that contain latitude and longitude coordinates.

24    Q.    All right.  And were those images able to be

12:09:47 25    extracted from the phone along with the metadata that

1    accompanied them?

2    A.    They were, yes.

3    Q.    Okay.  So now I'm going to put up Page 17.

4          Okay.  Now, let's focus on the top half

12:10:13  5    here.  What do we see here on the top half of Page 17 of

6    the report?

7    A.    Page 17 deals with the data files.  And as I said,

8    Cellebrite will extract the information and put it into

9    certain categories based on the type of device.

12:10:27  10          In this case obviously there are data files

11    that are part of the phone.  The subcategory for this

12    page would be then "Images" and there are five images

13    listed on Pages 17 and then -- or, I'm sorry, four on 17,

14    one on 18.  Those would be images that were recovered

12:10:45  15    from the -- from the device.

16    Q.    Okay.  Now, were these images recovered and were

17    the GPS coordinates that accompany the image also

18    recovered from the phone?

19    A.    Yes, they were.

12:11:02  20    Q.    Okay.  And then let me -- I'd like for you to

21    keep -- on Page 17, does it show the date and time that

22    these photos were taken as well?

23    A.    Yes, it does.

24    Q.    All right.  And for all five of these images, what

12:11:36  25    was the date on which they were taken?

1    A.    They were all taken January 5th, 2015.

2    Q.    Okay.  So now I'm going to turn to Page 28.

3          What do we see here on Page 28?  Is this

4    one of those images?

12:12:04 5    A.    28 is a screenshot showing a map of the,

6    essentially, the eastern, northeastern United States with

7    the words "Jordan's Family Restaurant, five hours, eleven

8    minutes, 341 miles" at the top.

9    Q.    Okay.  Was this screenshot taken by the defendant's

12:12:28 10    phone on his phone?

11    A.    Yes, it was.

12    Q.    And was this screenshot communicated to Agent

13    Helmick?

14    A.    Yes, it was.

12:12:36 15    Q.    Was it communicated to her as the defendant was

16    driving?

17    A.    That I do not know.

18    Q.    All right.  Next page, Page 29.

19          Is this another one of the images from the

12:12:57 20    defendant's phone?

21    A.    Yes, it is.

22    Q.    Okay.  And did this image have along with it GPS

23    coordinates?

24    A.    Yes, it did.

12:13:11 25    Q.    So and explain to the jury how that works.

1      If someone's got that enabled on their

2  phone, particularly an iPhone in this case, what happens?

3  A.    When you have your location or your GPS services

4  turned on, the soft -- the device would basically attach

12:13:31 5  the latitude and longitude coordinates to that photo once

6  it was taken.

7  Q.    So would that show where the device was

8  geographically when the photograph was taken?

9  A.    Yes.  Correct.

12:13:45 10  Q.    Okay.  Do we have that for this particular photo?

11  A.    We do, yes.

12  Q.    Okay.  So the next page there, Page 30, is this the

13  GPS coordinates where the previous page, the picture of

14  the map, was taken?

12:14:07 15  A.    It appears to be, yes.

16  Q.    All right.  And there is a red dot.  What does it

17  show, where was the phone when the picture was taken?

18  A.    It appears to be just east of Interstate 70 on the

19  Pennsylvania Turnpike which is the New Stanton service

12:14:28 20  plaza.

21  Q.    And is that along the same line of travel as we saw

22  on the screenshot showing from Virginia to Jordan's

23  Family Restaurant?

24  A.    Yes, it is.

12:14:38 25  Q.    Okay.  Going to the next page, Page 31, what do we

1    see there?

2                   Is it another picture from the defendant's

3    phone?

4    A.    Yes, it is.

12:14:59  5    Q.    Okay.  And do we have GPS coordinates for this

6    picture?

7    A.    Yes, we do.

8    Q.    Now showing you Page 33, where was the picture of

9    the Turnpike receipt taken?

12:15:27 10    A.    This picture was taken again on the Pennsylvania

11    Turnpike northwest of Pittsburgh at the 79, where

12    Interstate 79 crosses the Pennsylvania Turnpike in the

13    area of Cranberry, Pennsylvania.

14    Q.    And was that also along the same line of travel

12:15:50 15    that we saw on the screenshot from Virginia to Jordan's

16    Family Restaurant?

17    A.    Yes, it was.

18    Q.    Going to the next photograph from the defendant's

19    phone, Page 34, do you recognize that photograph?

12:16:11 20    A.    Yes, I do.

21    Q.    Okay.  And let's -- what do we see in that picture?

22    A.    That picture depicts a sign on the Ohio Turnpike

23    which reads "77 Cleveland Akron two miles."

24                   That is approximately or near the area of

12:16:34 25    where the -- where the Ohio Turnpike crosses over 271 and

1   just -- just east of the 77 exit on the Ohio Turnpike.

2   Q.    Okay.  And was this another picture taken by the

3   defendant's phone?

4   A.    Yes, it was.

12:16:51 5   Q.    And do we have GPS coordinates showing where that

6   was taken?

7   A.    Yes, we do.

8   Q.    Putting up Page 35 there, is that what we see in

9   that picture?

12:16:59 10  A.    Yes.

11  Q.    Okay.  And finally, with regard to locations, the

12  map that you had in your report, if -- can that then be

13  blown up to show the dots of all of those pictures taken

14  where they were?

12:17:32 15  A.    I don't believe it can.

16  Q.    Okay.

17  A.    Are you talking about the map on Page 5?

18  Q.    Right.  Or was there another map perhaps that

19  showed all of them in a more close-up fashion?

12:17:46 20  A.    I don't know.  I've never tried to blow up the map.

21        It's always been there to sort of give you,

22  as I say, a graphical representation of where of -- where

23  the dots would fall.

24  Q.    Okay.

12:18:05 25  A.    Although to clarify, in the report it does say

1    below the map "Open in Google Earth or open in Google

2    Maps," so that would typically indicate that you could

3    open that map and the plots would appear on a Google Map

4    image, which you could then blow up.

12:18:22  5    Q.    There we go.  All right.  And was that done in this

6    case, looking at the next page, Page 36?

7    A.    Yes, it was.

8    Q.    All right.  And let's show that Page 36 there.

9              Are those red dots corresponding to where

12:18:43 10    the pictures were on the defendant's phone when they were

11    taken according to their own GPS metadata?

12    A.    Yes, they were.

13    Q.    And does that correspond to the screenshot of the

14    defendant's line of travel from Virginia to Jordan's

12:19:01 15    Family Restaurant?

16    A.    Yes, it does.

17    Q.    Okay.  Last few questions here about this report.

18              These messages, the messages to and

19    from -- or the messages that were recovered from the

12:19:27 20    defendant's phone, did it show messages to and from

21    Investigator Helmick?

22    A.    Yes, it did.

23    Q.    And did those messages correspond with the evidence

24    she gathered in this particular case, this particular

12:19:42 25    investigation?

1    A.    Yes, they do.

2    Q.    All right.

3              MR. FILIATRAUT:  Thank you.  No further

4    questions, Judge.

12:20:02 5              THE COURT:  Thank you, Mr. Filiatraut.

6              May I see counsel briefly, please?

7              (Proceedings at side-bar:)

8              THE COURT:  Okay.  We'll break for lunch

9    obviously.

12:20:16 10              MR. GREG McCORMACK:  Sure.

11              THE COURT:  We're all hungry.

12              Greg, anticipated time for cross?

13              MR. GREG McCORMACK:  Oh, short.  15, 20

14    minutes, sir.

12:20:23 15              THE COURT:  Okay.  All right.  Let's talk

16    about what we're going to do after this.

17              We'll do exhibits, 29, get that over with.

18    And what's your preference as far as when to charge and

19    do close; tomorrow morning?  Or do you think we can

12:20:46 20    squeeze it in today?

21              MR. GREG McCORMACK:  Do it today.

22              MR. McDONOUGH:  Today would be great.

23              THE COURT:  Okay.

24              MR. GREG McCORMACK:  Do you advise him on

12:20:53 25    the record of his right to testify?

```
            1              THE COURT:  I'd like to.

            2              MR. GREG McCORMACK:  I would definitely

            3    like you to.

            4              THE COURT:  I planned on it, especially in

12:21:00    5    this case.

            6              MR. GREG McCORMACK:  Okay.

            7              THE COURT:  Okay.  We'll do that.

            8              Okay.  Let's take an hour for lunch and you

            9    have the revised jury instructions.

12:21:12   10              MR. McDONOUGH:  We did and e-mailed a copy,

           11    and so if there's -- do we get a printout?

           12              THE COURT:  Did you get a chance to look at

           13    that?

           14              MR. JARRETT McCORMACK:  We don't have a

12:21:23   15    hard copy.

           16              THE COURT:  Okay.  Start glancing at it.

           17    We'll obviously go over that, and it will take us a

           18    little while to make copies, but if we can wrap it up

           19    today, that would be great.

12:21:32   20              MR. GREG McCORMACK:  Yes, sir.

           21              MR. McDONOUGH:  Yes.

           22              THE COURT:  Okay.  Let's eat.

           23              (End of side-bar conference).

           24              THE COURT:  Time for lunch, ladies and

12:21:39   25    gentlemen.  We are on track to not only finish the
```

1    testimony in this case, but we are going to try to give

2    you this case today.  Okay?

3                    That's our goal.  We'll see how things

4    transpire in the next hour or so, but we hope to do that.

12:21:57  5            So let us work on that, and we'll send you

6    to lunch, get something to eat, and be back in the jury

7    room at 25 after 1:00.

8                    (Jury out).

9                    THE COURT:  We are adjourned.

12:22:35 10          (Luncheon recess taken).

11                   (Proceedings adjourned at 12:22 p.m.)

12                        - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>WEDNESDAY, DECEMBER 2, 2015, 1:37 P.M.</u> |
| 2 | THE COURT:  Please be seated, ladies and |
| 3 | gentlemen. |
| 4 | We're on cross, Mr. McCormack. |
| 13:37:59 5 | MR. GREG McCORMACK:  Thank you, Your Honor. |
| 6 | CROSS-EXAMINATION OF DAVID FRATTARE |
| 7 | BY MR. GREG McCORMACK: |
| 8 | Q.   Good afternoon, sir. |
| 9 | A.   Good afternoon. |
| 13:38:02 10 | Q.   Let's talk about the search of the vehicle first. |
| 11 | On the photographs and on the inventory, |
| 12 | we've seen there's a pill bottle, is that correct? |
| 13 | A.   Yes. |
| 14 | Q.   In that pill bottle, did you have the pills |
| 13:38:18 15 | analyzed or not? |
| 16 | A.   I do not believe we did. |
| 17 | Q.   Okay.  There's no report back that there's any type |
| 18 | of illegal pills or any what we call roofies or anything |
| 19 | else, correct? |
| 13:38:26 20 | A.   Not to my knowledge. |
| 21 | Q.   All right.  Were there any girl's underwear located |
| 22 | in the vehicle? |
| 23 | A.   No. |
| 24 | Q.   And were there any clothing, suitcase, men's |
| 13:38:37 25 | clothing or anything else in the vehicle? |

1       A.    I don't believe so.

2       Q.    All right.  Now, on the cell phone that was

3       recovered, the cell phone belonging to Mr. Vickers, you

4       said you conducted a Cellebrite examination on that

13:38:53 5      phone, is that correct?

6       A.    Yes.

7       Q.    All right.  Now, I understand that a logical

8       forensic examination was done on the cell phone, correct?

9       A.    Yes.

13:39:02 10     Q.    Now, can you tell from that forensic evaluation

11      that was done, whether or not that cell phone actually at

12      any time had any child pornography on it whatsoever?

13      A.    I did not see any.

14      Q.    Okay.  So you cannot say that that cell phone was

13:39:24 15     used by David Vickers to distribute or send child

16      pornography at all, correct?

17      A.    Correct.

18      Q.    And can you tell whether or not that child -- that

19      cell phone actually contained the app KIK?

13:39:39 20     A.    I cannot, no.

21      Q.    All right.  So that cell phone, you cannot relate

22      to having any involvement with the offense of

23      distribution of child pornography whatsoever, correct?

24      A.    Yes.

13:39:55 25     Q.    So other than the testimony of Investigator

1    Helmick, do you have anything to specifically relate

2    Mr. Vickers to the offense of distributing child

3    pornography?

4    A.    I do not.

13:40:11 5    Q.    All right.  Now, with Investigator Helmick, I

6    understand that she was new to your investigation team

7    totally approximately, what, two, three months prior to

8    this investigation?

9    A.    Yes.

13:40:27 10    Q.    And the specific training that she received to be

11    an investigator on this task force was what?

12    A.    At that point she would have been receiving

13    on-the-job training from other undercover investigators,

14    investigators who would have been overseeing her

13:40:48 15    investigations as well as myself overseeing these

16    investigations.

17              But up until that point, most of what she

18    would have been trained in would have come from myself as

19    well as some other ICAC investigators.

13:41:00 20    Q.    Who was her actual supervisor; was that you?

21    A.    Yes.

22    Q.    So you were her direct supervisor, correct?

23    A.    Yes.

24    Q.    Okay.  So prior to the investigation involving

13:41:08 25    Mr. Vickers, how many other investigations of this nature

1    was she involved in?

2    A.    I couldn't say.  Maybe a few --

3    Q.    Okay.

4    A.    -- at least.

13:41:20 5    Q.    Was she involved in any others that resulted in an

6    arrest prior to Mr. Vickers?

7    A.    I believe so.

8    Q.    And on those occasions, those other investigations,

9    did they all involve the same scenario where she was

13:41:36 10    acting out as a mother involving a child being portrayed,

11    also?

12    A.    I don't recall.  Either that, or just simply as a

13    child.

14    Q.    All right.  Now, were there protocols that were

13:41:53 15    utilized as far as how to handle a situation if the

16    target of the investigation became more interested in her

17    as the mother of the child, than in the child?

18    A.    I wouldn't say so much as protocols as more as a

19    decision on the part of the investigator.

13:42:12 20    Q.    Okay.  So was it up to the investigator, Special

21    Investigator Helmick, to decide how to handle this?

22    A.    For the most part, but it would require some

23    discussions with myself if she ran into some issues

24    where, like you said, the subject of the investigation

13:42:30 25    was more interested in the adult.

1      Obviously with our focus being on child

2   exploitation, it's up to the investigator to sort of

3   determine whether that individual is, in fact, interested

4   only in the adult, or the adult and the child.

13:42:46  5   Q.    Now, as a supervisor, this is something you would

6   absolutely insist upon being made aware of, is that

7   correct, if that situation occurred?

8   A.    At some point.

9   Q.    Now, my understanding is that you were made aware

13:43:03  10  of the actual substance of the chat conversation, the

11  physical communications, the written communications that

12  took place between Mr. Vickers and Special Agent Helmick

13  prior to the arrest taking place, prior to the actual

14  traveling involved, correct?

13:43:17  15  A.    Yes.

16  Q.    And that was on January 5th, so you would have been

17  made aware of that once you knew that actual travel was

18  going to take place, correct?

19  A.    Correct.

13:43:27  20  Q.    Okay.  And I understand that you became aware of

21  that travel was going to take place literally the day,

22  the day of the travel, January 5th, correct?

23  A.    I'm not sure of the exact date.

24  Q.    All right.  Well, the chat messages, I mean the

13:43:46  25  jury is going to have the chat messages, and those chat

1    messages would indicate when the agent, the investigator

2    became aware that he was going to be traveling on that

3    date, which I believe was January 5th itself?

4    A.    You're correct, yeah, I would have known the actual

13:44:00  5    date.

6    Q.    Once the investigator knew that he was traveling

7    that date, correct?

8    A.    Correct.

9    Q.    Okay.  So and it was a pretty quick on-the-spot

13:44:08 10    scenario, "Hey, he's kind of on his way," correct?

11    A.    I believe there were some prior communications

12    indicating that there might be a travel arrangement

13    either the 5th or the day before.

14    Q.    Okay.  But prior to that, if the investigation

13:44:24 15    started on December 12th, 2014 until on or about the

16    travel date of January 5th, 2015, would it be fair to say

17    that you really had no direct communications or oversight

18    of the investigator as far as seeing the actual chats

19    going on back and forth between her and Mr. Vickers?

13:44:44 20    A.    It's hard to say.  I would have, based on what

21    Investigator Helmick would have been telling me during

22    the course of the investigation, if she indicated that it

23    looked like the subject was going to travel, that's

24    usually at the time where I would request to see the

13:45:00 25    conversations from the beginning up to that point.

1    Q.    Okay.  Be fair to say, however, that you never

2    became aware of any potential issues with Mr. Vickers

3    becoming more interested in Special Agent Helmick than in

4    the girl Katie, correct?

13:45:15  5              You never became aware of that?

6    A.    Other than a review of the conversations, no.

7    Q.    Okay.  Well, tell me about the review of the

8    conversations.

9              Were you at any time made aware that the

13:45:25 10   agent herself became concerned that Mr. Vickers was more

11   interested in her than he was with Katie?

12   A.    I think some of the conversations seemed to

13   indicate a back and forth nature, if you will, based on

14   the conversations between the adult as well as the child.

13:45:42 15              Nothing that caused me concern as far as

16   the belief that he was traveling to engage in sexual

17   activity with the adult, though.

18   Q.    Okay.  Did she ever have -- and by "She," did

19   Investigator ever indicate to you that she had concerns

13:46:00 20   that in actuality he was more -- "He" being

21   Mr. Vickers -- he was more interested with her than he

22   was with Katie?

23   A.    I'm sure we had a conversation about some comments

24   that he may have made, but I don't believe they were

13:46:15 25   concerns.

309

1    Q.    So she never indicated having any concerns?

2    A.    Investigator Helmick?

3    Q.    Correct.

4    A.    No.

13:46:21 5    Q.    Okay.  Now, did she at any time ever bring to your

6    attention the fact that she, or a concern that she

7    thought the investigation should be shut down --

8    A.    No.

9    Q.    -- with Mr. Vickers?

13:46:41 10              If I may show you Government Exhibit 20,

11    Page 53, had you seen this specific chat before?

12              I'm pointing down to this particular area

13    here (indicating).

14    A.    Yes.

13:47:08 15    Q.    Okay.  You saw that before?

16    A.    Yes, I have.

17    Q.    Okay.  Tell me when you would have seen that

18    before.

19    A.    I don't recall.

13:47:15 20    Q.    Okay.  So something you've just seen recently

21    preparing for this trial, or is this something you saw

22    during the course of the investigation?

23    A.    I would have seen it during, during the course of

24    the investigation.

13:47:27 25    Q.    Now, does this indicate to you at that particular

1    point when you saw this that the agent or Investigator

2    Helmick in her mind had concerns that she was putting --

3    the situation where she was putting ideas in this

4    individual's head that he would be doing and saying

13:47:54  5    things that he did not want to do?

6    A.    No.

7    Q.    Even though she said that to him?

8    A.    Correct.

9    Q.    All right.  Now, when an individual who's a target

13:48:19 10    of an investigation says that he wants to shut it down,

11    he wants to stop it, how should the investigator handle

12    it at that particular point?

13              Should the investigator at that particular

14    point try to keep it going?

13:48:33 15    A.    I mean, typically the investigator may ask some

16    questions, some follow-up questions as to why that may be

17    the case, but ultimately with the number of targets that

18    we investigate at any given time, typically the

19    investigator may just sort of walk away from him or back

13:48:50 20    off from that investigation if the subject clearly is not

21    interested.

22    Q.    Okay.  Should the investigator in any manner try to

23    goad the individual into trying to keep it going?

24    A.    I wouldn't say goad.

13:49:04 25    Q.    No.  Should not -- should the investigator pretty

1    much start cursing at the individual, calling the

2    individual names such as "You're an asshole"?

3    A.    Well, I think that depends on the conversations

4    that come before it.

13:49:18  5         If you're talking about an investigation

6    that has spanned over several months where the subject or

7    the target has indicated a desire to engage in activity

8    with the purported child, to travel to a location,

9    obviously you would have an undercover profile as an

13:49:35 10   adult that would be somewhat upset by that, upset by

11    those conversations.

12         So I think that's certainly normal that two

13    adults talking about essentially child exploitation

14    activity, one of them would find some issue with an

13:49:53 15   individual who then suddenly said "I'm not interested."

16    Q.    All right.  Now, this investigation lasted a total

17    of three weeks, is that correct?

18    A.    I believe so, yes.

19    Q.    All right.  I'm going to show you what's been

13:50:07 20   marked as Government's Exhibit 20, Page 82.

21         Now, here as you can see Mr. Vickers is

22    indicating that he had second thoughts and indicates

23    that, "I don't think I can morally do this.  After all, I

24    was trying to get with you more than anything, but the

13:50:23 25   more I wrap my brain around it, I was saying and doing

1   things that weren't true to myself just to impress you

2   instead.  Most of the things I said weren't true after

3   all."

4                    And your agent responds "Awesome, I knew

13:50:36  5   you were like the last guy.  You're an asshole."

6                    Is that what you expect your agents to be

7   doing and saying in response to somebody indicating he

8   can't do this?

9   A.    In terms of this investigation, certainly.

13:50:45  10  Q.    Oh, so this is how you expect your agent to

11  respond, correct?

12  A.    In this case, I would say yes.

13  Q.    Okay.  Why is that?

14  A.    Well, again, you have an individual who has

13:50:54  15  previously expressed an interest, he's engaged in these

16  conversations with our undercover officer, and he says,

17  you know, again he has second thoughts.

18                    So I would certainly believe that an

19  undercover officer posing as an adult interested in child

13:51:10  20  exploitation would take some offense to someone that she

21  thought she was developing a trust with suddenly deciding

22  he didn't want to do this.

23  Q.    Okay.

24  A.    It wouldn't really fit our undercover persona to

13:51:23  25  say "Okay, no big deal.  I'm a police officer."

1          I mean, that's taking it a little far, but
2     we have to pose as sort of a deviant segment of the
3     population in terms of these undercover investigations.
4          The Internet is not nice.  It contains
13:51:40  5     explicit language, explicit actions, and it certainly
6     contains swear words.
7     Q.   So if the individual says "I'm done with this, I
8     don't want to be involved with this," you expect your
9     agent to be basically saying, "Hey, you're an asshole,"
13:51:55 10    and basically try to egg him on into keep going, that's
11    what you would expect?
12    A.   I wouldn't say they're egging him on.
13    Q.   Okay.  All right.  Now, showing you Page 83, your
14    agent indicates again at a later point when he's trying
13:52:11 15    to pull out of this thing, "You're jacking me around and
16    I don't appreciate it.  I'll send a picture, you wouldn't
17    come.  You just been fantasizing jacking off this whole
18    time, haven't you?  But when it comes time to follow
19    through, you're a big pussy."
13:52:28 20          Again that's in concert with how you expect
21    your agents to handle this, correct?
22    A.   We conduct a number of investigations where
23    individuals clearly are just, as we would say,
24    fantasizing or role playing or as this references here
13:52:39 25    sitting at home and masturbating.

1          So I believe clearly that line is certainly

2     relevant, something I would expect an adult to say if

3     they thought they were engaged in a conversation with

4     another individual who suddenly said, you know, "Maybe

13:52:53  5     I'm not into this."

6     Q.    Okay.  All right.  So now, do you expect your

7     agents to be in any manner enticing a target in an

8     investigation to be interested in the agent sexually?

9     A.    Well, that depends on the time and place that it

13:53:22 10     occurs in the conversation.

11          We would never want our investigators to

12     entice or escalate a subject at the very beginning of the

13     investigation.  In fact, we always tell our investigators

14     not to initiate those first conversations.

13:53:36 15          However, if the subject or the target of

16     the investigation starts talking about sex, starts asking

17     for certain things such as pictures or videos or proof of

18     the child, we may respond accordingly at that point.

19     Q.    Well, should the investigators lead the agent -- or

13:53:53 20     the target to believe if the target commits the act which

21     is the subject of the investigation, that the target may

22     be able to engage in sexual activity with the agent?

23     A.    Can you say that again?

24     Q.    Sure.  Should the agent be leading the target to

13:54:14 25     believe that if the target commits the act which is the

1    subject of the investigation, that he may be able to

2    engage in sexual activity with the agent?

3                 That's not proper, is it?

4    A.    I'm not sure I understand the question.

13:54:26  5    Q.    All right.  Let me break it down.

6                 Should your agent be leading the target to

7    believe if the target commits the act which is the

8    subject of the investigation, that he may be able to

9    engage in sexual activity with the agent?

13:54:48 10    A.    I, again, I'm sorry, I'm just not following you.

11    Q.    You're not following me.

12                 All right.  Should this agent right

13    here --

14    A.    Okay.

13:54:59 15    Q.    -- through her conduct be leading Mr. Vickers to

16    believe if he engages in this conduct with Katie, that he

17    may be able to engage in a sexual relationship with Agent

18    Helmick?

19    A.    Again that depends on -- that depends on the

13:55:17 20    conversation.

21    Q.    Depends on the conversation.

22                 So you think it's proper for an agent of

23    the government to entice this agent's body -- use this

24    agent's body to entice this man to commit a crime?

13:55:35 25                 MR. FILIATRAUT:  Objection.

1    BY MR. GREG McCORMACK:

2    Q.    Yes?

3                THE COURT:  Sustained.  You can rephrase,

4    though, Mr. McCormack.

13:55:48  5                MR. GREG McCORMACK:  All right.

6                THE COURT:  Here, let's make it easier.

7                Is it within protocol to do what

8    Mr. McCormack asked, depending on the circumstances?

9                THE WITNESS:  I'm not sure.  I apologize,

13:56:02 10   Your Honor.

11                THE COURT:  Okay.  The question is is it

12   within protocol, is it permissible from your point of

13   view to have a conversation with a target, in essence,

14   "If you have sex with my daughter, you may be able to get

13:56:27 15   me in the future"?

16                MR. GREG McCORMACK:  Okay.

17   A.    No.

18                THE COURT:  Is that fair, Mr. McCormack?

19                MR. GREG McCORMACK:  That is certainly

13:56:33 20   fair.

21                No further questions.

22                THE COURT:  Thank you, Mr. McCormack.

23                MR. GREG McCORMACK:  Thank you, Your Honor.

24                Mr. Filiatraut.

13:56:44 25                MR. FILIATRAUT:  Yes, Judge.

1      REDIRECT EXAMINATION OF DAVID FRATTARE

2    BY MR. FILIATRAUT:

3    Q.    As investigators with the Internet Crimes Against

4    Children task force, is it your goal to put -- to turn

13:57:11  5    people who are just fantasizing into people who are going

6    to be acting?

7    A.    No.

8    Q.    Okay.  Now, along those lines with the last

9    question, why is it impermissible for an agent to say,

13:57:27 10    "Here, if you have sex with my daughter, you can have sex

11    with me"?

12    A.    Well, our focus is on individuals who are

13    attempting to exploit children, plain and simple.

14    Q.    Right.  Do you want your agents putting those ideas

13:57:48 15    into people's minds?

16    A.    No.

17    Q.    Okay.  Did you review this case?

18    A.    I did.

19    Q.    Do you feel that Agent Helmick put any of those

13:57:56 20    ideas into the mind of her subject?

21              MR. GREG McCORMACK:  Objection.

22              THE COURT:  Overruled.

23              He can answer.

24    A.    No, I do not.

13:58:03 25    Q.    Now, when it comes to language being used, all

1  right, why is it permissible for an agent to use curse

2  words, rough language when speaking with a subject?

3  A.    For the mere fact that I think they need to fit the

4  persona, fit in with the other users of, say, that

13:58:34 5  website or that chat room or that -- that e-mail

6  exchange.

7          You're talking about two adults who are

8  talking about something extremely explicit and something

9  that is extremely illegal.  I would certainly believe

13:58:44 10  that they would talk about things in a graphic,

11  expletive-filled nature.

12          And I believe we've seen enough of that on

13  the internet through our own investigations to say that

14  that's how individuals will talk and communicate when

13:59:02 15  they're online.

16  Q.    When Agent Helmick spoke with the defendant, was

17  she Miranda Helmick or was she Traci Black?

18  A.    She was Traci Black.

19  Q.    And when she spoke as 13-year-old Katie, was she

13:59:14 20  Miranda Helmick or was she 13-year-old Katie?

21  A.    Thirteen-year-old Katie.

22  Q.    What does it mean for an agent's persona to get

23  burned?

24  A.    Technically that would mean either through another

13:59:31 25  individual online or through some other means outside of

1    our control, that undercover persona would be sort of

2    outed as a law enforcement officer or as a police

3    officer, where either an individual sees something on a

4    profile or in cases where we've made a prior arrest of a

13:59:53  5    target and information has gotten out about that profile,

6    to where we can no longer utilize it in an undercover

7    capacity.

8    Q.    In your experience, do people who use the

9    Experience Project website chat with each other about --

14:00:08 10            MR. GREG McCORMACK:  Objection, Your Honor.

11   BY MR. FILIATRAUT:

12   Q.    -- law enforcement officers?

13            THE COURT:  Hold on.

14            Overruled.  You can answer.

14:00:19 15   A.    That's happened before.  I can't say specifically

16   with regards to the Experience Project, but certainly

17   there are chat rooms and websites devoted to exposing

18   undercover law enforcement operations.

19            MR. GREG McCORMACK:  Your Honor, objection.

14:00:32 20            THE COURT:  Overruled.

21   BY MR. FILIATRAUT:

22   Q.    Let me ask you this:  If Agent Helmick as Traci

23   Black had received communication from the defendant and

24   said, "You know what, you're right, I'm a police officer,

14:00:49 25   we're going to stop this right here," is the persona of

1    Traci Black useful any more?

2    A.    If the defendant had said that?

3    Q.    No.  If --

4    A.    Or if --

14:01:03  5    Q.    If Agent Helmick said this, "We're going to stop

6    this because I'm a police officer"?

7    A.    Yeah, we would have wasted a lot of time at that

8    point then.

9    Q.    Right.  And not only -- is it fair to say not only

14:01:13 10    is Traci Black burned with regard to --

11                   MR. GREG McCORMACK:  Objection to leading.

12                   THE COURT:  Rephrase.  It is correct.

13                   Sustained.

14    BY MR. FILIATRAUT:

14:01:19 15    Q.    All right.  If a persona is burned with one

16    individual, would you expect that persona to be burned

17    with others in the future?

18    A.    Could be.

19    Q.    Okay.  In your review of your agent's activities

14:01:47 20    here, do you feel that she gave the defendant chances to

21    stop this, outs as they're known?

22    A.    Absolutely.

23    Q.    Do you feel she put in his mind to have sex with

24    13-year-old Katie?

14:02:13 25    A.    No.

1          MR. GREG McCORMACK:  Objection, Your Honor.

2          THE COURT:  Overruled.  He's the

3     supervisor.

4     A.    No, I do not.

14:02:20  5   BY MR. FILIATRAUT:

6     Q.    Is it -- in your review, were her actions proper in

7     this case?

8          MR. GREG McCORMACK:  Objection, Your Honor.

9     That's calling for a final --

14:02:26 10        THE COURT:  No, that's overruled.  I will

11    allow it.

12    A.    Yes, they were.

13    Q.    Okay.  Last few questions.

14          In order to send a video file to someone

14:02:47 15   using KIK, so in other words for a KIK user to receive a

16    video file through KIK, does one need an electronic

17    device such as an iPhone that can access the Internet?

18    A.    Yes, they do.

19    Q.    Okay.  Mr. McCormack asked you about whether

14:03:08 20   there's any other evidence besides the testimony of Agent

21    Helmick regarding child pornography.

22          Not only did you review the chats between

23    Traci Black and the defendant, did you review the chats

24    between Katie Black and the defendant?

14:03:25 25   A.    Yes, I did.

1    Q.   And within those chats, the KIK, did, indeed, Katie

2    Black receive child pornography from the defendant?

3    A.   Yes, she did.

4            MR. FILIATRAUT:  Nothing further.

14:03:44 5            THE COURT:  Thank you, Mr. Filiatraut.

6            Mr. McCormack.

7        RECROSS-EXAMINATION OF DAVID FRATTARE

8    BY MR. GREG McCORMACK:

9    Q.   Is Katie Black real?

14:04:04 10   A.   No.

11   Q.   So again, do we have any evidence other than Traci

12   as to child pornography?

13   A.   Could you repeat that?

14   Q.   Do we have any evidence other than Traci's

14:04:17 15   testimony concerning child pornography?

16   A.   Other than the files that were between --

17   Q.   Right.  Other than Traci's testimony as to the

18   source of child pornography?

19            THE COURT:  You mean and the investigator's

14:04:31 20   testimony.

21   BY MR. GREG McCORMACK:

22   Q.   Right.  And the investigator's testimony, correct?

23   A.   I'm aware of activity between the child and the

24   defendant with regards to child pornography.

14:04:38 25   Q.   Okay.

1    A.    Through KIK.

2    Q.    I understand that.  But when the agent -- I'm

3    sorry -- when the prosecutor is asking you about Katie,

4    Katie is not a person, correct?

14:04:48 5    A.    Correct.

6    Q.    All right.  Now, this investigation could have been

7    ended without outing the special agent, correct?

8    A.    Correct.

9    Q.    Okay.  She could have just ended it without

14:05:04 10   disclosing the fact that she was an investigator or law

11   enforcement officer, correct?

12   A.    Yes.

13              MR. GREG McCORMACK:  Thank you.  No further

14   questions.

14:05:12 15             THE COURT:  All right.  Mr. McCormack,

16   thank you.

17              Ladies and gentlemen, any questions?

18   Before the witness steps down, any questions?

19              Thank you very much, sir.

14:05:24 20             THE WITNESS:  Thank you, Your Honor.

21              (Witness excused).

22              THE COURT:  May I see counsel, please?

23              (Proceedings at side-bar:)

24              THE COURT:  Government prepared to rest?

14:05:42 25             MR. McDONOUGH:  Yes, Your Honor.

        1           THE COURT:  Okay.  I'll have you rest on

        2   the record.  I'll send the jury out, but after you rest,

        3   and then we'll do the --

        4           MR. GREG McCORMACK:  Yes, sir.

14:05:53  5           THE COURT:  -- 29.

        6           MR. GREG McCORMACK:  Defendant says no

        7   evidence, he will not testify.

        8           THE COURT:  I'll make sure of that.

        9           MR. GREG McCORMACK:  Yes, sir.

14:05:59 10           THE COURT:  So the instructions are being

       11   printed so we're getting a jump on that, so let them

       12   relax for a while, we'll go through the exhibits and get

       13   rid of the legal stuff.

       14           MR. GREG McCORMACK:  Yes, sir.

14:06:08 15           THE COURT:  Okay.  All right.

       16           MR. GREG McCORMACK:  Sir, how do you handle

       17   deliberations?  Do you go past 5:00 with them?

       18           THE COURT:  No.  No.

       19           MR. GREG McCORMACK:  Okay.

14:06:16 20           THE COURT:  They won't, I doubt it today.

       21   Usually they will come back tomorrow.

       22           MR. GREG McCORMACK:  Yes, sir.

       23           THE COURT:  What they will normally do is

       24   pick a foreperson, break for the evening, come back and

14:06:27 25   start deliberating.  That's what I expect, but we'll see.

1          MR. GREG McCORMACK:  Yes, sir.

2          THE COURT:  Okay.  Thank you.

3          (End of side-bar conference).

4          THE COURT:  Mr. McDonough, on behalf of the

14:06:41 5    government.

6          MR. McDONOUGH:  Your Honor, on behalf of

7    the United States, we would rest pending the admission of

8    Government's Exhibits.

9          THE COURT:  All right.  Ladies and

14:06:48 10   gentlemen, the government has rested at this point.

11          We're going to give you a break.  I have

12   some legal matters to discuss with the attorneys, and

13   we're going to be working on the jury instructions and

14   again trying to give you everything today before you go

14:07:02 15   home.

16          So let's take a break.  We'll keep you

17   up-to-date on where we are and when we'll bring you back

18   into court.

19          (Jury out).

14:07:37 20          THE COURT:  Please be seated, everyone.

21          As I indicated, we'll deal with exhibits at

22   the close of everything, which is I assume going to be

23   very shortly.

24          But the government has rested.

14:07:50 25   Mr. McCormack, any motions?  Mr. Jarrett McCormack.

1          MR. JARRETT McCORMACK:  Yes, Your Honor.

2     We would, the defense would make a Rule 29 motion for

3     judgment of acquittal at this point, Your Honor.  I'll be

4     relatively brief, Judge, as far as I'll break it down

14:08:02  5     into three counts.

6          Count 1, distribution, we would submit that

7     the evidence at this point is insufficient to sustain a

8     conviction.

9          Count 2, the enticement count, Your Honor,

14:08:16 10     the defense position at this point is government has

11     failed to meet its burden to prove that the defendant

12     Mr. Vickers used the means of interstate and foreign

13     commerce to entice the juvenile here and that basically

14     the interest was in the juvenile; not the mother.

14:08:34 15          And then as far as Count 3 goes, Your

16     Honor, again pretty much the same argument there.  We've

17     got the knowingly travel in interstate commerce, but what

18     his intents were and what his purposes were to do that, I

19     think the government has failed to meet their burden and

14:08:48 20     that they could not sustain a conviction based upon these

21     facts that his purpose there was to engage in illicit

22     sexual conduct with a 13-year-old.

23          Thank you, Your Honor.

24          THE COURT:  Mr. McDonough, on behalf of the

14:09:02 25     government.

1          MR. McDONOUGH:  Your Honor, on behalf of

2     the government, the government would ask that this case

3     go to the jury.  That the government has presented

4     evidence through the Google Voice text messages, through

14:09:14  5     the KIK communications with 13-year-old Katie, through

6     the KIK communications with the mother profile and with

7     the recorded calls that there's a -- evidence as to each

8     and every element of the three counts.

9          We do have some joint stipulations

14:09:32 10     regarding Count 1, regarding the interstate and foreign

11     commerce and the fact that there were real minors as well

12     as through the testimony of Investigator Helmick and the

13     testimony of David Frattare regarding the intent, the

14     enticement, the attempt to persuade as well as traveling

14:09:55 15     from the State of Virginia to the State of Ohio.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          The Court has listened to all the testimony

19     the government has presented at this point, and the Court

14:10:05 20     finds that there is more than sufficient evidence on each

21     element of each count such that a reasonable jury could

22     convict the defendant of all three charges.

23          Therefore, the Rule 29 motion on behalf of

24     the defense is denied.

14:10:21 25          MR. JARRETT McCORMACK:  Thank you, Your

1    Honor.

2                    THE COURT:  Exhibits.  Mr. McDonough, I'll

3    start with you.  I understand you have discussed this

4    with Mr. McCormack and Mr. McCormack.

14:10:32 5                MR. McDONOUGH:  Yes, Your Honor.

6                    The government at this time would move to

7    admit disk 5 which is the disk of child pornography.

8                    THE COURT:  Are there going to be any

9    objections to the exhibits?

14:10:45 10               MR. JARRETT McCORMACK:  Your Honor, I think

11   the only one we had concerns on was Exhibit --

12   Government's Exhibit Number 23.  I think those have been

13   addressed.

14                    MR. McDONOUGH:  Yes.

14:10:55 15               MR. JARRETT McCORMACK:  So I do not believe

16   beyond that, Judge.

17                    MR. McDONOUGH:  That is correct, Your

18   Honor.

19                    THE COURT:  23 is what?

14:11:01 20               MR. GREG McCORMACK:  Cell phone.

21                    MR. McDONOUGH:  23 is the extraction report

22   of the iPhone, and the government will agree to make

23   redactions on that.

24                    THE COURT:  Let's go ahead and run through

14:11:11 25   the exhibits and we will have an agreement on the record.

1              Go ahead, Mr. McDonough.

2              MR. McDONOUGH:  The agreement would be to

3     Exhibit 5, the disk with child pornography.

4              To Exhibit 9, the Experience Project chat

14:11:23 5    with David W. Vickers.

6              The Exhibit 12 which is the one-page

7     Experience Project private messages sent by David W.

8     Vickers.

9              Exhibit 17, the KIK, excuse me, KIK app

14:11:37 10   communications between David W. Vickers and Katie Black,

11    the 13-year-old daughter profile.

12             Exhibit 18, KIK app communications between

13    David W. Vickers and Traci Black, 29-year-old mother

14    profile.

14:11:52 15            Exhibit 20, the master transcript of Google

16    chats between David W. Vickers and Traci Black, the

17    29-year-old mother profile.

18             Exhibit 21, which was the photos of the

19    vehicle of David W. Vickers.

14:12:06 20            Exhibit 22, driver's license picture sent

21    by David W. Vickers.

22             Exhibit 23, which will be redacted, the

23    extraction report of the Apple iPhone of David W. Vickers

24    by David K. Frattare.

14:12:22 25            Exhibit 26, which is the -- an item, it's

1    the Apple iPhone recovered from David W. Vickers.

2                    Item -- Exhibit 27, an item, the unopened

3    LG Realm Boost cell phone from the vehicle of David W.

4    Vickers.

14:12:40 5                    Exhibit 28, an item, the driver's license

6    of David W. Vickers.

7                    Exhibit 29, an item, the Pennsylvania

8    Turnpike receipt.

9                    Exhibit 30, the inventory of the vehicle of

14:12:54 10   David W. Vickers.

11                   And then Exhibit 31, recorded call number

12   one of David Vickers and Traci Black.

13                   Exhibit 33, recorded call number two of

14   David Vickers and Traci Black.

14:13:05 15                  Exhibit 35, recorded call number three of

16   David Vickers and Traci Black.

17                   And Exhibit 37, the recorded call number

18   four of David Vickers and Traci Black.

19                   The government would also be providing a

14:13:18 20   laptop that is stripped down so that if the jury would

21   like to listen to any of the recorded calls, that they

22   would have that opportunity.

23                   And as well if the jury would like to view

24   the child pornography or bestiality on disk five, they

14:13:34 25   could have that opportunity as well.

1          MR. GREG McCORMACK:  Did you say 12?

2          MR. McDONOUGH:  12, and 12 is a

3     one-page --

4          MR. GREG McCORMACK:  Yes.  I'm sorry.

14:13:43 5     That's revised 12, yes.  Okay.

6          THE COURT:  Okay.  Either Mr. McCormack,

7     Jarrett?  I just want to make sure you agree to the

8     Government's Exhibits.

9          MR. GREG McCORMACK:  Yes, sir.

14:13:59 10         MR. JARRETT McCORMACK:  No objection.  As I

11    said, Judge, on 23 there will be the redactions.

12         THE COURT:  He did mention the redactions.

13         MR. GREG McCORMACK:  Yes, sir.

14         MR. JARRETT McCORMACK:  Yes, sir.

14:14:05 15         THE COURT:  Okay.  On behalf of the

16    defense, Mr. McCormack.

17         MR. GREG McCORMACK:  A, B, C, and D, Your

18    Honor; just four photographs.

19         MR. McDONOUGH:  No objection.

14:14:13 20         THE COURT:  Okay.  All those exhibits will

21    be admitted.

22         Okay.  We will deal with Mr. Vickers at

23    this point.

24         Mr. Vickers, I'm sure and I know that you

14:14:25 25    have discussed this case at length with both Mr. Greg

1    McCormack and Mr. Jarrett McCormack, is that correct?

2                     THE DEFENDANT:  Yes, Your Honor.

3                     THE COURT:  And they have so far answered

4    all of your questions?

14:14:35  5                     THE DEFENDANT:  Yes, Your Honor.

6                     THE COURT:  And I know that you discussed

7    at length that you have a constitutional right to testify

8    and a constitutional right not to testify, and no one can

9    hold that against you.

14:14:46 10                     You understand that?

11                     THE DEFENDANT:  Yes, Your Honor.

12                     THE COURT:  It is my understanding, and you

13   have to confirm this, that you have voluntarily decided

14   not to testify.

14:14:56 15                     Is that correct?

16                     THE DEFENDANT:  Correct, Your Honor.

17                     THE COURT:  Okay.  Mr. Greg McCormack, do

18   you have any concerns at all that he made a voluntary

19   decision?

14:15:04 20                     MR. GREG McCORMACK:  That is correct, Your

21   Honor.  We have discussed this at length on numerous

22   occasions.

23                     THE COURT:  All right.  Very well.  Then I

24   will accept it as such.

14:15:10 25                     Thank you.

1          MR. GREG McCORMACK:  Thank you, Your Honor.

2          THE COURT:  As we speak, the jury

3    instructions are being printed, and we'll see how far

4    along we are with that.

5          In the meantime, you can gather your

6    thoughts.

7          Mr. McDonough, how are you and

8    Mr. Filiatraut splitting?  Are you splitting?

9          MR. McDONOUGH:  Yes, Your Honor.

10   Mr. Filiatraut will be doing the opening close --

11         THE COURT:  I'm sorry, I keep butchering

12   your name.  Forgive me.

13         MR. FILIATRAUT:  That's all right.

14         MR. McDONOUGH:  Mr. Filiatraut will be

15   doing the opening close, and I will be doing the closing

16   close.

17         THE COURT:  Very well.  Estimated time?

18         MR. FILIATRAUT:  Oh, I would say no more

19   than 20 minutes for me, more like 15.

20         THE COURT:  Okay.  Mr. McDonough?

21         MR. McDONOUGH:  Ten minutes.

22         THE COURT:  Okay.  Mr. McCormack.

23         MR. GREG McCORMACK:  20 minutes to half an

24   hour, Judge.

25         THE COURT:  Very well.  That's -- that's

1    easy.

2              Okay.  Let's go see where we are for the

3    printing and we'll keep you up-to-date, and we'll be good

4    to go pretty soon.

14:16:09  5              We're adjourned.

6              (Recess taken).

7              THE COURT:  Please be seated, ladies and

8    gentlemen.

9              Ladies and gentlemen, as I indicated before

14:32:28 10   the government has rested its case.

11             I now turn to the defense.  Mr. McCormack,

12   what is the pleasure of the defense now that the

13   government has rested?

14             MR. GREG McCORMACK:  Thank you, Your Honor.

14:32:36 15   Your Honor, defense rests.

16             THE COURT:  Okay.

17             MR. GREG McCORMACK:  Your Honor, we do need

18   a quick side-bar, please.

19             THE COURT:  Very well.

14:32:42 20             (Proceedings at side-bar:)

21             MR. GREG McCORMACK:  We need to renew the

22   Rule 29 motion.

23             THE COURT:  Okay.  Any response?

24             MR. McDONOUGH:  We incorporate our same

14:32:56 25   arguments, Your Honor.

1            THE COURT:  Okay.  Nothing has changed in

2     the Court's view, so the motion is denied.

3            MR. GREG McCORMACK:  Yes, sir.  Thank you.

4            (End of side-bar conference).

14:33:03  5            THE COURT:  All right.  Ladies and

6     gentlemen, all the evidence is in.  You will hear no

7     further testimony.

8            Our order of business will be as follows:

9     We will start with the instructions of law, a copy of

14:33:18  10    which you have in your hands, and I will ask that you

11    read along with me.

12            And then we will have closing arguments and

13    then, finally, the last part of these instructions are

14    the procedures you must follow for your deliberations.

14:33:29  15            As you know, the government has the right

16    to argue first and last since they bear the burden in

17    this case.

18            So let's start with the instructions of

19    law.  Please read along with me.

14:33:42  20            Members of the jury, now it is time for me

21    to instruct you about the law that you must follow in

22    deciding this case.

23            I will start by explaining your duties and

24    the general rules that apply in every criminal case.

14:33:53  25            Then I will explain the elements or parts

1    of the crimes that the defendant is accused of

2    committing.

3              Then I will explain some rules that you

4    must use in evaluating particular testimony and evidence.

14:34:04  5              And last, I will explain the rules that you

6    must follow during your deliberations in the jury room,

7    and the possible verdicts that you may return.

8              Please listen very carefully to everything

9    I say.

14:34:14 10              You have two main duties as jurors.  The

11    first one is to decide what the facts are from the

12    evidence that you saw and heard here in court.  Deciding

13    what the facts are is your job, not mine, and nothing

14    that I have said or done during this trial was meant to

14:34:30 15    influence your decision about the facts in any way.

16              Your second duty is to take the law that I

17    give you, apply it to the facts, and decide if the

18    government has proved the defendant guilty beyond a

19    reasonable doubt.

14:34:41 20              It is my job to instruct you about the law,

21    and you are bound by the oath that you took at the

22    beginning of the trial to follow the instructions that I

23    give you, even if you personally disagree with them.

24    This includes the instructions that I gave you before and

14:34:55 25    during the trial, and these instructions.  All the

1    instructions are important, and you should consider them

2    together as a whole.

3              The lawyers will talk about the law during

4    their arguments.  But if what they say is different from

14:35:10  5    what I say, you must follow what I say.  What I say about

6    the law controls.

7              Perform these duties fairly.  Do not let

8    any bias, sympathy or prejudice that you may feel toward

9    one side or the other influence your decision in any way.

14:35:27  10             As you know, the defendant has pleaded not

11   guilty to the crimes charged in the indictment.  The

12   indictment is not any evidence at all of guilt.  It is

13   just the formal way that the government tells the

14   defendant what crimes he is accused of committing.  It

14:35:39  15   does not even raise any suspicion of guilt.

16             Instead, the defendant starts the trial

17   with a clean slate, with no evidence at all against him,

18   and the law presumes that he is innocent.  This

19   presumption of innocence stays with him unless the

14:35:52  20   government presents evidence here in court that overcomes

21   the presumption, and convinces you beyond a reasonable

22   doubt that he is guilty.

23             This means that the defendant has no

24   obligation to present any evidence at all, or to prove to

14:36:06  25   you in any way that he is innocent.  It is up to the

1   government to prove that the defendant is guilty, and

2   this burden stays on the government from start to finish.

3   You must find the defendant not guilty unless the

4   government convinces you beyond a reasonable doubt that

5   he is guilty.

6          The government must prove every element of

7   the crimes charged beyond a reasonable doubt.  Proof

8   beyond a reasonable doubt does not mean proof beyond all

9   possible doubt.  Possible doubts or doubts based purely

10  on speculation are not reasonable doubts.  A reasonable

11  doubt is a doubt based on reason and common sense.  It

12  may arise from the evidence, the lack of evidence, or the

13  nature of the evidence.

14         Proof beyond a reasonable doubt means proof

15  which is so convincing that you would not hesitate to

16  rely and act on it in making the most important decisions

17  in your own lives.

18         If you are convinced that the government

19  has proved the defendant guilty beyond a reasonable

20  doubt, say so by returning a guilty verdict.  If you are

21  not convinced, say so by returning a not guilty verdict.

22         You must make your decision based only on

23  the evidence that you saw and heard here in court.  Do

24  not let rumors, suspicions, or anything else that you may

25  have seen or heard outside of Court influence your

1    decision in any way.

2              The evidence in this case includes only

3    what the witnesses said while they were testifying under

4    oath, the exhibits that I allowed into evidence, and the

14:37:30  5    stipulation that the lawyers agreed to.

6              And with that let us go to the fourth-last

7    page of your instructions.  It's right before the verdict

8    forms, and we'll address the stipulations.

9              Everybody see that?  It says "Joint

14:37:53  10    stipulations."  Okay.  Let's read along together.  The

11    United States and the defendant David W. Vickers hereby

12    agree and stipulate to the following:

13              One, the children depicted in the images

14    and videos contained in Government's Exhibit 5 are real

14:38:08  15    children.

16              Two, the images and videos contained in

17    Government's Exhibit 5 traveled in interstate and foreign

18    commerce.

19              Three, furthermore, the parties hereby

14:38:18  20    agree that it is not -- it will not be necessary to call

21    a custodian of records from the Experience Project to

22    testify as to the authenticity and identity of

23    Government's Exhibits 9 through 13 and 16.  Defendant

24    stipulates to the authenticity and identity of

14:38:37  25    Government's Exhibits 9 through 13, 16, while reserving

1    the right to object to the admission of Government's

2    Exhibits 9 through 13 and 16.

3                And furthermore, the parties hereby agree

4    that it will not be necessary to call a custodian of

5    records from KIK to testify as to the authenticity and

6    identity of Government Exhibit 19.  Defendant stipulates

7    to the authenticity and identity of Government Exhibit 19

8    while reserving the right to object to the admission of

9    Government Exhibit 19.

10               Furthermore, the parties hereby agree that

11   it will not be necessary to call a custodian of records

12   from Apple to testify as to the authenticity and identity

13   of Government Exhibit 25.  Defendant stipulates to the

14   authenticity and identity of Government Exhibit 25 while

15   reserving the right to object to the admission of

16   Government Exhibit 25.

17               And we have the signatures of all the

18   attorneys in this case, and including Mr. Vickers, and I

19   have signed it, also.

20               And, ladies and gentlemen, I have ruled on

21   all the admissibility of the exhibits, so you don't have

22   to concern yourself with that at this point.

23               All right.  Let's go back to Page 5 and

24   continue on from there.

25               I'm on Paragraph Number 3.  Nothing else is

1    evidence.  The lawyers' statements and arguments are not

2    evidence.  Their questions and objections are not

3    evidence.  My legal rulings are not evidence.  And my

4    comments and questions are not evidence.

5         During the trial I did not let you hear the

6    answers to some of the questions that the lawyers asked.

7    I also ruled that you could not see some of the exhibits

8    that the lawyers wanted you to see.  And sometimes I may

9    have ordered you to disregard things that you saw or

10   heard, or I struck things from the record.  You must

11   completely ignore all of these things.  Do not even think

12   about them.  Do not even speculate about what a witness

13   might have said or what an exhibit might have shown.

14   These things are not evidence, and you are bound by your

15   oath not to let them influence your decision in any way.

16        Make your decision based only on the

17   evidence, as I have defined it here, and nothing else.

18        You should use your common sense in

19   weighing the evidence.  Consider it in light of your

20   everyday experience with people and events, and give it

21   whatever weight you believe it deserves.  If your

22   experience tells you that certain evidence reasonably

23   leads to a conclusion, you are free to reach that

24   conclusion.

25        Now, some of you may have heard the terms

1    "Direct evidence" and "Circumstantial evidence."

2              Direct evidence is simply evidence like the

3    testimony of an eyewitness which, if you believe it,

4    directly proves a fact.  If a witness testified that he

14:41:25 5    saw it raining outside and you believed him, that would

6    be direct evidence that it was raining.

7              Circumstantial evidence is simply a chain

8    of circumstances that indirectly proves a fact.  If

9    someone walked into the courtroom wearing a raincoat

14:41:38 10   covered with drops of water and carrying a wet umbrella,

11   that would be circumstantial evidence from which you

12   could conclude that it was raining.

13             It is your job to decide how much weight to

14   give the direct and circumstantial evidence.  The law

14:41:51 15   makes no distinction between the weight that you should

16   give to either one, or say that one is any better

17   evidence than the other.  You should consider all the

18   evidence, both direct and circumstantial, and give it

19   whatever weight you believe it deserves.

14:42:05 20             Another part of your job as jurors is to

21   decide how credible or believable each witness was.  This

22   is your job, not mine.  It is up to you to decide if a

23   witness's testimony was believable, and how much weight

24   you think it deserves.  You are free to believe

14:42:21 25   everything that a witness said, or only part of it, or

1        none of it at all.  But you should act reasonably and

2        carefully in making these decisions.

3                    Let me suggest some things for you to

4        consider in evaluating each witness's testimony.

5                    Ask yourself if the witness was able to

6        clearly see or hear the events.  Sometimes even an honest

7        witness may not have been able to see or hear what was

8        happening, and may make a mistake.

9                    Ask yourself how good the witness's memory

10       seemed to be.  Did the witness seem able to accurately

11       remember what happened?

12                   Ask yourself if there was anything else

13       that may have interfered with the witness's ability to

14       perceive or remember the events.

15                   Ask yourself how the witness acted while

16       testifying.  Did the witness appear honest, or did the

17       witness appear to be lying?

18                   Ask yourself if the witness had any

19       relationship to the government or the defendant, or

20       anything to gain or lose from the case, that might

21       influence the witness's testimony.  Ask yourself if the

22       witness had any bias, or prejudice, or reason for

23       testifying that might cause the witness to lie or to

24       slant the testimony in favor of one side or the other.

25                   Ask yourself if the witness testified

1    inconsistently while on the witness stand, or if the

2    witness said or did something or failed to say or do

3    something at any other time that is inconsistent with

4    what the witness said while testifying.

14:43:38  5         If you believe that the witness was

6    inconsistent, ask yourself if this makes the witness's

7    testimony less believable.  Sometimes it may; other times

8    it may not.

9         Consider whether the inconsistency was

14:43:51 10   about something important, or about some unimportant

11   detail.  Ask yourself if it seemed like an innocent

12   mistake, or if it seemed deliberate.

13        And ask yourself how believable the

14   witness's testimony was in light of all the other

14:44:03 15   evidence.  Was the witness's testimony supported or

16   contradicted by other evidence that you found believable?

17   If you believe that a witness's testimony was

18   contradicted by other evidence, remember that people

19   sometimes forget things, and that even two honest people

14:44:17 20   who witness the same event may not describe it exactly

21   the same way.

22        These are only some of the things that you

23   may consider in deciding how believable each witness was.

24   You may also consider other things that you think shed

14:44:28 25   some light on the witness's believability.  Use your

1    common sense and your everyday experience in dealing with

2    other people.  And then decide what testimony you

3    believe, and how much weight you think it deserves.

4              One more point about witnesses.  Sometimes

14:44:44  5    jurors wonder if the number of witnesses who testified

6    makes any difference.

7              Do not make any decisions based only on the

8    number of witnesses who testified.  What is more

9    important is how believable the witnesses were, and how

14:44:55 10    much weight you think their testimony deserves.

11    Concentrate on that, not the numbers.

12              There is one more general subject that I

13    want to talk to you about before I begin explaining the

14    elements of the crimes charged.

14:45:08 15              The lawyers for both sides objected to some

16    of the things that were said or done during the trial.

17    Do not hold that against either side.  The lawyers have a

18    duty to object whenever they think that something is not

19    permitted by the Rules of Evidence.  Those rules are

14:45:22 20    designed to make sure that both sides receive a fair

21    trial.

22              And do not interpret my rulings on their

23    objections as any indication of how I think the case

24    should be decided.  My rulings were based on the Rules of

14:45:32 25    Evidence, not on how I feel about the case.  Remember

1      that your decision must be based only on the evidence

2      that you saw and heard here in court.

3                      That concludes the part of my instructions

4      explaining your duties and the general rules that apply

14:45:48  5      in every criminal case.  In a moment, I will explain the

6      elements of the crimes that the defendant is accused of

7      committing.

8                      But before I do that, I want to emphasize

9      that the defendant is only on trial for the particular

14:46:05  10     crimes charged in the indictment.  Your job is limited to

11     deciding whether the government has proved each of the

12     crimes charged.

13                     Also keep in mind that whether anyone else

14     should be prosecuted and convicted for these crimes is

14:46:17  15     not a proper matter for you to consider.  The possible

16     guilt of others is no defense to a criminal charge.  Your

17     job is to decide if the government has proved this

18     defendant guilty.  Do not let the possible guilt of

19     others influence your decision in any way.

14:46:32  20                     The defendant, David W. Vickers, has been

21     charged with three crimes.  The number of charges is no

22     evidence of guilt, and this should not influence your

23     decision in any way.  It is your duty to separately

24     consider the evidence that relates to each charge, and to

14:46:49  25     return a separate verdict for each one.

1          For each charge, you must decide whether

2     the government has presented proof beyond a reasonable

3     doubt that the defendant is guilty of that particular

4     charge.

14:46:59  5          Your decision on one charge, whether it is

6     guilty or not guilty, should not influence your decision

7     on the other charge.

8          Next I want to say a word about the dates

9     mentioned in the indictment.

14:47:14 10          The indictment charges that the crimes

11     occurred on or about specific dates.  The government does

12     not have to prove that the crimes happened on that exact

13     date.  But the government must prove that the crimes

14     happened reasonably close to that date.

14:47:32 15          Next, I want to explain something about

16     proving a defendant's state of mind.

17          Ordinarily, there is no way that a

18     defendant's state of mind can be proved directly, because

19     no one can read another person's mind and tell what that

14:47:45 20     person is thinking.

21          But a defendant's state of mind can be

22     proved indirectly from the surrounding circumstances.

23     This includes things like what the defendant said, what

24     the defendant did, how the defendant acted, and any other

14:47:58 25     facts or circumstances in evidence that show what was in

1   the defendant's mind.

2              You may also consider the natural and

3   probable results of any acts that the defendant knowingly

4   did, and whether it is reasonable to conclude that the

14:48:12  5   defendant intended those results.  This, of course, is

6   all for you to decide.

7              All right.  Count 1 of the indictment

8   charges the defendant David W. Vickers with violating

9   Title 18, United States Code, Section 2252(a)(2).

14:48:32 10             Specifically, Count 1 charges:  From on or

11   about December 15th, 2014, through on or about

12   December 31st, 2014, in the Northern District of Ohio,

13   Eastern Division, and elsewhere, the defendant David W.

14   Vickers did knowingly distribute in interstate and

14:48:43 15   foreign commerce, numerous computer files, which files

16   contained visual depictions of real minors engaged in

17   sexually explicit conduct, as defined in Title 18, United

18   States Code, Section 2256(2), in violation of Title 18,

19   United States Code, Section 2252(a)(2).

14:49:08 20             18, U.S.C., Section 2252(a)(2) provides:

21   Any person who, knowingly distributes any visual

22   depiction using any means or facility of interstate or

23   foreign commerce or that has been mailed, or has been

24   shipped or transported in or affecting interstate or

14:49:28 25   foreign commerce, or which contains materials which have

1       been mailed or so shipped or transported by any means

2       including by computer, or knowingly reproduces any visual

3       depiction for distribution using any means or facility of

4       interstate or foreign commerce or in or affecting

14:49:44 5      interstate or foreign commerce or through the mails if,

6       A, the producing of such visual depiction involves the

7       use of a minor engaging in sexually explicit conduct; and

8       such visual depiction is of such conduct, shall be

9       punished as provided in Subsection B of this section.

14:50:07 10             Count 1 of the indictment charges the

11      defendant with receiving and distributing a visual

12      depiction of a minor engaged in sexually explicit

13      conduct.

14             For you to find the defendant guilty of

14:50:15 15     this crime, you must find that the government has proved

16      each and every one of the following elements beyond a

17      reasonable doubt.

18             First, that the defendant knowingly

19      received or distributed a visual depiction.

14:50:24 20             Second, that the production of the visual

21      depiction involved the use of a minor engaging in

22      sexually explicit conduct.

23             Third, that the visual depiction was of a

24      minor engaging in sexually explicit conduct.

14:50:38 25             Fourth, that the defendant knew that the

1    visual depiction was of a minor engaging in sexually

2    explicit conduct.

3                   Fifth, that the visual depiction was

4    received or distributed using any means or facility of

14:50:52 5    interstate or foreign commerce or had been shipped or

6    transported in or affecting interstate or foreign

7    commerce using any means or facility of interstate or

8    foreign commerce.

9                   Now, I will give you more detailed

14:51:05 10    instructions on some of these terms.

11                   The term "visual depiction" includes data

12    stored on a computer disk or by electronic means which is

13    capable of conversion into a visual image or data which

14    is capable of conversion into a visual image that has

14:51:24 15    been transmitted by any means, whether or not stored in a

16    permanent format.

17                   The term "minor" means any person under the

18    age of 18 years.

19                   The term "sexually explicit conduct" means

14:51:36 20    actual or simulated sexual intercourse including

21    genital-genital, oral-genital, anal-genital, or oral-anal

22    whether between persons of the same or opposite sex or

23    bestiality or masturbation or sadistic or masochistic

24    abuse, or lascivious exhibition of the genitals or pubic

14:51:56 25    area of a person.

351

1    In deciding whether an exhibition is

2 lascivious, you may consider these six factors:

3    One, whether the focal point of the visual

4 exhibition is on the child's genitalia or pubic area.

14:52:10  5    Two, whether the setting of the visual

6 depiction is sexually suggestive, i.e. in a place or pose

7 generally associated with sexual activity.

8    Three, whether the child is depicted in an

9 unnatural pose or in inappropriate attire considering the

14:52:27 10 age of the child.

11    Four, whether the child is fully or

12 partially clothed or nude.

13    Five, whether the visual depiction suggests

14 sexual coyness or a willingness to engage in sexual

14:52:39 15 activity.

16    And six, whether the visual depiction is

17 intended or designed to elicit a sexual response in the

18 viewer.

19    This list is not exhaustive, and an image

14:52:47 20 need not satisfy any single factor to be deemed

21 lascivious.  Instead, you must determine whether the

22 visual depiction is lascivious based on its overall

23 content.  It is for you to decide the weight or lack of

24 weight to be given any of these factors.

14:53:02 25    The term "In interstate or foreign

1    commerce" means the visual depiction crossed a state

2    line.

3              The term "Means or facility of interstate

4    or foreign commerce" includes the Internet or the

14:53:17  5    telephone.

6              The phrase "Affecting interstate or foreign

7    commerce" means having at least a minimal effect upon

8    interstate or foreign commerce.

9              The government is not required to prove

14:53:28 10   that the defendant knew that a means or facility of

11   interstate commerce would be used when he received or

12   distributed the visual depictions or the defendant was

13   involved in any way in the production of the visual

14   depiction.

14:53:40 15             If you are convinced that the government

16   has proved all of these elements, say so by returning a

17   guilty verdict on this charge.  If you have a reasonable

18   doubt about any one of these elements, then you must find

19   the defendant not guilty of this charge.

14:53:55 20             Count 2 of the indictment charges the

21   defendant David W. Vickers with violating Title 18,

22   United States Code, Section 2422(b).

23             Specifically, Count 2 charges:  From on or

24   about December 12th, 2014, through on or about

14:54:09 25   January 5th, 2015, in the Northern District of Ohio,

1    Eastern Division, and elsewhere, the defendant, David W.

2    Vickers, did knowingly use facilities and means of

3    interstate and foreign commerce, to attempt to persuade,

4    induce, entice, and coerce an individual who had not

14:54:25  5    attained the age of 18 years, that is a 13-year-old girl,

6    to engage in illegal sexual activity with him, in

7    violation of Title 18, United States Code, Section

8    2422(b).

9              Count 2 of the indictment charges the

14:54:45 10    defendant with persuading a minor to engage in unlawful

11    sexual activity.

12              For you to find the defendant guilty of

13    this crime, you must find that the government has proved

14    each and every one of the following elements beyond a

14:54:56 15    reasonable doubt.

16              First, that the defendant knowingly

17    persuaded, induced, enticed, or coerced an individual

18    under the age of 18 to engage in unlawful sexual

19    activity.

14:55:06 20              Second, that the defendant used a means or

21    facility of interstate or foreign commerce to do so.

22              Third, that the defendant knew the

23    individual was under the age of 18.

24              Now, I will give you more detailed

14:55:17 25    instructions on some of these terms.

1           "Unlawful sexual activity" includes a

2    sexual act.

3           The term "Sexual act" means contact between

4    the penis and the vulva or the penis and the anus, and

5    for purposes of this subparagraph contact involving the

6    penis occurs upon penetration, however slight; contact

7    between the mouth and the penis, the mouth and the vulva,

8    or the mouth and the anus; the penetration, however

9    slight, of the anal or genital opening of another by a

10   hand or finger or by an object, with an intent to abuse,

11   humiliate, harass, degrade or arouse or gratify the

12   sexual desire of any person; or the intentional touching,

13   not through the clothing, of the genitalia of another

14   person who has not attained the age of 16 years with an

15   intent to abuse, humiliate, harass, degrade or arouse or

16   gratify the sexual desire of any person.

17          "Using a means or facility of interstate

18   commerce" includes the using the Internet or the

19   telephone.

20          It is not necessary that the government

21   prove that the sexual activity occurred.

22          If you are convinced that the government

23   has proved all of these elements, say so by returning a

24   guilty verdict on this charge.  If you have a reasonable

25   doubt about any one of these elements, then you must find

1       the defendant not guilty of this charge.

2                   Count 3 of the indictment charges the

3       defendant David W. Vickers with violating Title 18,

4       United States Code, Section 2422(b).

14:56:49  5         Specifically, Count 3 charges:  On or about

6       January 5th, 2015, in the Northern District of Ohio,

7       Eastern Division, and elsewhere, the defendant David W.

8       Vickers did knowingly travel in interstate commerce, from

9       the State of Virginia to the State of Ohio, for the

14:57:03 10     purpose of engaging in illicit sexual conduct, as defined

11      in Title 18, United States Code, Section 2423(f), with

12      another person, that is a 13-year-old girl, in violation

13      of Title 18, United States Code, Section 2423(b).

14                  Count 3 of the indictment charges the

14:57:28 15     defendant with traveling with intent to engage in illicit

16      sexual conduct.

17                  For you to find the defendant guilty of

18      this crime, you must find that the government has proved

19      each and every one of the following elements beyond a

14:57:38 20     reasonable doubt.

21                  First, that the defendant traveled in

22      interstate commerce.

23                  Second, that the defendant did so with

24      intent to engage in illicit sexual conduct.

14:57:45 25                 Now I will give you more detailed

1    instructions on some of these terms.

2                    The term "Illicit sexual conduct" includes

3    a sexual act.

4                    The term "Sexual act" means contact between

14:57:57 5    the penis and the vulva or the penis and the anus, and

6    for purposes of this subparagraph contact involving the

7    penis occurs upon penetration, however slight; contact

8    between the mouth and the penis, the mouth and the vulva,

9    or the mouth and the anus; the penetration, however

14:58:17 10   slight, of the anal or genital opening of another by a

11   hand or finger or by an object, with the intent to abuse,

12   humiliate, harass, degrade or arouse or gratify the

13   sexual desire of any person; or the intentional touching,

14   not through clothing, of the genitalia of another person

14:58:34 15   who has not attained the age of 16 years with an intent

16   to abuse, humiliate, harass, degrade, or arouse or

17   gratify the sexual desire of any person.

18                    And the term "In interstate commerce" means

19   the defendant traveled across a state line.  The

14:58:51 20   government is not required to prove that the defendant

21   took any steps to entice, coerce, or persuade the person

22   under 18 years of age to engage in sexual conduct.

23                    If you are convinced that the government

24   has proved all of these elements, say so by returning a

14:59:04 25   guilty verdict on this charge.  If you have a reasonable

1    doubt about any one of these elements, then you must find

2    the defendant not guilty of this charge.

3              All right.  Ladies and gentlemen, that

4    concludes the part of my instructions explaining the

5    elements of the crimes.  I will have you stop at this

6    point and we will have closing arguments and we will pick

7    up with the remainder of this after closing arguments.

8              On behalf of the government.

9              MR. FILIATRAUT:  Thank you, Judge.

10             May it please the Court, counsel, and

11   members of the jury, I want to begin by sincerely

12   thanking you for your time and attention on behalf of the

13   people of the United States of America for your jury

14   service thus far.

15             You've given us your time, your attention

16   in this case, and in a few moments you're going to be

17   asked to go back into the deliberation room and perform

18   the essential job of the juror.

19             It's your job to settle this dispute

20   between the United States Government and one of your

21   fellow citizens, the defendant David Vickers.

22             We've charged him with three counts, and

23   it's our job, as the government and the prosecution, it's

24   our job and our job alone to prove each element with

25   evidence beyond a reasonable doubt.

1    You've heard all the elements, you've heard

2    all the evidence in this case, and I'm confident you will

3    decide that we have done just that.

4    So let me review those elements with you

15:01:06  5    and talk about the ones that I believe are most disputed

6    in this case.

7    Count 1, the defendant's charged with

8    between December 15th and December 31st of 2014, in the

9    Northern District of Ohio, Eastern Division, and

15:01:22  10    elsewhere, with knowingly distributing in interstate and

11    foreign commerce numerous computer files, which files

12    contained visual depictions of real minors engaged in

13    sexually explicit conduct.

14    So what did we need to prove here?  The

15:01:41  15    defendant, in the Northern District of Ohio, this

16    division, knowingly distributed in interstate and foreign

17    commerce numerous computer files, and those files

18    contained visual depictions of real minors engaged in

19    sexual -- sexually explicit conduct.

15:02:01  20    Count 2, from December 12th, 2014 through

21    January 5th, 2015, in the Northern District of Ohio, the

22    defendant did knowingly use facilities and means of

23    interstate and foreign commerce to attempt to persuade,

24    induce, entice, and coerce an individual who was 13 years

15:02:30  25    old, attempt to do that, to engage in illicit sexual

1    activity with him in violation of the law.

2                 And finally, the last count, Count 3, that

3    on January 5th of this year, in the Northern District of

4    Ohio, the defendant did knowingly travel in interstate

15:02:57 5    commerce from Virginia to Ohio for the purpose of

6    engaging in illicit sexual conduct with a 13-year-old

7    girl.

8                 That's what we needed to prove.  I submit

9    to you, ladies and gentlemen, that's, indeed, what we did

15:03:15 10   prove.

11                With Count 1, indeed, you had visual

12   depictions of real minors engaged in sexually explicit

13   conduct.  You have children on those videos having sex

14   with adults -- we showed you a little bit of it, not all

15:03:45 15   of it -- that was sent by the defendant to both

16   13-year-old Katie and the adult mother of Katie, Traci.

17                He sent those things.  He sent them.

18   You've got questions.  Did he knowingly do it?  Did he

19   know it was child pornography?  And we have plenty of

15:04:12 20   evidence that he did.

21                Government's Exhibit 9, Page 19, in

22   discussions with Traci Black the defendant says, "Hey,

23   haven't you heard of KIK?  Lot of great stuff on KIK."

24   Talking about child pornography.

15:04:36 25                He goes in depth and she asks him how old.

1    He said about 11.  And then not only does he show a

2    familiarity of what is on KIK, he then sends it through

3    KIK to both Traci and, more importantly, to Katie.

4              So that shows his familiarity with what is

15:05:02  5    on KIK and then him distributing it through KIK, an

6    Internet program in interstate commerce, to, most

7    importantly, to Katie.

8              I'll get back to why he did that in a

9    moment, but the fact that he did it and he knew it was

15:05:23  10   child pornography, that's Count 1, ladies and gentlemen.

11   That's Count 1.

12             Count 2, questions, did he use facilities

13   and means of interstate and foreign commerce to attempt

14   to persuade, induce, entice, and coerce a 13-year-old

15:05:48  15   girl to have sex with him?  What do we know?  I don't

16   think it's going to be disputed that it's illegal in Ohio

17   for someone who's 13 to have sex with an adult male.  The

18   age of consent is 16.

19             So what do we have here?  We have the

15:06:11  20   defendant attempting to have sex with a 13-year-old girl.

21   That itself is illegal.

22             And what did he do?  He, indeed, attempted

23   to entice, induce, and persuade Katie Black to have sex

24   with him.

15:06:35  25             And how do we know that?  The questions,

1        ladies and gentlemen, of these counts is going to come

2        down to intent.  Did we prove what the defendant's intent

3        was?

4                        Count 2 goes along with Count 1.  Not only

15:06:49 5      is he sending child pornography to who he thinks is a

6        13-year-old girl, we have what his intention is with that

7        13-year-old girl.  States Exhibit -- or Government's

8        Exhibit 17, 157 pages of communications between the

9        defendant and Katie, the fake 13-year-old girl on KIK.

15:07:19 10                     This is it.  All of this is the defendant's

11       communications with someone he thinks is 13.

12                       You want to know what his intent was with

13       Katie?  Here it is.  In this, in these KIK messages, he

14       sends her child pornography.  He talks about her body.

15:07:57 15     He asks her questions.  He wants to see pictures.  After

16       the videos he sends, he says, "This is going to be us in

17       two weeks."

18                       Come on.  He sends a 13-year-old girl child

19       pornography, an actual child having sex with an actual

15:08:18 20     adult, and says "That will be us in two weeks."  His

21       intent, ladies and gentlemen, is fairly obvious.  And his

22       intent was for it to be fairly obvious to Katie.

23                       He wanted Katie to know what him and her

24       mother were planning because this isn't just

15:08:49 25     conversations between the defendant and the fake

1    13-year-old, it's conversations between the defendant and

2    her fake mother Traci.

3                    We know more from his intent through those

4    conversations.  He talks to Traci.  He meets her on the

15:09:10  5    Experience Project.  This is not a mainstream website.

6    This is not a mainstream social networking site.

7                    Deviant behavior occurs on the Experience

8    Project.  This is one of those places where ICAC agents

9    go to investigate people, to catch people who want to

15:09:45 10    have sex with 13-year-olds.  They go to the Experience

11    Project.  They make a fake profile.  And the

12    defendant -- and we are here, make no mistake, ladies and

13    gentlemen, we are here because of the choices the

14    defendant made.  Nobody else.

15:10:08 15                    David Vickers chose to be on the Experience

16    Project.  David Vickers chose to strike up conversation

17    with Traci Black.  David Vickers chose to continue those

18    conversations and discuss with Traci the breeding of her

19    13-year-old daughter.

15:10:31 20                    David Vickers chose to communicate with

21    that 13-year-old daughter.  David Vickers chose to send

22    child pornography to that 13-year-old daughter.  David

23    Vickers chose to talk to her about sex, talk to her about

24    her body, ask her how much pubic hair she had, ask her

15:11:01 25    mother about her cup size, ask her about the size of her

1    boobs, and then chat with her even further.

2               What does it show us?  It shows us what his

3    intent was.  He intended on sending her child

4    pornography, not only to send her child pornography, but

15:11:27  5    to show her what he wanted to do, that he wanted to have

6    sex with her.  That's Count 2.

7               He is enticing her.  He wants her to agree.

8    And he wants her to know "This is what we are going to

9    do.  And don't worry, your mom says it's okay."

15:11:53  10               Count 3, questions for you, did the

11    defendant knowingly travel in interstate commerce for the

12    purpose of engaging in illicit sexual conduct with a

13    13-year-old girl?

14               One of the questions you're going to have

15:12:11  15    back in that jury room, ladies and gentlemen, is in

16    regards to the conduct of government agents in this case.

17    They created fake profiles:  The fake profile of Traci

18    Black, the fake profile of Katie Black.  Why did they do

19    that?  Why did Miranda Helmick do that?  She did that to

15:12:39  20    catch people who want to have sex with 13-year-olds.

21               Did she put in the mind of the defendant,

22    did she make him into someone who wanted to have sex with

23    a 13-year-old, or did he want to do that himself?

24               If the sending of child pornography in

15:13:05  25    Count 1 and the talking to Katie and enticing her in

1    Count 2 don't show it, it's the traveling, the choice.

2    He chose, he chose on January 5th to get into his car and

3    drive hundreds of miles from Virginia to Cleveland, to

4    stop and take pictures along the way and send them to

15:13:31  5    Traci Black, "I'm coming.  I'm coming."

6              And who did he send them to?  Who is Traci

7    Black to him?  Who is she to him?  She is, in his words,

8    his partner in crime.  From his key strokes to the jury's

9    ears, she is his partner in crime.

15:14:02  10             He found someone on the Experience Project

11   who he thought was like him, who he thought had these

12   same urges and these same desires.  And you can see it,

13   you can see it December 12th as he's getting to know

14   Traci, the further he goes, the more open he gets about

15:14:31  15   himself, about his life, and about his desires.

16             He thinks he has met someone here just like

17   him.  That's how you know it.  That's how you know what

18   his intent was when he got in his car and drove from

19   Virginia to Ohio.

15:14:57  20             All the evidence in this case shows he

21   thought he had someone just like him and was going to

22   have sex with her daughter and she was going to play

23   along, she was going to get naked, she was going to

24   assist, and she was maybe going to have sex with him,

15:15:17  25   too.

1           But make no mistake, he went there for her.

2    And how do we know that?  How do we know that?  What is

3    the very last thing he says to Katie?  Government's

4    Exhibit 17, Page 158, 156 and 157.

15:15:47  5           "I am horny, very.  Any ideas?"  Smiley

6    face.

7           That is the last thing he says to Katie

8    before he's arrested.

9           Ladies and gentlemen, judge the defendant's

15:16:14 10   conduct for what it was.  Those were choices he made to

11   violate the law of the United States.  We ask you to hold

12   him accountable and find him guilty.

13           Thank you.

14           THE COURT:  Thank you, Mr. Filiatraut.

15:16:29 15           Mr. McCormack, on behalf of the defendant.

16           MR. GREG McCORMACK:  Thank you, Your Honor.

17           Good afternoon.

18           THE CLERK:  Check your mic, please.  All

19   right.

15:17:28 20           MR. GREG McCORMACK:  As I said when this

21   thing started, it would be unpleasant and that's kind of

22   an understatement.  I want to apologize for our judicial

23   system for you having to watch what you had to watch.

24           Very, very unpleasant.

15:17:55 25           This is not a dispute in any respect.  This

1        is a criminal Court of law.  As the Judge said when we

2        started this case, your role as a juror is just one of

3        the ultimate responsibilities that we have as citizens of

4        the United States.

15:18:36   5            I've never had that pleasure, because I sit

6        on this side, but the responsibility you have as a juror

7        is just unbelievable because you have responsibility to

8        make a determination in this case that is just so

9        massive.

15:18:57  10            You have the responsibility to take the

11        evidence that you've heard in this case and make a

12        decision that is so profound because it has just

13        unbelievable impact upon the lives of many people, some

14        of which are not here.  Most of all his sitting right

15:19:20  15        there.

16            And it's based upon the evidence, these

17        books that we have up here that you're going to get, and

18        the testimony from two witnesses in this case.

19            As the Judge says, you have to determine

15:19:38  20        the evidence based upon the credibility of witnesses.

21        That's something you would hope would be an easy task,

22        especially when you have law enforcement officers

23        testifying.

24            You don't expect law enforcement officers

15:19:55  25        to be playing games with you on the witness stand.  You

1   would hope when you ask a law enforcement officer a

2   question, they would answer your question.  Not sit up

3   here and say, "Look, I don't understand your question."

4   Make me ask it three or four times.  Had the Judge come

15:20:16  5   in and say "Let me explain it to you a different way and

6   answer the question."

7               I mean, it's a fact that what was going on

8   here is that this young lady was basically enticing this

9   man to the point of engaging in sexual activity with her

15:20:48 10   daughter so that making him believe that he would have

11   sex with her.

12               I don't understand that.  Ask it a

13   different way, I mean several different ways, both her

14   and her supervisor.  "I don't understand that.  I don't

15:21:18 15   understand that."

16               The Judge breaks it down to her supervisor,

17   "If you have sex with my daughter, you can have sex with

18   me.  Is that within your protocols?

19                "No."

15:21:48 20               That's wrong.  That's not how our

21   government works.  We don't do that in the United States.

22   Whether it's an agent that has two months of service as a

23   law enforcement officer, or a supervisor who's got years

24   and years of service, we don't do that to this man.  We

15:22:10 25   don't do that to anybody, a citizen of the United States

1    Government.

2                    And when you go through and you read

3    170-some pages of chat conversations or KIK

4    conversations, there's some pretty darn disgusting things

15:22:28  5    that this man says in those conversations to Katie, a

6    girl that he clearly, when you go through the

7    Government's Exhibit 20, he clearly through the day he

8    travels on January 5th, doesn't think exists.  And he's

9    asking her, the day he travels, "Send me pictures of this

15:22:51 10    kid next to you because I don't think she even exists."

11                   That tells you what's going on.  She's got

12    him so wrapped around the axle that he's doing anything

13    and everything because he has hopes that he's going to

14    get in bed with her, and that is sick.  I mean, there's

15:23:36 15    something seriously wrong in his mind, there's no

16    question about it.  This man needs help.  He seriously

17    needs help.

18                   But he doesn't need to go to prison for

19    this stuff.

15:23:58 20                   MR. McDONOUGH:  Objection.

21                   THE COURT:  Sustained.  The jury will

22    disregard any comment about punishment.

23                   MR. GREG McCORMACK:  Yes, Your Honor.

24    Apologize.

15:24:04 25                   He seriously needs help.  But this agent

1   with two months' worth of experience who comes in and

2   testifies that she's being supervised on a daily basis,

3   that she's taking her chat conversations every single

4   day, her testimony under oath was, and she's showing her

15:24:28 5   supervisor every single day, her testimony was under

6   oath, and she's being closely supervised, which we know

7   was BS, it's not happening.

8           And she's absolutely running amuck with her

9   two months' worth of experience, and here we are.

15:25:04 10           Enticing.  He's charged with Count 2,

11   enticing, enticing a 13-year-old child that does not

12   exist, that he every single -- almost every single page

13   of these communications is telling Traci, "Send me

14   something, send me pictures."

15:25:27 15           Oh, yeah.  The government is going to stand

16   up.  They get a second shot at argument here.  I get to

17   sit down and watch this.  Mr. McDonough is making notes

18   because he gets to argue.  I've got to suck it up because

19   I can't say another word.

15:25:41 20           All right?  But yeah, they got all these

21   pages and pages and pages of him talking to this kid who

22   he clearly is saying does this kid even exist?  That's

23   known as fantasy.  That's known as role playing.

24           Experience Project.  What's in his mind,

15:26:11 25   who knows?  But what we do know is in the Government

1    Exhibit 20 is he is constantly telling Traci "Come on,

2    give me something, give me something to indicate Katie

3    exists."

4                    It's not there.  It's simply not there.

15:26:36  5             But, yeah, there's enticing going on in

6    this case.  It starts right from the beginning, day one,

7    December 12th.

8                    Now, again, what's -- what are we doing

9    here?  Who's enticing who?  All right.  So this is the

15:27:06  10   photograph that this thing starts out with.  Right from

11   the beginning she can see he responds, "Wow, you're hot."

12                   Right out of the box, she can see he's

13   interested in her, but yet how many times is she playing

14   games with me on the witness stand?  Oh, he's not

15:27:36  15   interested in having sex with her, oh, no.  Give me a

16   break, lady.

17                    "Oh, my God, you're hot."  And I guess

18   this is what's in protocol, okay?  This is within

19   protocol.  Who's enticing who here?

15:28:19  20            Now, at some particular point, all right,

21   in this particular case, and I am not going to go through

22   page upon page upon page and upon page in Government

23   Exhibit 20 because I did it before, and believe me,

24   there's more, where he is commenting time and time again

15:28:41  25   how sexually interested he is in her, all the way through

1        the end.

2                    When we get into, I believe, it's Page 40

3        where the government in their direct examination of her,

4        obviously based I would assume on my opening statement,

15:29:10  5        they knew I was coming down this road, asked her, "Did

6        you give him an out?

7                    "Well, yeah, I gave him an out because he

8        was getting interested in me."

9                    And Page 36 you'll see in my -- when you

15:29:25 10        get back to the opportunity to review all this stuff,

11        you'll see where we had the wink wink comments that she

12        referred to.  And in the wink wink comments, she comes

13        back and she testifies, well, she was getting real

14        concerned about this because she was saying -- he was

15:29:42 15        saying wink wink, I was concerned about this, because she

16        was concerned that he was getting more interested in her

17        than Katie.

18                    So at that particular point, she wanted to

19        give him an out.  And the government in their direct

15:29:59 20        examination, they kind of address that, that's an out,

21        she gave him an out at that particular point.  You know,

22        the government kind of made it appear that was it and

23        they kind of dropped it right there.  And as you see as I

24        addressed her in my cross-examination, it didn't stop

15:30:15 25        there, okay?

1      Now, when we had the supervisor on the

2  stand, the government made a big deal of, oh, my God,

3  yeah, she could have given him an out at that particular

4  point, but she would have -- you know, she would have

5  been burned at that time.  "You know, how do we -- how do

6  we end this investigation at that particular point?  She

7  would have been burned at that time."

8      Excuse me, you know, you don't have to say

9  "Hey, I'm a cop.  You know, I'm going to end this

10  investigation, I'm a cop, so I'm going to get burned."

11      I mean, that's a little bit ridiculous.

12      She admitted on direct examination

13  throughout the course of these particular things, I

14  believe it was at that particular point, where she

15  based -- where he basically comes in and says, "Hey, I

16  can't do this.  You've got me so deep into this thing

17  where I'm basically saying stuff that you want me to say,

18  you got me saying that I'm going to have sex with your

19  daughter.  I don't want to do this.  I can't do this.  I

20  don't want to be involved with this.  All right?  I just

21  want to get out of this.  I'm done."

22      And here's our two-month experience agent

23  who's just freelancing on this guy with, of course, her

24  daily supervision from her supervisor, that she's telling

25  us that she has here, and the supervisor says, oh, this

1    is no problem.  And she admits -- she tells us that she

2    admits that at that particular point this guy's clearly

3    saying he's done, he's over with, so end it right there.

4                    But, oh, no, she's got to goad him on a

15:32:11  5    little bit.  "Awesome.  I knew you were like the last

6    guy.  You're an asshole."

7                     "You're an asshole.  You know, you're

8    awesome."

9                    Sure, this is a fair government

15:32:31 10    investigation here.  Let's just wrap this guy into this

11    thing, Mr. Vickers.

12                    And of course, this is Page 82.  Remember,

13    it was Page 40 that the government addressed on direct

14    examination that she gave him his out.  This is 42 pages

15:32:55 15    later.

16                    And we go to the next page, and of course

17    she doesn't end it right there, we know that, because she

18    goes back at him.  "You know, you're just jacking me

19    around.  I don't appreciate it.  I'll send the pic and

15:33:17 20    you won't come.  You've just been fantasizing."

21                    She tells my guy, "Here you are

22    fantasizing."  Everything that they've been talking back

23    and forth where he's giving her the nonstop, you know,

24    the page-by-page talking on KIK to Katie that he knows

15:33:33 25    doesn't exist and fantasy, fantasy, fantasy and she tells

1    him right here, "You're fantasizing and you've been

2    jacking off all this time, haven't you?  But when it

3    comes time to follow through, you're just a big pussy."

4              Not a problem.

15:33:54  5              But something in this man's brain just

6    doesn't let loose because this is what he wants.

7    (Indicating).  He doesn't have the common sense to just

8    cut this lady loose.  He knows there's no Katie.  All

9    right?  He's being enticed, but what he knows, the only

15:34:27 10    way he's going to get to her is he's got to keep playing

11    her fantasy game with Katie.  He's got to keep this Katie

12    malarky going.  He's got to keep playing the Katie game

13    with this woman, all right, because that's the only way

14    she's going to talk with him.

15:34:48 15              And we see that in the 18th or 19th,

16    December communications that I talked to her about on

17    cross-examination where we had the break in conversation

18    until 22.  And remember when I went over that?  And

19    you'll see these in the chat rooms, okay, because we had

15:35:08 20    18, 19, 20, 21 and he keeps contacting her, he's trying

21    to contact her.  Absolutely nothing.

22              But we get to 22 and he says, you know,

23    "It's really about Katie, I really want Katie.  And by

24    the way, you're too old for me."

15:35:27 25              And all of a sudden, bam, here she comes

1     out of the blue again because he said the magic words,

2     all right?  "It's all about Katie."  And now he's

3     shooting her down, "You're too old for me, lady.  I don't

4     like you any more, you're too old for me.  I want Katie."

5          And here she comes back into his life

6     again, all right?  Because she just pulled him in hook,

7     line and sinker.  There's something in this man's mind,

8     all right, he's so warped that he's just playing her

9     game, and he knows the only way he's going to be able to

10    keep trying to get to her is he's got to keep saying what

11    she wants him to say about Katie.  He's got to keep

12    talking up Katie, just like he did in all those chats or

13    those KIK messages, got to keep talking about Katie.

14    "Katie, I want to do this to you.  Katie, I want to do

15    that to you."  Keep talking about Katie.

16         And that's his only way to get to her.  And

17    she says that in these text messages back and forth, in

18    these Google text messages.

19         Remember, the ultimate goal here?  "The

20    ultimate goal is not me; the ultimate goal is Katie.  As

21    long as you do Katie, okay, you'll get to me, but you got

22    to keep Katie going to get to me."

23         This is our government.  This is our law

24    enforcement agency with two months' of experience under

25    the supervision of this agent who is playing games with

1    me on repetitive questions about the -- literally, the

2    ethics of the protocols of having an agent basically

3    literally drawing this man in with her body, sexually

4    enticing him with her body into committing a criminal

5    act.  And he's jerking us around in the courtroom.

6              Child porn.  All right.  He's charged with

7    doing this during the month of December.  The document

8    reads that he did it while he was in Ohio.  I never saw

9    anything that indicated he was in the State of Ohio

10   during the month of December.

11             Why is he asking Traci what's on the videos

12   that he's sending to her if he knows what's on the

13   videos?  What proof is there that he sees, that he has

14   seen what he sent to her?

15             What evidence is there?  We don't have any

16   child porn on his phone, the phone they collected.  None

17   whatsoever.  There's no evidence whatsoever.  All right?

18             We have the testimony of Ms. Traci Black,

19   okay.  I believe her credibility is seriously questioned

20   in this courtroom based upon the games she's played of us

21   in this courtroom.

22             All right.  So we don't have any evidence

23   as to the actual source of where those images came from.

24   We've had testimony about it.  We got the phone that he

25   was supposedly using, but there's no evidence that it

1    came from that home.  We have no evidence of any other

2    computers that he supposedly sent it from.

3              We have no evidence that he was in Ohio

4    when it was supposedly sent.  We have evidence that she

15:40:05  5    is the one who suggested he go to Motherless.com.

6              We have no evidence as to any websites that

7    he supposedly got this stuff from.  None.  Nothing.

8    Nonexistent.

9              As a reminder, the Judge has given you an

15:40:32 10    instruction here.  Again, this is not a dispute, this is

11    not a contract dispute here.  This is a criminal Court of

12    law.  In a criminal Court of law, the burden is right

13    here.  And in this case the evidence comes from one

14    source and it's right here.  Every bit of this evidence

15:40:53 15    comes from this one source right here.

16              And that's got to be a bit disturbing and

17    disconcerting in this case.

18              Now, I must admit she's very good.  She can

19    talk like two different people at the same time.  I mean,

15:41:15 20    she's very good at her communication capabilities.  But

21    she could probably use another round of training because

22    pulling people into committing a criminal act is a bit of

23    a problem.

24              MR. McDONOUGH:  Objection.

15:41:33 25              THE COURT:  Sustained.

1          MR. GREG McCORMACK:  Proof beyond a

2     reasonable doubt means proof which is so convincing that

3     you would not hesitate to rely and act on it in making

4     the most important decision in your own lives.

15:41:47  5          I mean, that's a pretty hefty burden.  I

6     mean, that, that's the foundation of our judicial system.

7     That's some serious stuff.

8               And as the government says, the question is

9     what's on his mind, what was in his mind at that

15:42:20 10     particular point?  Obviously his mind was not in the

11     right place, but, you know, there's a big difference

12     between role playing a fantasy and fantasizing about, you

13     know, what do I need to do to get with her, what do I

14     need to say to make her happy, what do I need to say to

15:42:41 15     touch this body, and to be with this body, and to go to

16     bed with this body?

17               That's a big difference between what I

18     really want to do with a kid that I -- that I don't think

19     exists.  And when I cross state lines, what am I going to

15:42:59 20     do when I cross state lines?

21               All right.  She suggests to him buy panties

22     for this girl.  Where's the panties?  If he wants to have

23     sex with her, why doesn't he buy her panties?  But, of

24     course, you know, he's got to keep her happy so he buys

15:43:24 25     her -- he buys the telephone, okay?  I mean, if he wants

1       to -- if he's supposed to be having sex, I mean if he

2       doesn't think the kid is there, what is he going to buy

3       panties for?

4                       The child porn, again, who brings up the

15:43:54 5      subject of the child porn?  Right here (indicating).  All

6       right.  "One  of the other daddies sent Katie pictures

7       and vids."  So who plants that seed in his mind?  Right

8       here.  All right.  She plants it.  She plants a seed and

9       she plants a source, Motherless.com.

15:44:35 10                     Because if she plants that source, his

11      comments come back, "Oh, is that where kids are doing

12      stuff?"

13                      Very, very, very troubling case.  As I

14      said, there's a lot of things that Mr. Vickers says in

15:45:11 15     those chat conversations that you've just got to shake

16      your head at, but I guess unless you played a fantasy

17      game and you're into the fantasy stuff, you just don't

18      understand that.

19                      But the government's got to prove that he

15:45:33 20     crossed that state line to engage in sex with a person he

21      thought was a 13 -year-old kid.  All right.  While he was

22      driving up there, moments before he arrived, he asked her

23      "Send me pictures of you and Katie," so moments before he

24      arrived he was telling her "I don't think Katie exists."

15:46:01 25                     So you can't, you can't possibly find that

1    he was driving up here to do anything other than to be

2    with her.  All right.  He was really hoping, but he knew

3    that he had to be playing her game with Katie.  He knew

4    he had to be selling her "Oh, it's all about Katie.

5    You're too ugly."

6              I guess he didn't say "You're too ugly,"

7    but "You're too old for me.  I don't want you.  I want

8    Katie.  Wink wink.  You know, I want Katie, wink wink.

9    I'm going to drive to Ohio, but I want Katie, wink wink."

10             Enticing?  Oh, yeah, lots of enticing going

11   on in this case, right here.  She enticed the heck out of

12   this guy.  She enticed him right into this courtroom.

13   She enticed him right into this courtroom.

14             David Vickers is not guilty of every one of

15   these charges.

16             Difficult case.  Again, I am truly, truly

17   sorry that you all had to watch what you all had to

18   watch.  I can tell you the government hasn't in any

19   manner shown you that he's ever watched that before.

20             I apologize for you having to sit through

21   this case.  All right.  This young lady brought everybody

22   into this courtroom, most importantly him.

23             David Vickers is not guilty.

24             Thank you.

25             THE COURT:  Thank you, Mr. McCormack.

1          Mr. McDonough, government's final close.

2          MR. McDONOUGH:  This is not Fantasy Island.

3    There is no Mr. Roarke.  There is no plane and Tattoo

4    mentioning it.

15:48:26  5          This is another world that is out there, a

6    world on the Internet.  And in this case what you had the

7    ability to see is child pornography and bestiality that

8    came from one source, and one source only, and that is

9    David W. Vickers.

15:48:44  10          He sent it.  He sent it through the KIK

11   social media app and he sent it to a 13-year-old.  Why

12   did he send it?  This was goal-oriented material of a man

13   who has a sexual proclivity for children and wanted to

14   have a 13-year-old watch the video.

15:49:06  15          We went into great detail in the early

16   conversations on December 12th, and it was important not

17   to take anything in this case out of context, but to

18   learn line-by-line the communications that the defendant

19   used starting first with this Experience Project, this

15:49:26  20   anonymous site for fantasy, this -- and experiences, and

21   lo and behold him reaching out and contacting an

22   undercover officer.

23          And the mission of the Ohio Internet Crimes

24   Against Children task force is to protect children from

15:49:44  25   online predators, to throw a life line, a rescue line to

1    children drowning in a see of child sexual abuse and

2    child pornography.

3              And they play a role, and they play a role

4    well as an undercover, who knew that this world existed,

15:50:04  5    that a couple clicks away of creating an account, of

6    being on there and interacting and how quickly the

7    content went sexual.

8              The evidence in this case is about 435

9    pages of documented text messages and recorded phone

15:50:18 10    calls as well as the KIK communications to a 13-year-old

11    girl and her mother.  And that gives us some insight, and

12    the evidence shows what is in the mind of the defendant.

13    How do you know?  You've heard his voice, you've seen the

14    texts that we've gone through and what is in his mind.

15:50:39 15              And in going through these charges, the

16    three charges, and the first charge being distributing

17    child pornography, we have a stipulation that, number

18    one, these are real children.  And unfortunately, you've

19    had an opportunity to witness these children on the worst

15:50:59 20    day of their lives.  That these children are being raped,

21    that these children are bound with ropes, that they are

22    engaged in sexual intercourse against their will and

23    against their consent.  These are children that are under

24    the age of 18, and in this case focusing on that range of

15:51:22 25    8 to 13 years old.

1      How do you know that the defendant sent

2  these messages?  I'm going to turn you to one of the

3  exhibits, and I realize you looked at the monitors and I

4  appreciate your patience on it, but if we can have the

15:51:39  5  front table, please, and in looking at Exhibit,

6  Government's Exhibit 18, Page 29, and you'll see the

7  communication on here in the middle of the screen from

8  the defendant to the undercover mother, "Laughing out

9  loud, they are child rapists, not photographers."

15:52:13 10      In this case you have evidence and going to

11  Government's Exhibit 18, Page 57, you have the defendant

12  communicating "Laughing out loud.  Is it wrong to tie a

13  child up?"  And then sending that video of a child being

14  tied up, being bound, being powerless.

15:52:37 15      This is a -- the evidence shows the control

16  that is involved in the sexual abuse and exploitation of

17  a child.

18      And looking at that, was the -- what was

19  the sending of the child pornography, this, as you might

15:52:57 20  recall during some of the -- excuse me -- forgive me.

21      As you might recall, during some of the

22  testimony in this case, this defendant used a social

23  media application called KIK, and one of the features of

24  the app itself is that the videos that are sent do not

15:53:24 25  remain on the phone.  Actually they remain in the app.

1  And as the communications are made via the app, that's

2  where the videos are.

3  What's interesting in this case is when the

4  phone is recovered at the time, that KIK app is no longer

15:53:42 5  on the defendant's phone.  If this were just fantasy, why

6  would the defendant delete the application itself, that

7  KIK app, because it's no longer --

8  MR. GREG McCORMACK:  Objection.  The

9  evidence is not that he deleted the application.

15:53:59 10  THE COURT:  Overruled.  Could be a

11  reasonable conclusion based on the evidence.

12  Go ahead.

13  MR. McDONOUGH:  In looking at the evidence

14  on here, turning to Exhibit 20, Page 98, the bottom half

15:54:17 15  of the page, and you'll see at the bottom a message, "Bad

16  news.  They locked me out of my KIK account so I have no

17  way to chat with K."

18  And further, Government's Exhibit 20,

19  Page 101, bottom half of the page, third line -- fourth

15:54:42 20  line from the bottom, this is from the defendant's Google

21  Voice chat, from the defendant to Traci Black, "I don't

22  have my KIK any more and contact Katie because I don't

23  have her name for my new account."

24  Was the defendant aware of the risk?

15:55:02 25  Absolutely.  If you go to Government's Exhibit 20,

1    Page 103, can you go about halfway down on the page?

2    Right there.  Starting with "Put yourself in my shoes and

3    see what I am risking, understand the way that I act and

4    I do."

5            These are the defendant's concerns on that.

6            Turning to Government's Exhibit 20,

7    Page 104, the top half of the page, just above the

8    halfway point, "I get it, I really do, but trouble

9    defined for me in this case is like 15 years mandatory

10   for crossing state lines so, yeah, I'm shady because I am

11   being careful.  Please understand."

12           Look at the next line.  "It's federal

13   statutes."

14           He is aware of the risks, he is aware of

15   what's involved, and what is his intent?  How do we get

16   into his mind and look at his intent?  If we go to

17   Government's Exhibit 20, Page 79, talking about the top

18   half of the page, talking about the dropped travel plans,

19   about halfway down.

20           "I need to be in bed by 10:00, up at 4:00,

21   on the road at 4:30, five hour drive, that's the plan.

22   Katie's vagina by 11:30.  Smiley face with a wink."

23           His intent.  And throughout all the

24   communications -- you can go to black -- throughout all

25   the communications, whatever they may be, there is a

1    common thread, a common link and that is this defendant's

2    sexual proclivity for a 13-year-old.

3              And in his world, once he has that, perhaps

4    as an added bonus perhaps he'll get the mom because this

15:57:00  5    has to be too good to be true that there's a mother who

6    is putting out her 13-year-old daughter on the Internet.

7    And it is too good to be true.  It's the Ohio Internet

8    Crimes Against Children task force fulfilling their

9    mission of protecting children.

15:57:15 10              And look on January 5th when it comes time

11   to travel, this defendant, he's conflicted.  There's a

12   battle going on.  He's got a decision to make and when

13   you cross the line, when you go from fantasy to reality,

14   that's when he gets in the car and makes the trip.

15:57:31 15              And what more does he do?  He gets a gift

16   bag.  It's the gift bag and it's the phone for Katie, the

17   13-year-old.  That will be the gift.  That is his intent,

18   to go ahead and deliver that phone to her as a gift.

19              You don't buy phones for someone who is not

15:58:05 20   real.  You buy a phone for someone who is real.  He's

21   conflicted and he's asking for these pictures, he's

22   asking for pictures on Katie.

23              Another common thread throughout all the

24   conversations is he wants nude pics, he wants naked pics,

15:58:18 25   he wants these pictures of Katie, not to test if she's

1    real, to go ahead and to gratify himself on it.

2              And one of the things you found on the

3    standard and protocol of the Ohio Internet Crimes Against

4    Children task force, they have standards that are

15:58:38  5    complied with, peer review, and in this case all of those

6    are followed.  The government is not sending child

7    pornography.  The government is not sending those things.

8    It is the defendant who is sending those things in this

9    case and who is traveling.  Traveling.

15:58:50 10              When you consider all the evidence in this

11    case, and I encourage you to look through, we have played

12    portions, those representative portions of the videos, we

13    have played all the calls for you, we have laid out all

14    the text messages that we have here and there's

15:59:06 15    additional, feel free to go all through it, and at the

16    end of the day you will be firmly convinced beyond a

17    reasonable doubt that this defendant is guilty as

18    charged.

19              THE COURT:  Thank you, Mr. McDonough.

15:59:17 20              Ladies and gentlemen, let's just read a

21    couple pages of the instructions and then I'll take a

22    short break with counsel at side-bar.

23              Focusing on Pages 28 and 29, please read

24    along with me.

15:59:34 25              A defendant has an absolute right not to

1    testify.  The fact that a defendant did not testify

2    cannot be considered by you in any way.  Do not even

3    discuss it in your deliberations.

4              Remember that it is up to the government to

15:59:44  5    prove the defendant guilty beyond a reasonable doubt.  It

6    is not up to the defendant to prove that he is innocent.

7              During the trial you have seen counsel use

8    summaries, charts, or similar material which were offered

9    to assist in the presentation and understanding of the

16:00:02 10   evidence.  This material is not itself evidence and must

11   not be considered as proof of any facts.

12             And I will see counsel at side-bar, please.

13             (Proceedings at side-bar:)

14             THE COURT:  Okay.  Guys, for the record, on

16:00:23 15   behalf of the government, any objections, additions,

16   comments to the Court's substantive instructions of law?

17             MR. McDONOUGH:  No, Your Honor.

18             THE COURT:  Mr. McCormack, on behalf of the

19   defense?

16:00:33 20   MR. GREG McCORMACK:  No, Your Honor.

21             THE COURT:  Okay.  I'm going to dismiss the

22   alternates at this point and then continue on with my

23   instructions for deliberations.

24             MR. GREG McCORMACK:  Yes, Your Honor.

16:00:42 25   (End of side-bar conference).

1      THE COURT:  Okay.  ▮▮▮▮ and ▮▮▮▮,

2  you are alternates in this case and looks like everybody

3  is healthy and good to go for deliberations pretty soon,

4  so we are going to excuse you with our thanks for

5  participating in this trial and for paying attention in

6  this case.

7      Please keep in mind that you still cannot

8  discuss this case with anyone until this jury reaches a

9  verdict.  Okay?  Either way.  After that, you're free to

10  discuss it with anyone.  So you can check in with us and

11  see how things are going if you want, but please keep

12  that in mind.

13      All rise, please.

14      (Alternate jurors dismissed).

15      THE COURT:  Please be seated, ladies and

16  gentlemen.

17      Ladies and gentlemen, let's continue on

18  with our reading.

19      We will pick up on Page 30.  Start with

20  that concluding the part of my instructions explaining

21  the rules for considering some of the testimony and

22  evidence.  Now let me finish up by explaining some things

23  about your deliberations in the jury room and your

24  possible verdicts.

25      The first thing that you should do in the

1    jury room is choose someone to be your foreperson.  This

2    person will help to guide your discussions and will speak

3    for you here in court.

4                   Once you start deliberating, do not talk to

16:02:10  5    the jury officer, or to me, or to anyone else except each

6    other about the case.  If you have any questions or

7    messages, you must write them down on a piece of paper,

8    sign them, and then give them to the jury officer.  The

9    officer will give them to me, and I will respond as soon

16:02:26 10    as I can.  I may have to talk to the lawyers about what

11    you have asked, so it may take me some time to get back

12    to you.

13                   Any questions or messages normally should

14    be sent to me through your foreperson.

16:02:37 15                   One more thing about messages.  Do not ever

16    write down or tell anyone how you stand on your votes.

17    For example, do not write down or tell anyone that you

18    are split six-six or eight-four or whatever your vote

19    happens to be.  That should stay secret until you are

16:02:53 20    finished.

21                   Remember that you must make your decision

22    based only on the evidence that you saw and heard here in

23    court.  Do not try to gather any information about the

24    case on your own while you are deliberating.

16:03:06 25                   For example, do not conduct any experiments

1    inside or outside the jury room.  Do not bring any books,

2    like a dictionary, or anything else with you to help you

3    with your deliberations.  Do not conduct any independent

4    research, reading, or investigation about the case.  And

16:03:20  5    do not visit any of the places that were mentioned during

6    the trial.

7              And let me add just please keep in mind

8    that instruction about technology that I gave you at the

9    beginning of the trial.

16:03:31  10              And make your decision based only on the

11    evidence that you saw and heard here in court.

12              Now, your verdict, whether it is guilty or

13    not guilty, must be unanimous.  To find a defendant

14    guilty of a particular charge, every one of you must

16:03:46  15    agree that the government has overcome the presumption of

16    innocence with evidence that proves him guilty beyond a

17    reasonable doubt.

18              To find him not guilty, every one of you

19    must agree that the government has failed to convince you

16:03:57  20    beyond a reasonable doubt.

21              Either way, guilty or not guilty, your

22    verdict must be unanimous.

23              Now that all the evidence is in and the

24    arguments are completed, you are free to talk about the

16:04:10  25    case in the jury room.  In fact, it is your duty to talk

1    with each other about the evidence, and to make every

2    reasonable effort you can to reach unanimous agreement.

3    Talk with each other, listen carefully and respectfully

4    to each other's views, and keep an open mind as you

16:04:26  5    listen to what your fellow jurors have to say.

6              Try your best to work out your differences.

7    Do not hesitate to change your mind if you are convinced

8    that other jurors are right and that your original

9    position was wrong.

16:04:36 10              But do not ever change your mind just

11    because other jurors see things differently, or just to

12    get the case over with.

13              In the end, your vote must be exactly that,

14    your own vote.  It's important for you to reach unanimous

16:04:49 15    agreement, but only if you can do so honestly and in good

16    conscience.

17              No one will be allowed to hear your

18    discussions in the jury room, and no record will be made

19    of what you say, so you should all feel free to speak

16:05:01 20    your minds.

21              Listen carefully to what the other jurors

22    have to say, and then decide for yourself if the

23    government has proved the defendant guilty beyond a

24    reasonable doubt.

16:05:13 25              If you decide that the government has

1   proved the defendant guilty, then it will be up to me, it

2   is my job to decide what the appropriate punishment

3   should be.

4               Again deciding what the punishment should

5   be is my job, not yours.  It would violate your oaths as

6   jurors to even consider the possible punishment in

7   deciding your verdict.

8               Your job is to look at the evidence and

9   decide if the government has proved the defendant guilty

10  beyond a reasonable doubt.

11              I have prepared and will provide a verdict

12  form for each count that you should use in -- to record

13  your verdicts.

14              If you decide that the government has

15  proved the charge against the defendant beyond a

16  reasonable doubt, say so by having your foreperson mark

17  the appropriate place on the form.  If you decide that

18  the government has not proved the charge against him

19  beyond a reasonable doubt, say so by having your

20  foreperson mark the appropriate place on the form.

21              Each of you should then sign the form, put

22  the date on it, and return it to me.

23              Let's take a look at those verdict forms.

24  They are right after the stipulations in the back.

25              We have, "Verdict form.  Count 1.  We, the

1    jury, in this case having been duly impaneled and sworn

2    find the defendant David W. Vickers" either guilty or not

3    guilty, and of course it continues on from there.

4         There's a place for your foreperson to

5    sign, date, and for each one of you then to sign.

6         Now, obviously if you take a look at these

7    forms, we have 12 at the bottom here and then a signature

8    for the foreperson.  The foreperson doesn't have to sign

9    twice.  Simply just point that out.

10        Verdict form, Count 2, that's enticement,

11   same basic form, it's guilty or not guilty.  Everybody

12   has to sign, make sure it's dated.

13        And verdict form, Count 3, traveling with

14   intent to engage in illicit sexual conduct, again same

15   form, same protocol, guilty, not guilty, and everybody

16   has a signature line and it's dated.

17        Let's continue on with Page 36.

18        Remember that the defendant is only on

19   trial for the particular crimes charged in the

20   indictment.  Your job is limited to deciding whether the

21   government has proved the crimes charged.

22        Remember that if you elected to take notes

23   during the trial, your notes should be used only as

24   memory aids.  You should not give your notes greater

25   weight than your independent recollection of the

1    evidence.  You should rely upon your own independent

2    recollection of the evidence or lack of evidence and you

3    should not be unduly influenced by the notes of other

4    jurors.  Notes are not entitled to any more weight than

5    the memory or impression of each juror.

6                 Whether you took notes or not, each of you

7    must form and express your own opinion as to the facts of

8    the case.

9                 Now, let me finish up by repeating

10   something I said to you earlier.  Nothing that I have

11   said or done during this trial was meant to influence

12   your decision in any way.  You decide for yourselves if

13   the government has proved the defendant guilty beyond a

14   reasonable doubt.

15                All right.  Ladies and gentlemen, that's

16   it.  You will have in the jury room everything necessary

17   to reach a verdict in this case.  You have all the

18   exhibits that have been admitted, the videos, the

19   recording, you will have everything and you will have the

20   ability to access that.

21                It should be very easy.  If you have any

22   problems, let us know.  We'll be happy to assist you in

23   that regard, but you will have everything in your

24   possession.

25                Finally, again, I want to thank you very

1    much for being part of this trial.  Even though it was a

2    relatively short trial, nothing's easy.  You can see

3    that.  But I think by now you can see how important it is

4    that we have people come in and decide cases, even when

16:09:15  5    they're difficult.

6                    Sometimes they seem to be easy.  Other

7    times they appear to be difficult.  It's not an easy one,

8    but you're here to give a fair trial to both sides, and

9    that's all we ask of you.

16:09:28 10                    I want to thank counsel in this case,

11    Mr. McDonough, Mr. Filiatraut, both Mr. McCormacks for

12    their hard work.  You just see the result for a trial.

13    You never see the hours and hours and hours that are

14    spent putting this together, and of course the hours put

16:09:47 15    into this case by both sides.

16                    So I don't want to gloss over that lightly.

17    Everybody has worked very hard in this case.  And again

18    we hope that you give everyone a fair shot, look at the

19    evidence very carefully and follow the instructions of

16:10:00 20    law, take everything into consideration as I have

21    discussed with you.

22                    With that, I hope you're going to be proud

23    to be part of this process, as difficult as it may be,

24    because again you make us part of the United States of

16:10:14 25    America as jurors.  Keep that in mind.

1          With that, good luck.  This case is now in

2     your hands for a verdict.

3               (Jury out).

4               THE COURT:  We're adjourned.

16:10:55  5               May I see counsel at side-bar, please?

6               (Side-bar conference had off the record).

7               (Proceedings recessed at 4:13 p.m.)

8                    - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3                I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     **/s/Susan Trischan**
      _____

10    /S/ Susan Trischan, Official Court Reporter

11    Certified Realtime Reporter

12

13    7-189 U.S. Court House

14    801 West Superior Avenue

15    Cleveland, Ohio 44113

16    (216) 357-7087

17

18

19

20

21

22

23

24

25

399

1                           **I N D E X**

2

3      <u>**WITNESSES**</u>:                                    <u>**PAGE**</u>

4       CROSS-EXAMINATION OF MIRANDA HELMICK              182

5       BY MR. GREG McCORMACK

6       REDIRECT EXAMINATION OF MIRANDA HELMICK          233

7       BY MR. McDONOUGH

8       RECROSS-EXAMINATION OF MIRANDA HELMICK           247

9       BY MR. GREG McCORMACK

10      REDIRECT EXAMINATION OF MIRANDA HELMICK          252

11      BY MR. McDONOUGH

12      RECROSS-EXAMINATION OF MIRANDA HELMICK           253

13      BY MR. GREG McCORMACK

14      DIRECT EXAMINATION OF DAVID FRATTARE             256

15      BY MR. FILIATRAUT

16      CROSS-EXAMINATION OF DAVID FRATTARE              302

17      BY MR. GREG McCORMACK

18      REDIRECT EXAMINATION OF DAVID FRATTARE           317

19      BY MR. FILIATRAUT

20      RECROSS-EXAMINATION OF DAVID FRATTARE            322

21      BY MR. GREG McCORMACK

22

23                            * * * * *

24

25